| Registration Number | Mark | Description of Goods/Services (in pertinent part) |
|---|---|---|
| 2,219,219 | WASHINGTON WIZARDS | clothing, namely, hosiery , footwear, t-shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, and gloves, all relating to or promoting the sport of basketball |
| 2,211,045 | HARLEM WIZARDS | clothing, namely t-shirts, sweatshirts, jackets, shorts and jerseys |

| Registration Number | Mark | Description of Goods/Services (in pertinent part) |
|---|---|---|
| 1,843,003 | NEW YORK GIANTS | men's, women's and children's clothing and footwear; namely, coaches caps, wool hats, painters caps, baseball caps, visors, headbands, ear muffs, knit face masks, belts, wristbands, T-shirts, tank tops, pajamas, golf shirts, sweaters, sweatshirts, jackets, neckties, braces, bibs, jerseys, night shirts, coats, robes, raincoats, parkas, ponchos, sneakers, gloves, scarves, snow suits, mittens, aprons, down jackets, leather jackets, shorts, sweatpants, jeans, pants, knickers, socks, underwear, bathing suits and leg warmers |
| 1,544,375 | SAN FRANCISCO GIANTS | clothing, namely, t-shirts, sweatshirts, jackets, sweaters, sun visors, hats and caps |

| Registration Number | Mark | Description of Goods/Services (in pertinent part) |
|---|---|---|
| 1,981,446 | SACRAMENTO KINGS | clothing; namely, hosiery, footwear, T-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands and wrist bands |
| 1,718,268 | LOS ANGELES KINGS | clothing; namely, shirts, jerseys, sweaters, sweat-shirts, T-shirts, jackets, pants, sweatpants, warm-up suits, wristbands, [ headbands, ] shorts, caps, hats, socks, [ nightshirts, ] mittens and cloth bibs |

| Registration Number | Mark | Description of Goods/Services (in pertinent part) |
|---|---|---|
| 2,008,813 | FLORIDA PANTHERS | clothing, namely, shirts, jerseys, sweaters, jackets, sweatshirts, T-shirts, pants, sweatpants, warm-up suits, wristbands, headbands, shorts, caps, hats, socks, nightshirts, [ scarves ] and cloth bibs |
| 2,120,117 | CAROLINA PANTHERS | men's, women's and children's clothing, namely, fleece tops and bottoms, caps, T-shirts, sweatshirts, shorts, tank tops, sweaters, pants, jackets, turtlenecks, jumpsuits, jerseys, sweatsuits, swimwear, parkas, sleepwear, namely, robes and pajamas, gloves, scarves, aprons, boots and sneakers, and windwear, namely, jackets, pants and hats |

| Registration Number | Mark | Description of Goods/Services (in pertinent part) |
|---|---|---|
| 2,125,896 | ARIZONA CARDINALS | men's, women's and children's clothing, namely, fleece tops and bottoms, caps, T-shirts, sweatshirts, shorts, tank tops, sweaters, pants, jackets, turtlenecks, jumpsuits, jerseys, warm up suits, swimwear, wind resistant jackets, parkas, sleepwear, namely, robes and pajamas, gloves, scarves, aprons, boots and sneakers |
| 1,561,782 | ST. LOUIS CARDINALS | Clothing, namely, t-shirts, hats, scarves, shorts, sweatshirts, ¾ sleeve jerseys and caps |

All of the marks noted above are used in connection with sports teams. Nevertheless, the USPTO did not find these marks confusing with each other even where they share a common, dominant element and their goods overlap. The same analysis applies to the case at hand. The mere fact that the mark KENTUCKY COLONELS is used in both cases in connection with t-shirts, hats and related goods, without more, does not constitute a likelihood of confusion. This is also true for marks within the same state as illustrated by the USPTO's registration of the mark OHIO for Ohio University in connection with clothing and registration of the mark OHIO STATE for Ohio State University in connection with clothing. [*See* Exhibit DD & EE]

Consider also *Harlem Wizards Entertainment Basketball v. NBA Properties*, 952 F.Supp. 1084 (N.J. 1997), where the court found that it was highly unlikely that merchandise offered by the parties under the marks the WASHINGTON WIZARDS in connection with a professional basketball team and the HARLEM WIZARDS in connection with a theatrical basketball organization would result in a likelihood of confusion. The court noted that, "when two products or services fall within the same general field, it does not mean that the two products or services are sufficiently similar to create a likelihood of confusion." *Id.*, at 1094. While the court noted that the marks, when compared in their entirety were similar and use by the parties of the mark WIZARDS was obviously identical, the "use of a design as part of a mark minimizes any

likelihood of confusion." *Id.* The court went on to recognize that the NBA used a unique logo and color scheme and therefore, it was highly unlikely that the merchandise would result in a likelihood of confusion among consumers. Just as the NBA team uses a unique logo and color scheme, as discussed in more detail below, Building Champions incorporates a unique basketball-related logo and color scheme in connection with its KENTUCKY COLONELS (stylized) mark.

The court further recognized that fans are "generally sophisticated and knowledgeable of their sport; they read about their favorite teams in the sports pages or listen to sports reporting and commentary on television and radio." *Id.* at 1097. For these reasons, the court found that the consumers would not likely be confused between the NBA basketball team and the Harlem Wizards' basketball shows. Just as the court and the USPTO did not deem there to be confusion between merchandise with the mark the WIZARDS for two sports-related teams, there can be no likelihood of confusion between a t-shirt for the KENTUCKY COLONELS basketball team and a t-shirt for the Honorable Order of Kentucky Colonels when the two sources of the t-shirts provide totally unrelated services and the indications of source for the t-shirts are clear to the purchasing public.

Moreover, when a trademark is used in this context on clothing or related novelty items, the mark is not being used to indicate the source of the product. Instead, the mark is used in an ornamental fashion to indicate an affiliation with a particular group, such as a sports team or a charitable organizations. As discussed in greater detail above, use of Building Champions' KENTUCKY COLONELS (stylized) mark on a t-shirt is meant to

display an affiliation with the basketball team - not to indicate that the shirt was manufactured by Building Champions.

2. <u>Relatedness of the Goods</u>

In determining the relatedness of goods, cases generally fit into one of three categories:  (1) if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; (2) if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; or (3) if the goods or services are totally unrelated, confusion is unlikely. *Daddy's Junky Music Stores*, 109 F.3d at 282.  First, the parties are not competitors by any stretch of the imagination.  The Honorable Order is a non-profit organization that distributes grants to needy organizations and educational institutions [Verified Complaint, ¶ 2].  Building Champions is a limited liability company which owns the American Basketball Association's new Louisville basketball team.  The businesses of the two parties are not even remotely similar.

Building Champions is in the business of owning and operating a professional basketball team for entertainment purposes.  The Honorable Order is a charitable organization.  As discussed above, both parties' use of the mark KENTUCKY COLONELS in connection with merchandise relates back to the primary businesses.  As the primary services of the parties are wholly unrelated,  confusion is virtually impossible.  Even if it could be said that the *goods* are somewhat related, i.e. both parties are selling t-shirts for example, such goods are not competitive.

This position is bolstered by a respective comparison of the Plaintiff's and Defendant's Internet Web pages.  The Honorable Order's Web site

(www.kycolonels.org) displays images of the Commonwealth's seal, an eagle, ordinary citizens and a picture of the Governor. [*See* Exhibit FF].  Further, the top level Internet domain name ("TLD") used by the Honorable Order is ".org" and not ".com."  The TLD generally signifies the type of entity for whom use of the cyberspace has been reserved. For example, the TLD ".com" signifies to the public that the user of the domain name constitutes a commercial entity.  Defendant's Web site (www.colonelsbasketball.com) is dominated by words and images of basketball and Defendant uses the TLD ".com" together with a domain name containing the word "basketball." [*See* Exhibit GG].  Given these substantial differences, it is clear that the parties' respective customers are extremely different and that any consumer who happens upon the Web site of the other will not be confused but will recognize that he/she is in the wrong place.

"Services and goods are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Daddy's Junky Music Stores*, 109 F.3d at 282.  Due to the inherent differences in the services provided by the Honorable Order and Building Champions, a prospective purchaser is not going to believe that the items sold by Building Champions relate to the charitable activities of the Honorable Order.

3.  Similarity of the Marks

When analyzing similarity, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junky Music Stores*, 109 F.3d at 283.  The Honorable Order's Class 25 registration protects the word mark

KENTUCKY COLONELS. Building Champions does not use the KETNUCKY

COLONELS mark alone – it uses a stylized version of the mark together with a

basketball logo in connection with its merchandise. Specifically, Building Champions

uses a logo which contains a stylized version of "KENTUCKY COLONELS

LOUISVILLE" with a basketball design. In addition, the Building Champions' logo is

always depicted in red, white and blue [*See* attached Declaration of Jesse Dickerson, ¶ 2.]

The overall impression of the logo is clearly distinctive as the mark directly references an

affiliation with basketball. Accordingly, such use of the mark is not likely to lead a

prospective purchaser to question the source of the merchandise.

> "In evaluating the similarity of the marks, a court must determine, in the light of

what occurs in the marketplace, whether the mark will be confusing to the public when

singly presented." *Wynn Oil Company v. American Way Service Corporation*, 943 F.2d

595, 599 (6th Cir. 1991). Building Champions' use of the mark is graphically

distinguishable from (i) the form of the mark registered by the Honorable Order and (ii)

the Honorable Order's other use of the mark. The distinct quality of the KENTUCKY

COLONELS logo, which incorporates a basketball, signifies to the consumer that the

merchandise directly relates to the basketball team and not the Honorable Order. When

considered in its entirety, Building Champions' mark creates a substantially different

commercial impression than the impression conveyed by the mark of the Honorable

Order. As noted by the court in the Harlem Wizards case, the "use of a design as part of a

mark minimizes any likelihood of confusion." *Harlem Wizards Entertainment*

*Basketball*, 952 F.Supp. at 1094.

4.  Evidence of Actual Confusion

The Sixth Circuit has recognized that "evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284.  As previously noted by the Honorable Order, there is no evidence of actual consumer confusion.  Moreover, there is no likelihood of consumer confusion. Not only are the services of the Honorable Order and Building Champions completely different, the merchandise of the parties is not likely to be encountered by the same persons in the same places.  Persons that desire to purchase merchandise from the Honorable Order are likely members of the Honorable Order and/or Kentucky Colonels, buying these items in order to promote the charitable activities of the organization. Individuals who desire to purchase merchandise from Building Champions wish to purchase such products in order to promote their allegiance to the basketball team.  There is no apparent or actual overlap in these markets and therefore, it is virtually impossible that the same persons will encounter both products in the same place.

5.  Marketing Channels

Moreover, the organizations direct their products to entirely different buyers.  The Honorable Order directs its marketing efforts to individuals who wish to help fundraising efforts for the Order while Building Champions directs its marketing efforts to fans of the basketball team.  This factor "requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services." *Daddy's Junky Music Stores*, 109 F.3d at 285.  The predominant customers of the parties are inherently distinct.  The customer base for the Honorable Order is individuals who desire to support the organization and its charitable functions through the purchase of

novelty items. [Verified Complaint, ¶3].  Building Champions' prospective customers

are fans of the basketball team.  The predominant consumers are unrelated.  The Sixth

Circuit has recognized that "dissimilarities between the predominant customers of a

plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake,

or deception." *Homeowner's Group*, 931 F.2d at 1110.  Since charitable services and

basketball services are wholly unrelated, there is no overlap in the customer base and the

likelihood of confusion is lessened.

The Honorable Order asserts that the items on which the marks are used are sold

through the same marketing channels, i.e., the Internet.  The Web site for the team is

www.colonelsbasketball.com and as noted above, the Web site is dominated by words

and images of basketball.  The domain name specifically references "basketball."

Therefore, any person who attempts to enter Building Champions' Web site will

unequivocally recognize that the merchandise relates to the basketball team and not the

Honorable Order.    As noted above, the Honorable Order's Web site is

www.kycolonels.org and its TLD is ".org" not ".com."

While Building Champions anticipates selling its merchandise in a gift shop in the

Louisville Gardens, the venue for its home games, fans visiting the gift shop will

undoubtedly recognize the merchandise in the gift shop as being that which represents the

team that they are there to support and not that of the Honorable Order.  In fact, a fan

would never encounter the Honorable Order's products in this gift shop.

While Building Champions anticipates expanding its merchandising efforts to

include sports related retailers and e-tailers, that is the current extent of its intent to

explore marketing channels outside of its Web site and its anticipated gift shop.  [*See*

Declaration of Dickerson, ¶ 3]. While the Honorable Order has indicated that it too may expand its marketing channels to sporting good stores, such expansion would be an obvious attempt to profit from the goodwill related to Building Champions' mark and the anticipated success of the sports team.

     6.  <u>Likely Degree of Purchaser Care</u>

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Daddy's Junky Music Stores*, 109 F.3d at 285. The Honorable Order argues that the purchasing consumer will exhibit a low degree of care in purchasing these items. Building Champions strongly disagrees. "[W]hen services are expensive or unusual the buyer can be expected to exercise a greater care in her purchases." *Daddy's Junky Music Stores*, 109 F.3d at 285. While the goods sold by the parties are relatively inexpensive, such items are unusual, in fact they are unique. The items such as hats, shirts and jackets are being purchased solely based on the purchaser's affiliation for the sponsoring organization.

For example, a consumer will purchase a shirt sporting the KENTUCKY COLONELS logo to support its loyalty and affection for the team. Fans are very conscious of this affiliation when purchasing merchandise. As noted by the court in the Harlem Wizards case, fans are "generally sophisticated and knowledgeable of their sport; they read about their favorite teams in the sports pages or listen to sports reporting and commentary on television and radio." *Harlem Wizards Entertainment Basketball*, 952 F.Supp. at 1097.

Sports fans have a loyalty for their teams that is usually expressed by wearing team gear. These items are only purchased because of the consumer's affiliation with the sponsoring group. No one would purchase these items but for their support of the primary source – in this case the basketball team. To equate the degree of care exercised by a purchaser to the price of an item alone, fails to acknowledge the sense of loyalty and pride felt by a consumer when purchasing an item bearing its team logo.

7.  <u>Defendant's Intention in Selecting the Mark</u>

Courts have noted that "intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that this copying may divert some business from the senior user." *Daddy's Junky Music Stores*, 109 F.3d at 286. Plaintiff takes the preposterous position that, "Defendant is using the Honorable Order's trademark to lend authenticity and reputability to its relatively new basketball team and exhibitions." [*See* Plaintiff's Memorandum, page 11]. Building Champions' intent in selecting the mark KENTUCKY COLONELS had nothing whatsoever to do with the Honorable Order. It had everything to do with basketball.

From its initial press releases regarding the team's name, Building Champions has indicated that "the Colonels was the overwhelming favorite of fans in [the] Name the Team contest. . . people remember the ABA Kentucky Colonels with great fondness and are eager to bring back the excitement." [*See* ABAlive.com League News, *Kentucky Colonels is the Name, Winning will be the Game*, April 9, 2004, attached as Exhibit I.] Even recently, Stephanie Roach, the owner and President of Building Champions, has reiterated that "There's a lot of history with the Colonels of the old ABA, and I think

28

there's a strong selling point there.  Almost everybody in Kentucky either remembers the Colonels or has heard the stories."  [*See* Indianapolis Business Journal article, *Local Business Owner Living Her Hoop Dreams*, August 16-22, 2004, attached as Exhibit HH].  Building Champions was leaning towards naming the team the KENTUCKY COLONELS in part based on Kentuckian's fond memories of the prior Colonels team.

In fact, Building Champions conducted an open survey requesting suggestions from the public to name the team.  From those responses, over 25% requested that the name be the, "KENTUCKY COLONELS."  [*See* Declaration of Dickerson, ¶ 4].  Obviously, prior to even naming the team, the general public associated the mark KENTUCKY COLONELS with basketball.

8.  Likelihood of Expansion of the Product Lines

While Building Champions anticipates expanding its product lines to meet customer demand, such expansion will not affect the rights of the Honorable Order.  As demonstrated above, use of the KENTUCKY COLONELS' mark by Building Champions in connection with entertainment services related to basketball is not likely to cause confusion with the Honorable Order's use of the mark KENTUCKY COLONELS because the services are so unrelated.

As set forth above, none of the eight Sixth Circuit factors demonstrates that Building Champions' use of the mark KENTUCKY COLONELS is likely to cause confusion.  The Sixth Circuit has noted that the "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Daddy's Junky Music Stores*, 109 F.3d at 280.  For the reasons noted above, it is clear that relevant consumers are not likely to believe that

the services offered by Building Champions in connection with the basketball team are in anyway related to the Honorable Order. For these reasons, the Honorable Order is not likely to succeed on the merits in its claim of trademark infringement.

### B. THERE IS NO THREAT OF IRREPARABLE HARM

The Sixth Circuit has noted that in a trademark infringement action, "a finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk of reputation appears." *Wynn Oil Co.*, 943 F.2d at 608. As discussed in detail above, there exists no likelihood of confusion and therefore, there is no threat of irreparable harm or injury to the Honorable Order.

Further, courts have noted that in trademark infringement actions, a delay in moving for a preliminary injunction "evidences a lack of irreparable injury and constitutes a separate ground on which the extraordinary equitable relief now requested by the plaintiff should be denied." *Programmed Tax Systems v. Raytheon Co.*, 419 F.Supp. 1251 (S.D. N.Y. 1976). In *Programmed Tax Systems*, the court found that a four month delay after the plaintiff first learned of the alleged infringement evidenced a lack of irreparable injury.

The Honorable Order has known about the Defendant's use of the mark KENTUCKY COLONELS at least as early as April 20th, as evidenced by a letter from the Honorable Order to Building Champions dated April 20, 2004. [*See* Exhibit J]. As indicated in the press releases, the public has known of Defendant's intent to use the mark since April of 2004. However, the Honorable Order did not bring this motion until August 12th, almost four months later. The Honorable Order's delay in seeking this extraordinary relief further demonstrates the lack of irreparable injury.

## C. ISSUANCE OF A PRELIMINARY INJUNCTION WOULD CAUSE SUBSTANTIAL HARM TO DEFENDANT AND OTHERS

Issuance of a preliminary injunction in this case would cause substantial harm to Building Champions. The Honorable Order is requesting the Court to immediately enjoin Building Champions from using the mark KENTUCKY COLONELS in connection with its merchandise; destroy all merchandise bearing the mark KENTUCKY COLONELS along with all advertisements, labels and signs; and provide a full accounting of all revenues and sales relating to the sale of certain merchandise bearing the mark KENTUCKY COLONELS. Such an injunction would cause substantial harm to Building Champions.

Plaintiff has argued that Building Champions' current branded merchandise violates the rights of the Honorable Order and thus any injury should be of no consequence in the Court's decision. As discussed in detail above, Building Champions' current branded merchandise does not violate the rights of the Honorable Order because the Honorable Order's use of the KENTUCKY COLONELS mark is generic and accordingly, there can be no likelihood of confusion. The Honorable Order has indicated that it has invested 73 years in developing the goodwill associated with the mark KENTUCKY COLONELS. [*See* Plaintiff's Memorandum, page 11]. However, as clearly demonstrated above, the mark KENTUCKY COLONELS did not even originate with the Honorable Order. The Honorable Order cannot claim trademark goodwill for a term that is in the public domain. The mark in the context that the Honorable Order is using it originated with the Governor of Kentucky, not the Honorable Order. Any goodwill arguably associated with the KENTUCKY COLONELS term belongs to the Governor or the Commonwealth of Kentucky, not the Honorable Order.

31

The Honorable Order further contends that Building Champions' basketball team is "in its early stages" and therefore discounts the impact that an injunction would have upon the team. The Honorable Order's argument is misguided. Does the Honorable Order truly believe that a professional basketball team and its marketing campaign can be mobilized in a few short months? Building Champions has invested substantial time, resources and monies in developing the KENTUCKY COLONELS team name and other identifying indicia. [*See* Declaration of Dickerson, ¶ 5]. Building Champions has spent considerable sums in advertising the team and promoting its presence in the Commonwealth.

With season ticket sales beginning in August 2004 and the first home game scheduled in less than three months, Building Champions is currently at a pivotal point in the marketing momentum of the team. [*See* Declaration of Dickerson, ¶ 6]. Issuance of a preliminary injunction is likely to cause Defendant to suffer immeasurable harm if its investment in the KENTUCKY COLONELS team name were nullified as a result of the injunction. Further, the cost of implementing a new brand for the team would be substantial. Most importantly, the current team schedule renders such an option virtually impossible. If Building Champions cannot use the KENTUCKY COLONELS name at this point, the activities of the franchise will come to a screeching halt.   As noted above, the team is scheduled to play its first game on November 15, 2004. [*See* Declaration of Dickerson, ¶ 6]. Obviously, Building Champions will want to sell promotional items to its fans prior to and during the games.

Other Louisville businesses would also be substantially harmed by the result of such a drastic measure. Building Champions has currently teamed up with the WHAS

Crusade for Children, a local charitable organization, which will share in a percentage of the revenues based on ticket sales. [*See* Declaration of Dickerson, ¶ 7]. Issuance of the preliminary injunction would not only halt or severely impact Building Champions' ability to do business in the Commonwealth of Kentucky, it is likely to affect community relations with other Kentucky businesses and organizations. Such groups are likely to view the injunction as indicating that Building Champions is a pirate of some sort, or a ne'er-do-well, and therefore not likely to keep its commitment to the community. This is, of course, the farthest distance from the truth. Ticket sales and the team's success are due in large part to the support of the community. Building Champions needs such support.

Building Champions' success will likely have a positive impact on the economic growth of the Commonwealth. When attending home games at Louisville Gardens, located in the downtown area, fans are likely to patronize other downtown establishments such as local restaurants and bars. In addition, fans from outside the Louisville area are likely to stay in the downtown area hotels. Therefore, the success of the KENTUCKY COLONELS team is likely to assist in the revitalization of the downtown area. Therefore, the negative impact of the issuance of a preliminary injunction during this crucial juncture in the team's momentum is likely to disrupt not only the flow of income to Building Champions but also other local businesses. The damages caused by such a disruption would be so great as to be immeasurable.

The substantial harm to Building Champions and others outweighs the harm, if any and however remote, that Plaintiff will suffer as a result of the injunction not being issued. Thus, the substantial harm to Building Champions and others strongly weighs in favor of denying Plaintiff's motion pending the final outcome of this litigation.

## D.  GRANTING INJUNCTIVE RELIEF IS NOT IN THE PUBLIC INTEREST

"The public interest would not be served by the issuance of a preliminary injunction in a civil action where. . . there is no likelihood of confusion between the two marks at issue and where a party, such as the plaintiff, is unlikely to prevail on the merits." *Big Time Worldwide*, 236 F.Supp. 2d at 808.  As pointed out by the Honorable Order, in analyzing this factor the court must balance "the interest of protecting the public from confusion or deception with the interest of facilitating a competitive market." *Woodroast Systems, Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 919 (D. Minn. 1992).  As discussed above, Building Champions' use of the mark KENTUCKY COLONELS is not likely to cause confusion or deception with consumers and therefore the public interest would not be served by issuance of a preliminary injunction.

None of the four factors relevant to a preliminary injunction order weigh in favor of Plaintiff.

### CONCLUSION

FOR THE FOREGOING REASONS, Defendant Building Champions requests that this Court deny the Honorable Order's request for preliminary injunctive relief[2].

Respectfully submitted,

*Stephanie A. Hale*

Michelle Kaiser Bray
Stephanie A. Hale (Ky. Bar #87929)
SOMMER BARNARD ATTORNEYS, PC
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204

---

[2] Courts have found that "preliminary injunctions [may be] denied without a hearing, despite a request therefore by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be manifestly pointless." *Big Time Worldwide*, 236 F.Supp. 2d at 794. Upon review of the written evidence, if the Court so finds that conducting a hearing would be unnecessary Defendant does not object to a written order despite the previous scheduling of a hearing.

34

and

Amy B. Berge
Holland McTyeire
Greenebaum Doll & McDonald PLLC
3500 National City Tower
Louisville, KY 40202

*Counsel for Defendant*

**Certificate of Service**

The undersigned hereby certifies that a copy of the foregoing including all exhibits, attachments and this certificate of service was served on Plaintiff by delivering a true copy thereof to its attorneys of record, this 20th day of August, 2004, in an envelope, first class postage prepaid, addressed as follows:

Steven L. Snyder
Roxanne Baus Edling
WYATT, TARRANT & COMBS, LLP
PNC Plaza
500 West Jefferson Street, Suite 2600
Louisville, Kentucky 40202-2898

Counsel for Defendant

36