# EXHIBIT B

213 U.S.P.Q. 1111
1982 WL 52018 (Trademark Tr. & App. Bd.), 213 U.S.P.Q. 1111
(Cite as: 213 U.S.P.Q. 1111)
< KeyCite Citations >

**Page    1**

In re Paramount Pictures Corporation

Patent and Trademark Office Trademark
Trial and Appeal Board

Decided Apr. 9, 1982

United States Patents Quarterly Headnotes

TRADEMARKS
[1] Marks and names subject to ownership --
Descriptive -- Misdescriptive or not descriptive
-- Particular marks (§ 67.5078)
Marks and names subject to ownership --
Distinctive display (§ 67.511)
  Arbitrary design has obvious source-
indicating characteristics, just as do arbitrary
terms such as "Kodak," "Dreft," etc., because
they usually have no other perceived
significance.

TRADEMARKS
[2] Marks and names subject to ownership -- In
general (§ 67.501)
  While not every sign used on product, or on
its label, package, etc., functions as indication
of source of product on which it is used, broad
and liberal interpretation of law is that, where
such sign also serves source indicating
function, it should be regarded as acceptable
subject matter for registration.

TRADEMARKS
[3] Registration -- In general (§ 67.731)
  Not everything that is protected from
encroachment by others is registrable subject
matter; however, it is desirable, absent any
overriding public policy considerations, to
interpret Trademark Act so that subject
matter that is accorded protection in courts as
technical trademarks will be entitled to
registration as such.

TRADEMARKS
[4] Acquisition of marks -- How applied to
goods (§ 67.031)
Drawings (§ 67.30)
  If sign serves trademark function as it is
used in its normal commercial setting, it
should not be necessary to submit additional

specimens in order to satisfy formalistically
requirement for specimens of particular kind;
there is no prescribed method or place for
affixation of mark to goods; question in every
case is not whether mark has been associated
with goods by particular mode or manner, but
whether matter sought to be registered
performs function of trademark by signifying
to purchasers source of goods sold or offered
for sale; even if mark covers entire surface of
product, that fact does not necessarily mean
that mark does not perform trademark
function; on other hand, if sign does not
function as mark in its normal commercial
setting, submission of "token" specimens
should not be considered as overcoming basic
defect.

*1111 Appeal from Examiner of Trademarks

  Application for registration of trademark of
Paramount Pictures Corporation, Serial No.
210,108.  From decision refusing registration,
applicant appeals. Reversed.

  Gregory J. Battersby and Howard B.
Barnaby, both of New York, N.Y., for
applicant.

  Before Rice, Allen, and Simms, Members.

  Allen, Member.

  This is an appeal from the Trademark
Attorney's refusal to register the paired
names "MORK & MINDY" for decalcomanias
on the ground that the names are an integral
feature of the identified goods and, as such,
fail to perform the trademark function of
identifying or distinguishing applicant's goods
from the goods of others. [FN1] In the
specimens submitted with the application
(actual decals), the letters of the names and of
the ampersand separating them are colored in
gaudy "fluorescent" rainbow shading, from
orange to red to yellow (top to bottom), on a
background shaded from blue to purple.  The
multi-colored names are superimposed on a
brown toned photograph of subdued colors of
the actor and actress who portray the

COPR. © 2004 The Bureau of National Affairs, Inc.

213 U.S.P.Q. 1111
(Cite as: 213 U.S.P.Q. 1111, *1111)

characters "Mork" and "Mindy" in the television series of that name. Because of the complete absence of harmony between the coloring of the names and that of the characters, and the fact that the letters are not portrayed in three dimensions, whereas the characters are, the names appear to be separate and distinct in comparison to the rest of the design. Below is a reduced (5:1) reproduction of the specimens in black and white.



*1112 The form of the mark sought to be registered is exactly the same as the black outline of the names as they are depicted in the specimens.

The Examining Attorney's position is that the words "Mork & Mindy" as used on applicant's good would not be regarded by purchasers in the marketplace as an indication of source of origin but as aesthetically functional features of the goods. A further argument is that the function of the names on the decal is to identify the familiar television characters, "Mork" and "Mindy".

We think this case is controlled by our decision in In re Olin Corporation, 181 USPQ 182 (TTAB 1973), wherein we reversed the Examining Attorney's refusal to register a mark comprising a stylized letter "O" (Olin's corporate logo) applied to T-shirts based on the following reasoning:

"It is a matter of common knowledge that T-shirts are ornamented with various insignia, including college insignias, or ornamented with various sayings such as 'Swallow Your

Leader'. In that sense what is sought to be registered could be construed to be ornamental. If such ornamentation is without any meaning other than as mere ornamentation it is apparent that the ornamentation could not and would not serve as an indicia of source. Thus, to use our own example, 'Swallow Your Leader' probably would not be considered as an indication of source.

The 'ornamentation' of a T-shirt can be of a special nature which is inherently tells the purchasing public the source of the T-Shirt, not the source of manufacture but the secondary source. Thus, the name 'New York University' and an illustration of the Hall of Fame, albeit it will serve as ornamentation on a T-shirt will also advise the purchaser that the university is the secondary source of that shirt. It is not imaginable that Columbia University will be the source of an N.Y.U. T-shirt. Where the shirt is distributed by other than the university the university's name on the shirt will indicate the sponsorship or authorization by the university.

In the case before us, the T-shirt is ornamented with applicant's trademarks, and considering the nature of T-shirts, that particular ornamentation can serve as an indication of a secondary source of origin. The matter sought to be registered is an arbitrary symbol and can and does function as a trademark. As used on the T-shirts, we conclude that the mark serves as an identifier of a secondary source and as such is registrable."

The Olin test was affirmed by us in another T-shirt case, In re Expo-'74, 189 USPQ 48 (TTAB 1975). In that case, the sign "EXPO 74" was applied across the front of the shirt and was its only ornamental feature.

The facts of the instant case can be distinguished from Olin in only two respects. Firstly, the goods here are decals rather than T-shirts. This is a distinction without a difference. Decals are frequently purchased with a view to applying them to T-shirts and there are retail outlets which sell T-shirts,

COPR. © 2004 The Bureau of National Affairs, Inc.

213 U.S.P.Q. 1111
(Cite as: 213 U.S.P.Q. 1111, *1112)

Page 3

decals to apply to T-shirts, and T-shirts to which the decal of your choice is applied while you wait. Thus, in our contemporary society, decals are about as closely related to T-shirts as ice cream cones are to ice cream.

[1] Secondly, the mark in Olin was a design mark, a stylized "O", whereas the mark herein is the title of a television series -- also, the names of its principal characters. Admittedly there is a difference here. An arbitrary design such as the one involved in Olin has obvious source-indicating characteristics, just as do arbitrary terms such as "KODAK", "DREFT", etc., because they usually have no other perceived significance. On the other hand, the *primary* significance of the words "MORK & MINDY" to any prospective purchaser of a decal such as the one here involved is to indicate the television series and the principal characters thereof. [FN2]

Lest we be lured off on a tangent, we here affirm that there is nothing inherently wrong with a mark which comprises the name of television series and/or the names of its characters. The law is perfectly clear on that Prompted by "MA PERKINS" [FN3] and other decisions, the Trademark Act was amended in 1962 to expressly provide for protection of such names for the services which they identify. [FN4] Furthermore, by interpretation of the statute, such names have been accorded protection by the federal courts and this Board when used as trademarks on so-called "collateral" products. Lone Ranger, Inc. v. Cox, 52 *1113 USPQ 146 (4th Cir. 1942) ["LONE RANGER" and "HI, YO SILVER"]; Wyatt Earp Enterprises, Inc. v. Sackman, 116 USPQ 122 (S.D.N.Y. 1958) ["WYATT EARP" official outfit]; American Broadcasting Co. Merchandising, Inc. v. Button World Mfg., Inc., 151 USPQ 361 (N.Y. Sup Ct. 1966) ["GREEN HORNET"]; Warner Bros, Inc. v. Road Runner Car Wash, Inc., 189 USPQ 430 (TTAB 1975) ["ROAD RUNNER"]; Compare Sales v. Christy, 168 USPQ 62 (TTAB 1970) ["SOUPY SALES"], but see dissent by Lefkowitz; see also, discussion in J. GILSON, TRADEMARK PROTECTION AND PRACTICE, §5.05[10]. Thus, were the goods

for which applicant seeks to register "MORK & MINDY" steamrollers, for example, rather than decals, there would not seem to have been an even arguable basis for refusing registration. This is convincingly demonstrated -- and the Examining Attorney offers nothing in rebuttal -- by the fact that this applicant has already registered "MORK & MINDY" five times for various products. [FN5] The problem -- if, indeed, there is any -- rests in the combination of perfectly acceptable subject matter, i.e. the name of a T.V. series and its characters, with perfectly acceptable goods i.e. decals. As to this combination, the crux of the Trademark Attorney's position seems to be that the source indicating characteristics of the words "MORK & MINDY" are so dominated by their ornamental characteristics that purchasers would not perceive these words as indicating source. We do not agree.

We start from the point that our trademark law is very liberal -- perhaps the most liberal in the world -- as to what is registrable subject matter. [FN6] The outermost reach of this principle, perhaps, is in the interpretation we apply to applications for registration of "sound" marks. In many, if not most, other countries, such matter is not deemed registrable because, not being in any tangible form, sound would not be perceived by purchasers to constitute a mark, a rationale which is similar to that which has been applied here. However, the answer of our law is that this is an objection of form, without substance, where the sound is rendered in such a way as to impart, or also impart, source significance. To be sure, not all sounds distinguish source and most do not. In the case of musical sound, for example, the entertainment aspect generally overwhelms any other. However, this is not always the case and where a particular musical sound has, or also has, source indicating significance, we have recognized this trademark function by issuing a registration of the sound as a mark. See: Trademark Manual of Examining Procedure, §1301.07(a).

[2] Similarly here, while not every sign used on a product, or on its label, package, etc.,

COPR. © 2004 The Bureau of National Affairs, Inc.





functions as an indication of source of the product on which it is used -- e.g. some are merely part of the aesthetic ornamentation -- the broad and liberal interpretation of our law is that, where such a sign also serves a source indicating function, it should be regarded as acceptable subject matter for registration. See: In re Kotzin, 125 USPQ 347 (CCPA 1960); In re Todd Co., 129 USPQ 408, 410 (CCPA 1961); In re Olin, supra; In re Expo '74, supra; In re McDonald's Corp., 199 USPQ 702, 704 (TTAB 1978); In re Penthouse International Ltd., 195 USPQ 698, 699-700 (CCPA 1977); In re Levi Strauss & Co., 165 USPQ 384 (TTAB 1970); Levi Strauss & Co. v. Blue Bell, Inc., 208 USPQ 713, 715 Cir. 1980).

[3] In applying this principle to the facts herein, we believe that the same reasoning which was applied in Olin is also applicable here. In that decision, Member Waldstreicher delineated a simple and -- we think -- workable test for use in considering the registrability of matter pressed on, or otherwise affixed to, T-shirts. Thus, if the subject matter is in the nature of the expression "SWALLOW YOUR LEADER", it is purely ornamental and would not be considered as an indication of source. See, e.g. In re Whataburger Systems, Inc., 209 USPQ 429 (TTAB 1980). On the other hand, the stylized "O" would be regarded as a trademark of Olin Corporation, hence, it can serve as a secondary indication of source when applied to T-shirts. Applying the same test here, it seems to us that the paired names "MORK & MINDY", while certainly part of the ornamentation of the decal, also indicate source or origin in the proprietor of the Mork & Mindy television series in the same sense as the stylized "O" in Olin. The Trademark Attorney contests this conclusion, arguing that the names, located as they are, beneath the photographic representations of the artists who portray the characters in the Mork & Mindy's series, are essentially part of the ornamentation and that they also perform the non-trademark function of *1114 identifying the characters by their names. We concede both points and would add that both non-trademark functions were also

apparent in Olin and Expo '74. [FN7] Although the fame of applicant's television series probably rendered the character identifying function unnecessary as a practical standpoint, the fact that the character names identified the artists is well supported in this record by evidence submitted by applicant of the close association in viewers' minds which these particular artists have with the series' principal characters. [FN8] More importantly, we think it is significant that it is a common merchandising technique in this country to license the use of character names and images as *trademarks* for a variety of products collateral to the product or services in respect of which the name or images are primarily known. Thus, while purchasers may be accustomed to seeing characters' names and images as part of the ornamentation of decals, T-shirts and the like, they are also accustomed to seeing characters' names and images used as trademarks to indicate source of origin. Applicant's other registrations of "MORK & MINDY" as trademarks demonstrate that "MORK & MINDY" is no exception. The above factors have persuaded this Board and the court above to recognize trademark significance in signs which also have ornamental significance, In re Olin, supra; In re Expo '74, supra; in re Penthouse International, supra, and we are similarly persuaded here. Obviously, not everything that is protected from encroachment by others is registrable subject matter. However, as to this point, we agree with applicant (brief on appeal, 13) that it is desirable, absent any overriding public policy considerations -- we know of none here --, to interpret the Trademark Act so that subject matter which is accorded protection in the courts as technical trademarks will be entitled to registration as such.

In support of his refusal of registration, the Trademark Attorney cites International Order of Job's Daughters, v. Lindenburg and Co. 208 USPQ 718 (9th Cir. 1980) and Pagliero v. Wallace China Co., 95 USPQ 45 (9th Cir. 1952). Pagliero is inapposite. The subject matter there involved merely the pattern or motif of the hotel china created by

COPR. © 2004 The Bureau of National Affairs, Inc.



213 U.S.P.Q. 1111
(Cite as: 213 U.S.P.Q. 1111, *1114)

Page   5

Wallace.  Although "SHADOW-LEAF" and other names were used on cartons to identify each of the motifs (which terms were not refused protection by the court), there were no words or other signs used as part of the decoration of the china itself which purchasers would normally recognize as marks.  Job's Daughters is distinguishable for another reason.  In that case, plaintiff had permitted many jewelers, including the defendant, to produce unauthorized "unofficial" jewelry bearing the plaintiff's emblem. It was as a result of this activity rather than the nature of the use that the trademark function of the plaintiff's emblem had been diluted to the point that it no longer indicated a single "official" source of jewelry bearing the emblem.

In both of these Ninth Circuit decisions, the court defined the applicable legal principle involved in terms which are entirely consistent with that which we applied in Olin and which we apply here.  Indeed, this interpretation was recently reaffirmed by the Ninth Circuit in a case not unlike the one which is before us. Vuitton et Fils S.A. v. J. Young Enterprises, Inc., 212 USPQ 85 (9th Cir. 1981). The decision of the lower court, Id., 208 USPQ 98 (C.D. Ca. 1980), had denied trademark protection to plaintiff's design comprising the initials "LV" superimposed one upon the other and surrounded by three fleur-de-lis symbols, used in an all-over repeated pattern as an ornamental feature of its luggage, on rationale not unlike that of the refusal of registration under appeal here.  However, that decision was reversed by a unanimous Court of Appeals based on the reasoning, albeit not the result, in its previous decision in Pagliero.  The Pagliero rationale equally supports our conclusion here that "MORK & MINDY" should not have been refused registration as a mark for decalcomanias.

We are constrained to address a point which, although not expressly made, was nevertheless clearly implied by the Examining Attorney in his statement on this appeal.  The *1115 implication is that registration might not have been refused had specimens other

than the decals themselves been submitted. Thus, in the conclusionary paragraph of the statement, page 5, the following statement is made:

Here the words Mork & Mindy, *as they appear on the specimens of record*, do not perform a trademark function * * *." (Emphasis added.)

This statement and others having the same import tie in with a suggestion apparently made to applicant during a telephone interview on this case (applicant's brief, 6) that the mark would be considered registrable if it was used on a label affixed to the product instead of as a component of the product itself. Applicant declined -- properly, we think -- to follow this suggestion, choosing instead to rely on the statement in Penthouse, supra, 191 USPQ 698, 701, that the "capacity of a mark to indicate origin is not destroyed because the mark appears as a charm on a bracelet, instead of as a symbol on the box which contains the bracelet."

The above cited admonition of Judge Rich in Penthouse was recently reiterated by Judge Weinfeld in a decision of the Federal Court of the Southern District of New York in a trademark infringement action which also involved marks used on jewelry.  Damn I'm good Inc. v. Hanover House Industries, Inc., 212 USPQ 684 (S.D. N.Y. 1981).  In that case, the plaintiff relied upon the presumption of validity earned as a result of its federal registration of "DAMN I'M GOOD" for jewelry (the goods were plain brass or copper bracelets and other jewelry, the *only* aesthetic feature of which was the phrase "DAMN I'M GOOD", one of numerous such expressions used as messages on applicant's jewelry), which was allowed after small cardboard tags had been submitted as specimens "at the Examiner's suggestion." Id, 212 USPQ 684, 688. Holding that the trademark "DAMN I'M GOOD" was invalid and unenforceable, Judge Weinfeld made the following observation about the registration history:

"This last-ditch attempt to overcome * * * the previous adverse ruling of the

COPR. © 2004 The Bureau of National Affairs, Inc.





213 U.S.P.Q. 1111
(Cite as: 213 U.S.P.Q. 1111, *1115)

Trademark Commission is insufficient to establish that the phrase 'DAMN I'M GOOD' has been used consistently by plaintiff to identify the source of the bracelets. * * * Since 'there is no such thing as property in a trademark except as a right in connection with which the mark is employed' (citing inter alia, United Drug Co. v. Theodore Rectanus Co., 284 U.S. 90 (1981) * * * plaintiff's limited use of the phrase 'DAMN I'M GOOD' as the source of origin of its products makes a very weak case for according this phrase trademark protection."

[4] There is much food for thought in Judge Weinfeld's observation. If a sign serves a trademark function as it is used in its normal commercial setting, it should not be necessary to submit additional specimens in order to satisfy formalistically a requirement for specimens of a particular kind. Clearly, there is no prescribed method or place for affixation of a mark to goods. In every case, the question is not whether the mark has been associated with the goods by a particular mode or manner, but whether the matter sought to be registered performs the function of a trademark by signifying to purchasers the source of the goods sold or offered for sale. In re Expo '74, supra, at 139 USPQ 49-50. Even if a mark covers the entire surface of a product, that fact does not necessarily mean that the mark does not perform a trademark function. Vuitton et Fils, S.A. v. J. Young Enterprises, Inc., supra, at 212 USPQ 89. On the other hand, if the sign does not, in its normal commercial setting, function as a mark, the submission of "token" specimens should not be considered as overcoming the basic defect.

Another teaching of Damn I'm Good is that the rationale supporting non-protectibility of the mark therein involved supports protectibility of the mark involved herein. This point is made in footnote 21, at 212 USPQ 689, in which Olin, Expo, Penthouse and -- in our opinion -- the instant case, are distinguished by the following language:

"By contrast, placement of a recognized trademark on, for example, a T-shirt, might

serve primarily as an indicator of source despite its functional component. See: In re Expo, 189 USPQ 48 (TTAB 1975); In re Olin, 181 USPQ 182 (TTAB 1973); cf. In re Penthouse Int'l Ltd., 565 F 2d 679, 195 USPQ (CCPA 1977)."

Thus, it seems to us that the phrase "Damn I'm Good", used as it was on the jewelry in the New York case does not satisfy registrability criteria for the same reason as the hypothetical example, "Swallow Your Leader", in Olin. It plainly would not be perceived by purchasers as serving any source-indicating function. We conclude on this record that "MORK & MINDY" would be and is so perceived.

Decision
The refusal of registration is reversed.

FN1 In the Examining Attorney's final refusal, the term "ground s" (emphasis ours) is used. However, in the Examiner's Statement the Attorney relies upon a single ground which, in terms of the statute, is that the subject matter sought to be registered is not a trademark within the definition set forth in §45, Trademark Act of 1946, as amended, 15 USC § 1127 (1976).

FN2 In this respect, the instant facts are more like those of Expo 74 wherein the primary significance of the mark "EXPO 74" was to identify the 1974 World's Fair held in Spokane, Washington.

FN3 Ex parte Procter & Gamble Co., 97 USPQ 78 (Com'r. of Pat. 1953).

FN4 "Service mark. * * * Titles, character names and other distinctive feature of radio or television programs may be registered as service marks * * *." Trademark Act, as amended, § 45, 15 U.S.C. § 1127 (1976).

FN5 Reg. No. 1,135,853, issued May 20, 1980 for chewing gum; Reg. No. 1,135,855, issued May 20, 1980 for chewing gum; Reg. No. 1,137,292, issued June 24, 1980 for film series; REg. No. 1,137,395, issued July 1, 1980 for notebooks; and Reg. No. 1,139,689, issued September 16, 1980 for dolls and dolls accessories.

COPR. © 2004 The Bureau of National Affairs, Inc.



FN6 One is tempted to say that our strict use requirement is an exception to this point. However, our use requirement is not a subject matter restriction but rather a condition which must be met by the applicant before registration of the mark can be applied for.

FN7 The stylized "O" was part of the ornamentation of the T-shirt and it identified Olin Corporation. "EXPO '74" was the T-shirt's only ornamentation and it identified the World's Fair of 1974.

FN8 Applicant had submitted this evidence for a different purpose, thinking that the Examining Attorney might require a showing of distinctiveness pursuant to Section 2(f) as a condition to registration. That issue is not before us, as the Trademark Attorney has not refused registration on this ground. We agree that a showing of distinctiveness pursuant to Section 2(f) is not necessary in this case. "MORK & MINDY" are fanciful names and we see no relationship between the mark and decals or between decals and the television series which would justify finding that the mark was subject to any inherent defect which would have to be overcome by a showing under Section 2(f). We do not, of course, exclude the possibility on other facts that registration might be refused where it was not apparent that the subject matter sought to be registered would be perceived as a mark. In such a case, evidence to demonstrate the perception of the subject matter as a mark by the relevant purchasing public might be of assistance.

P.T.O. T.T.A.B.

213 U.S.P.Q. 1111

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.





153 U.S.P.Q. 372
1967 WL 7627 (Trademark Tr. & App. Bd.), 153 U.S.P.Q. 372
**(Cite as: 153 U.S.P.Q. 372)**
< KeyCite Citations >

**Page    1**

Chemetron Corporation
v.
Matsuo Electric Company, Limited

Patent Office Trademark Trial and Appeal
Board

Decided Feb. 20, 1967

United States Patents Quarterly Headnotes

TRADEMARKS
[1] Opposition-Failure to take testimony (§
67.579)
 Since applicant offered no evidence as to use
of its mark, earliest use on which it can rely in
opposition proceeding is application's filing
date.

TRADEMARKS
[2] Class of goods - In applications to register (
§ 67.205)
 Application identifies goods as "electronic
capacitors"; in absence of any limitation as to
nature and use of capacitors, it may be
presumed that applicant is selling capacitors
of all types and descriptions including
capacitors suitable for use as replacement
parts in opposer's welding equipment.

TRADEMARKS
[3] Identity and similarity-How determined-
Considering other marks (§ 67.4059)
 Fact that others have used "NC" as
trademark does not establish that "NCG"
lacks distinctiveness for opposer's goods;
moreover, third party registrations are of no
particular significance if use of applicant's
mark "NCC" is likely to cause confusion.

TRADEMARKS
[4] Identity and similarity - Symbols (§ 67.409)

 "NCC" is so similar to "NCG" that confusion
is likely.

TRADEMARKS
[5] Identity and similarity - How determined -
Purchasers and selling methods (§ 67.4071)
 It may be that average purchaser of specific

goods is generally a technically trained and
informed individual, but it does not follow
that he is infallible in his recollection of
trademarks.

 **\*373** Trademark opposition No. 43,989 by
Chemetron Corporation against Matsuo
Electric Company, Limited, application, Serial
No. 173,079, filed July 15, 1963.  Opposition
sustained.

 Woodson, Pattishall & McAuliffe and
Nicholas M. Esser, both of Chicago, Ill., for
Chemetron Corporation.

 Mason, Fenwick & Lawrence, Washington,
D. C. for Matsuo Electric Company, Limited.

 Before Leach, Lefkowitz, and Shryock,
Members.

 Lefkowitz, Member.

 An application has been filed by Matsuo
Electric Company, Limited to register "NCC"
as a trademark for electronic capacitors or
condensers, use of the mark since 1938 being
alleged.

 Registration has been opposed by Chemetron
Corporation, which alleges that applicant's
mark "NCC" so resembles "NCG" previously
used by opposer as a trade name and
trademark on and in connection with
electrical, electronic, chemical, and
mechanical equipment as to be likely, when
applied to applicant's goods, to cause confusion
or mistake or to deceive.

 Opposer is the owner by assignment of
numerous registrations of "NCG" for such
goods as electrical arc welding machines,
welding units and parts thereof, carbon
electrodes, electrical cable and electrode
holders; [FN1] metal welding electrodes and
rods and solder; [FN2] tools used by welders
and in connection with welding and cutting
devices and processes; [FN3] gas welding and
cutting apparatus and supplies; [FN4] gas
handling and distributing supplies and

COPR. © 2004 The Bureau of National Affairs, Inc.



accessories; [FN5] welding hose; [FN6] protective devices, particularly for welding; [FN7] chemical fluxes and compressed gases; [FN8] and tube oscillator generators of radio frequency energy and electrical control equipment, and tuned electrode holding torch for use therewith. [FN9]

Only opposer has taken testimony.

[1] Since applicant has offered no evidence as to its use of the mark "NCC", the earliest use thereof on which applicant can rely herein is the filing date of the subject application, namely, July 15, 1963. See: Duffy-Mott Company Inc. v. General Mills, Inc., 148 USPQ 225 (CCPA, 1966).

Opposer introduced the testimony of its President and its Director of Advertising and Public Relations, who have been associated with opposer and its predecessors for many years, and filed numerous physical and documentary exhibits. This record shows that opposer, Chemetron Corporation, is a diversified company which, through its various divisions, manufactures or sells a wide variety of electrical, electronic, chemical, and mechanical equipment. The trademark "NCG" was adopted by opposer's predecessor in 1934 or 1935, and was first used on electric welding machines. The mark has been continuously used and has been the principal mark of opposer's predecessor and its present National Cylinder Gas Division since 1946 or 1947. The use of "NCG" was expanded prior to 1955 to cover all products manufactured or sold by opposer's National Cylinder Gas Division and covered by its pleaded registrations. Among such products are electric arc welding supplies and equipment, including component parts and accessories, and industrial and medical gases and equipment necessary for their utilization. Shipping labels bearing the mark "NCG" are applied to packages containing the equipment manufactured or sold by opposer's National Cylinder Gas Division. Sales of "NCG" products have been made throughout the United States and in foreign countries through direct sales solicitation, the operation of fifteen to twenty retail stores around the United States, and a network of

approximately seven hundred dealers scattered all over the country. The direct sales are confined largely to large manufacturing establishments such as in the automobile industry, the steel industry, the foundry business, railroads, electronic companies, and other large users of electric welding equipment, electrodes, and gases. The sales by the **374** retail outlets and dealers are made to small manufacturers and shop owners, such as welding shops, blacksmith shops, automotive garages, farm equipment repair companies, construction companies, and small contractors. Opposer's sales under its "NCG" trademark have averaged approximately sixty million dollars a year for the last ten years, of which an average of more than a million and a half dollars were attributed to sales of industrial electrical equipment. During the period from 1958 through 1964, opposer expended more than one and a half million dollars in advertising and promoting its products under the "NCG" mark through trade, professional, and business publications; promotional materials; exhibits and displays; and sales department materials.

For many years prior to July 15, 1963, opposer has had a substantial business in the sale of replacement parts for its various items of "NCG" welding and cutting equipment and apparatus. Included among these parts and accessories are capacitors which are identified and publicized in price and parts list under the designation "NCG" and which are packaged and shipped in cartons prominently displaying the "NCG" label.

Opposer has also made of record under Rule 2.123 copies of excerpts from three psychological treatises dealing with, inter alia, meaningfulness of three letter combinations in the mental process of remembering.

While applicant has offered no testimony to herein that applicant is selling under the mark "NCC" capacitors of all types and descriptions including capacitors suitable for use as replacement parts in opposer's welding and cutting equipment. See: Meyer Chemical Company v. Anahist Co., Inc., 120 USPQ 483 (CCPA, 1959); and California Stucco Products of New England, Inc. A. Maas & Waldstein Co., 124 USPQ 75 (CCPA,



. Accordingly, it is not unreasonable to assume that conditions and circumstances may possibly arise where the sale of capacitors by the parties under the same or similar marks would be likely to cause confusion or mistake in trade.

[3] The third party registration relied on by applicant are insufficient in and of themselves to establish that letter marks are basically "weak" marks. Likewise, the fact that others may have adopted as trademarks for their goods in the electrical field combinations of the letters "NC" is incompetent to establish that the specific mark of opposer, "NCG", is in any way lacking in distinctiveness for goods which it manufactures and sells thereunder. The record adduced in behalf of opposer can *375 lead to but one conclusion, namely, that opposer possesses a substantial goodwill and protectable interest in the mark "NCG". These registrations, moreover, are of no particular significance herein if the use of the specific mark in issue "NCC" is likely to cause confusion as to source as a result of opposer's prior use of "NCG". See: Sundure Paint Corporation v. Maas & Waldstein Co., 122 USPQ 377 (CCPA, 1959); and The Wella Corporation v. La Maur, Inc., 136 USPQ 453 (CCPA, 1963).

Applicant has argued that the only similarity between "NCC" and "NCG" lies in the letters "NC". This argument, however, disregards the visual and phonetic similarities between the remaining letters "G" and "C" and hence between the marks as a whole. Opposer has offered the aforementioned psychological treatises on the significance of meaningfulness in remembering three letter combinations in an effort to "assist" the Board in arriving at a

COPR. © 2004 The Bureau of National Affairs, Inc.



decision. Apart from the question as to the
competency of this material for the purpose
presented herein, it is noteworthy that the
Court of Customs and Patent Appeals in
Crystal Corporation v. Manhattan Chemical
Manufacturing Company, Inc., 25 USPQ 5, 6
(CCPA, 1935), a case decided long prior to the
publication of these its use of the mark "NCG", it has noticed
under the applicable rule copies of nineteen
third party registrations for marks including
the letters "NC" in some combination, for a
variety of goods, including radio transmitting

COPR. © 2004 The Bureau of National Affairs, Inc.





and receiving apparatus and parts thereof; paper cutting machines; printing ink; metal cutting tools; hand stamps; vacuum pumps; carbon and graphite bearings; electrodes; diodes, carbon resistors, etc.; industrial power elements, it is thus well known that there are differences among these and a mere identity of arbitrarily arranged letters than it is to a series of letters comprising the letters "NCG" is the identity of remembering such patterns as "NCG" as to the differences or distinctions between or applied to metal products "in class 21 and to products in other classes and that the trademark of the Patent Office award has substantial registration between the marks "NCG" and "NGC" it is concluded that inasmuch as whether it would probably result from the persons and that of capacitors applicable and as it are, as urged by applicant, that applied to the goods of the respectively particularly

[2] There are also certain similarities; prior use does not follow that because of his technical knowledge being in faith in his welding and cutting equipment Section Winchanger Corporation v. Bion, 130 USPQ 289 (CCPA, 1962) a component of certain types of equipment and as replacements for use in maintaining existing equipment. Opposer's prior registrations of "NCG" also cover "electronic arc welding machines * * * and parts thereof", and capacitors, sold both as complete units and as separate parts, necessarily come within the broad terminology, "parts thereof." See United States Steel Corporation v. Bijur Lubricating Corporation, 128 USPQ 547 (CCPA, 1961) and Dico Corporation v. Acme-Hamilton Manufacturing Corporation, 138 USPQ 512 (TT&A Bd., 1963). Applicant has, in effect, urged that the capacitors for which it seeks registration are used in many types of industries and, in particular in the radio and television field as distinguished from opposer's components or replacement parts for its specialized welding and cutting equipment. Applicant's goods, however, are identified in its application simply as "electronic capacitors or condensors". In the absence of any limitation therein as to the nature and

use of the capacitor, it may be presumed for purposes treatises and apparently with our Member 1256, this expertise 950 arrived at the conclusion that:

Pat.Off.  T.T.A.B.

153 U.S.P.Q. 372

END OF DOCUMENT

The opposition is sustained; and registration to applicant is refused.

COPR. © 2004 The Bureau of National Affairs, Inc.




Search Result                        Rank(R) 2 of 2                    Database
                                                                       FIP-PTO
1988 WL 252478 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1220
**(Cite as: 1988 WL 252478 (Trademark Tr. & App. Bd.))**
**<KeyCite Yellow Flag>**

Trademark Trial and Appeal Board
Patent and Trademark Office (P.T.O.)

**ALLSTATE INSURANCE COMPANY**
v.
GEORGE DELIBRO, D.B.A., **ALLSTATE** TRACTOR TRAILER TRAINING
January 29, 1988
*1 Hearing: September 16, 1987

Opposition No. 69,872, to application Serial No. 419,606 filed April 1, 1983

Richard C. Browne and Julie A. Strauss for Allstate Insurance Company

Laurence R. Brown for George DeLibro d.b.a., Allstate Tractor Trailer Training

Before Rice, Rooney and Seeherman
Members

Opinion by Rooney
Member

   An application was filed by George DeLibro, d.b.a. Allstate Tractor Trailer
Training to register the mark shown below (design of a truck disclaimed) for
professional training of tractor-trailer truck drivers claiming first use as of
July 5, 1975.
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
   An opposition to registration was filed by Allstate Insurance Company on the
ground that applicant's mark so resembles the marks ALLSTATE, [FN1] and ALLSTATE
LIFE (LIFE disclaimed [FN2] for insurance underwriting services and ALLSTATE
MOTOR CLUB (MOTOR CLUB disclaimed [FN3] for services to motorist members,
including assistance on planning auto trips, emergency road service benefits,
legal service benefit in event of traffic violation charges, accident insurance
and arranging for world-wide tours, previously used and registered by opposer
and used by opposer's related and affiliated companies as to be likely to cause
confusion, mistake or deception.
   Admitting the existence of the registrations relied on by opposer and the
allegation that applicant has not used the mark prior to its claimed use date,
applicant denied the remaining allegations of the notice of opposition and
affirmatively pleaded that ALLSTATE is a weak mark as evidenced by the existence
of certain enumerated third-party registrations and that applicant is guilty of
laches and estopped from bringing this suit as a result thereof.
   The record consists of stipulated testimony and exhibits [FN4] on behalf of
both parties, each of which was represented at the oral hearing held on this
matter.
   The following facts appear in the stipulated testimony of Ralph J. Jackson,
opposer's Director of Corporate Advocacy; Bruce W. Clements, Vice-President and
Asst. General Counsel and John J. Flieder, Asst. Vice-President for Corporate

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(Cite as: 1988 WL 252478, *1 (Trademark Tr. & App. Bd.))

Advertising.

Opposer is a general lines casualty insurance company founded as Allstate Insurance Co. by Sears Roebuck & Co. in 1931. Other Sears companies have used the ALLSTATE name since that time subject to the control of Allstate Insurance Co. The mark has been used and advertised over the years in connection with a broad range of consumer and financial services through the Sears organization network. Advertising expenditures between 1950 and 1985 have been from 5 to 30 million dollars per year. For each year since 1973, opposer has had more than 250 million dollars of credit insurance in force. Allstate Motor Club, founded in 1960, has issued membership to large numbers of individuals, collecting dues in amounts from 7 million dollars in 1970 to 35 million dollars in 1985. From 1953 to the early 1960's, opposer's charitable and community services foundation sponsored high school teacher driver training programs. Between 1960 and 1974, opposer produced and developed driver education training films for classroom use in connection with driver training equipment manufactured and distributed by other companies. Beginning in the 1970s through the present, opposer has financially supported a variety of driver education and safety programs including production of printed materials and films related to education of the public and for commercial and high school driving schools and driver education students in the areas of drunk driving, driving and drugs, court approved rehabilitation programs for chronic drunk driving offenders and in connection with auto safety programs including promotion of passive restraint systems for automobile crash protection.

*2 Applicant's facts are set forth in a statement signed by George DeLibro, Arnold J. De Maio, Vincent J. Mazzacca, Marion DeLibro and Frank DeFilippo.

According to that statement, applicant has operated a driving school under various names, all of which have included the term ALLSTATE, since July 25, 1957. Since January 1, 1964, applicant has used the name ALLSTATE TRACTOR TRAILER TRAINING.

On August 19, 1975, applicant registered the name Allstate Tractor Trailer School in Bridgeport, Conn. Applicant incorporated in 1981 in Connecticut as Allstate Driving School, Inc. On April 20, 1982 a name change, to Allstate Tractor Trailer Training School, Inc., was registered in the state of Connecticut. Applicant was listed in the Yellow Pages classified directory in Boston, Mass as early as 1977 as Allstate Tractor Trailer Training. Applicant has worked with public and private firms in connection with traffic safety and professional training of tractor trailer drivers as well as students in various states. A number of third-party ALLSTATE marks exist in various fields of activity.

The question of priority does not arise in this case because of opposer's reliance on its valid and subsisting registrations. See Black and Decker Mfg. Co. v. Bright Star Industries, Inc. 220 USPQ 890 (TTAB 1983). Apart from the foregoing, the evidence supports opposer's continuous use in connection with insurance services since 1931, and in connection with various driver education programs since 1953.

As to the services performed by each party, it is well settled that the goods or services involved in an opposition proceeding need not be the same or even competitive in order to support a finding of likelihood of confusion. It is sufficient if the products or the services are related in some manner such that their marketing under the same or a similar mark would lead purchasers or ultimate consumers to believe that they emanate from the same source or that

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252478, \*2 (Trademark Tr. & App. Bd.))**

there is an association between their respective sources. See Kraft, Inc. v. Country Club Food Industries, Inc., 230 USPQ 549 (TTAB 1986). Thus, contrary to applicant's arguments, a likelihood of confusion is not precluded simply because applicant does not sell insurance or opposer does not train drivers of tractor-trailers.

Apart from its substantial insurance services, which include automobile, business and fleet insurance, opposer has been involved for many years in driver education and safe driving programs. These are extended to teachers, to high schools and commercial establishments. Exhibit 8 concerns a number of programs sponsored by opposer including "auto body repair training". Opposer's services also include "motor club activities" in connection with which dues paid in 1985 were in excess of 41 million dollars. [FN5] In 1977 almost 20 million dollars was spent for advertising and promotion of opposer's services. These expenditures have been consistent and exceeded 29 million dollars in 1985.

**\*3** It is our opinion that opposer's activities, in particular its motor club services, driver education and safety programs, are sufficiently related to training of tractor trailer drivers as to be likely to cause confusion if the latter were offered under the same or a similar mark.

Turning to the marks, we note that although marks must be judged in the final analysis, in their entireties, it is nonetheless true that more or less weight may be given to a particular feature of a mark. See In re National Data Corp., 753 F.2d 1056, 224 USPQ 749 (Fed Cir 1985). In the case before us, there can be no question that ALLSTATE is the dominant portion of applicant's mark. There are numerous cases which state that, as between a design and a word mark, the word portion is dominant. See In re Carriage, Inc. 189 USPQ 648 (TTAB 1975). That is even more true where the design describes the services to some extent, as the truck in applicant's mark does. It would serve only to inform viewers of the nature of these particular services and, because of the identical word portion, would, in our view, indicate opposer as the source.

Applicant has argued that ALLSTATE is an exceedingly weak mark. But, that cannot be seriously contended of a mark which has been in use since 1931 and has been as extensively promoted as this one has. Even the court in the case cited by applicant, Sears, Roebuck and Co. and Allstate Insurance Company v. Allstate Driving School, Inc., 163 USPQ 335 (EDNY 1969) recognized that ALLSTATE has secondary meaning as did the court in Sears, Roebuck and Co. v. Johnson et al d.b.a. ALL-STATE School of Driving, 219 F2d 590, 104 USPQ 280 (CA 3 1955).

The alleged-third party state registrations listed in applicant's Exhibit 14 are of absolutely no probative value to the issue before us. Exhibit 15 includes copies of twenty third-party federal registrations. Apart from the fact that not one is for related services, it is well settled that third-party registrations have little, if any, probative value on the question of likelihood of confusion since in the absence of evidence relative thereto, we do not know the extent of their use, if any, and cannot assess the extent to which they may have made an impression on the public.

Applicant argues that opposer is estopped from bringing this opposition in view of its earlier involvement in the case of Sears, Roebuck and Co. and Allstate Insurance Co. v. Allstate Driving School, Inc., supra. Apart from the fact that applicant was not a party to or in privity with a party to that case and therefore cannot claim estoppel based thereon, the decision in that case was made on a different evidentiary record and an important factor entering therein was the applicant's innocent adoption of the mark.

Copr.  (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252478, \*3 (Trademark Tr. & App. Bd.))**

Concerning its laches defense, applicant asserts that in about 1965 a stockholder of Allstate Insurance Company objected to applicant's use of ALLSTATE and referred his objection to opposer and that applicant was subsequently notified to cease using the name by an attorney representing opposer. It is stated further that at that time, applicant was also using the phrase "You're in Good Hands" on a sign in his office window. As a result of the notification, applicant states, the sign was changed to read, "You're in Safe Hands" which was used for many years but was recently discontinued. Applicant, continuing to use ALLSTATE, heard nothing more from opposer until this opposition was filed. Applicant argues that because of opposer's silence, he assumed he had opposer's consent and he has since openly and notoriously continued to use the mark ALLSTATE for his driving school. It is applicant's position that opposer is guilty of laches and should, for that reason, be further estopped from pursuing this opposition.

**\*4** In support of this defense, applicant has submitted a copy of a letter, dated January 17, 1985, written by his wife, Marion DeLibro, to applicant's attorney of record herein, relating her visit to a Doctor Granger in "1965 or 1966", who said he was a stockholder of Allstate Insurance Company and expressed annoyance on learning that the name of her employer (her husband) was Allstate Driving School. She stated that he said he had reported Allstate Driving School to Allstate Insurance Company and that her husband had previously received notification from Allstate Insurance Company to cease use of the name. Also relative to this defense, applicant submitted a statement of Frank DeFilippo to the effect that "(B)ack about 20 years or more ..." Mr. DeLibro had mentioned to him receiving a letter from a New York law firm representing Allstate Insurance Company asking him to cease using the name ALLSTATE; that, at that time, Mr. DeLibro had a small sign in his office window reading "Allstate Driving School, You're in good hands"; "... so I suggested he change the motto to read, 'You're in Safe hands', which he did ..." and that Mr. DeFilippo understands that Mr. DeLibro has never heard any more from Allstate Insurance Company. [FN6]

As opposer has noted, a laches defense is considered only in cases where there is a reasonable doubt as to likelihood of confusion. Where no such reasonable doubt exists, laches, even if it were proved, would be an insufficient reason to allow a mark to be registered which would be likely to confuse the public. See Iodent Chemical Company v. Dart Drug Corporation, 207 USPQ 602 (TTAB 1980).

Apart from the public policy considerations, applicant has not proved its laches defense. All that is of record are statements by two individuals reporting on events as to which neither had first hand knowledge. Mrs. DeLibro's information relative to both Dr. Granger's actions and that of Allstate Insurance is second hand, as is Mr. DeFilippo's concerning whatever Mr. DeLibro may have been told in a letter from an unidentified law firm. Both are inadmissible hearsay. Applicant has failed to prove opposer's knowledge of its use of the mark ALLSTATE, an inexcusable delay after such knowledge and that applicant relied on that delay to his detriment. See Sun Valley Co., Inc. v. Sun Valley Mfg. Co., 167 USPQ 304 (TTAB 1970). Apart from the foregoing, it is noted that the mark for which registration is being sought herein, which differs from that involved in the above discussion, was not used before 1975 and there is nothing of record to indicate that opposer was ever aware of applicant's use of this particular mark prior to its publication in the Official Gazette.

The absence of evidence of actual confusion is not controlling since it is a well accepted fact that such evidence is difficult to obtain. Moreover, opposer

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252478, \*4 (Trademark Tr. & App. Bd.))**

has sustained its burden by proving likelihood of confusion. It is not necessary that actual confusion be proved. See Hydrotechnic Corp. v. Hydratech International, Inc., 196 USPQ 387 (TTAB 1978) and Guardian Products Co., Inc. v. Scott Papers Co., 200 USPQ 738 (TTAB 1979).

   **\*5** Finally, we cannot ignore the fact that applicant's intent in adopting the ALLSTATE designation does not seem to have been completely innocent since the record clearly shows that applicant adopted not only the word mark ALLSTATE but also for a time used the equally prominent slogan of opposer, You're in Good Hands".

   In view of the foregoing the opposition is sustained.

J. E. Rice
L. E. Rooney
E. J. Seeherman
Members, Trademark Trial and Appeal Board

FN1. Regn. No. 717,683 issued June 27, 1961, Section 8 affidavit accepted, Section 15 affidavit filed, renewed; Regn. No. 761,091, issued December 3, 1963, Section 8 affidavit accepted, Section 15 affidavit filed, renewed; Regn. No. 840,187, issued December 5, 1967, Section 8 affidavit accepted, renewed.

FN2. Regn. No. 724,938, issued December 5, 1961, Section 8 affidavit accepted, Section 15 affidavit filed.

FN3. Regn. No. 759,366, issued October 29, 1963, Section 8 affidavit accepted, Section 15 affidavit filed, renewed.

FN4. Applicant has objected to the submission of a copy of its abandoned application file (Ser. No. 334,288) on various grounds. Without a discussion of each of the grounds mentioned, we note that while the abandoned application (in which no appeal was filed), represents the final Office position with regard to the specific mark for which registration was sought therein, it has no bearing on the determination to be made in this case since the marks are not the same, the evidence in the record is not the same and, in any event, the Board is not bound by the final determination of an Examining Attorney. Both parties have made numerous objections to other exhibits on grounds of relevance and/or hearsay. These objections have been considered and the probative value of the subject matter has been weighed accordingly.

FN5. Applicant has objected to the copy of a license agreement between opposer and Allstate Motor Club. It is contended that it was not authenticated and that there is no evidence of actual use of ALLSTATE by the motor club. Applicant also raises the question of whether the license is in effect. The stipulated testimony of Mr. Bruce W. Clements, opposer's vice-president and assistant general counsel identifies and authenticates the license agreement. The extensive list of dues paid by members of the Motor Club from 1970 to 1985 attests to activities conducted under the mark. Apart from the foregoing, opposer owns the registration for ALLSTATE MOTOR CLUB (note that title is currently in opposer's name) and questions of nonuse of the mark constitute a collateral attack on its validity, which cannot be entertained in the absence of a counterclaim for its cancellation.

         Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252478, \*5 (Trademark Tr. & App. Bd.))**

FN6. Mr. Bruce W. Clements, Vice-President and Asst. General Counsel, Allstate Insurance Company stated in his stipulated testimony that a thorough search of records of the Corporate Law Division of Allstate Insurance Company had been made at his direction and no documents related to discussions with Mr. DeLibro about his use of the mark ALLSTATE were located.

  1988 WL 252478 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1220
END OF DOCUMENT

Copr.  (C) West 2004 No Claim to Orig. U.S. Govt. Works

Search Result                    Rank(R) 1 of 1

1987 WL 124293 (Trademark Tr. & App. Bd.), 3 U.S.P.Q.2d 1553
**(Cite as: 1987 WL 124293 (Trademark Tr. & App. Bd.))**
<KeyCite Yellow Flag>

                    Trademark Trial and Appeal Board
              Patent and Trademark Office (P.T.O.)

            IN RE **APPETITO** PROVISIONS CO. INC.
                    Serial No. 423,405
                        July 1, 1987
                *1 Hearing: April 15, 1987

Jan Alan Brody and Antonio Inacio for applicant

Ellen M. Devine
Trademark Examining Attorney
Law Office 2
(John C. Demos, Managing Attorney)

Before Rice, Allen and Cissel
Members

Opinion by Allen
Member

   An application has been filed by Appetito Provisions Co., Inc. to register the
mark APPETITO and Design, [FN1] as reproduced below, for Italian sausage:



   Registration has been refused by the Trademark Examining Attorney under
Section 2(d) of the Trademark Act, 15 U.S.C. s 1052(d) (1976), on the basis that
applicant's mark is likely to cause confusion or mistake, or to deceive if used
contemporaneously with the registered marks A APPETITO'S [FN2] and A APPETITO'S
INC. and sandwich design, [FN3] both of which are reproduced below, for
restaurant services:

            Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(Cite as: 1987 WL 124293, *1 (Trademark Tr. & App. Bd.))





   Applicant has appealed, contending that differences in the marks, and in the goods and services in connection with which they are used make confusion unlikely. [FN4] The Trademark Examining Attorney maintains that the dominant element is identical in both marks and that Italian sausage is sufficiently related to restaurant services to make confusion likely. In support of this relationship, she has submitted evidence intended to demonstrate that food and restaurant services are marketed by the same proprietors under identical marks.

   Although marks must be compared in their entireties, where they are used on goods and services offered to the general public, emphasis must also be placed on the recollection of the average purchaser, who normally retains a general rather than a specific impression of them. In evaluating the similarities of marks, a particular feature or portion of a mark can thus be accorded greater weight if it would make an impression upon purchasers that would be remembered and relied upon to identify the goods or services. In re Apparel Ventures, Inc., 229 USPQ 225, 226 (TTAB 1986). Thus, if one of the marks comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services. Kabushiki Kaisha Hattori Tokeiten v. Scuotto, 228 USPQ 461, 462 (TTAB 1985). The principle is especially important in cases involving restaurant services in view of the propensity of persons to try restaurants based on word-of-mouth recommendations.

   The dominant element of both marks is the word APPETITO. Because it is prominently displayed between the broad stripes of applicant's mark, and enhanced in registrant's marks by the capitalized letter A referring to its first letter, the word APPETITO makes an impression upon which purchasers would rely. The abbreviation 'Inc.' and the design of a sandwich featured in registrant's mark are less likely to be remembered because they merely describe its business form and the kind of food served in its restaurants. Therefore, because applicant's mark shares with registrant's mark that element responsible for creating its overall commercial impression, the marks are confusingly similar.

**2 Likelihood of confusion is supported if the goods and services are related in some manner or, because of marketing circumstances, the marks are likely to be encountered by the same persons under conditions that could give rise to the mistaken belief that they are in some way associated with the same source. In re Kangaroos U.S.A., 223 USPQ 1025, 1026 (TTAB 1985). In this regard, the

          Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1987 WL 124293, \*2 (Trademark Tr. & App. Bd.))**

predecessor of the Court above once broadly held that there existed such an intimate relationship between any food and food services that confusion is likely where the same or confusingly similar marks are used by different entities on those goods and services. In re H.J. Seiler Co., 289 F.2d 674, 129 USPQ 347 (CCPA 1961) [smoked and cured meats and food catering services]; See also, In re Three Chefs Corp., 175 USPQ 177 (TTAB 1972), following the Seiler rule. Recent decisions have emphasized, however, that this relationship does not rise to the level of a presumption, but must be evaluated according to the facts presented by each particular case. Jacobs v. International Multifoods Corp., 668 F.2d 1234, 212 USPQ 641, 642 (CCPA 1982); In re Farm Fresh Catfish Co., 231 USPQ 495 (TTAB 1986); In re Best Western Family Steak House, Inc., 222 USPQ 827 (TTAB 1984). The Examining Attorney argues that the unrestricted nature of the registrations merits concluding that Italian sausages are served in registrant's restaurants, and that purchasers will assume that the marketing of these food products and restaurant services under similar marks implies an association of source.

The evidence submitted by the Examining Attorney regarding the issue of the relatedness of the goods and services involved herein comprises a package of frozen soup bearing the mark STOUFFER'S and an excerpt from the 1984 District of Columbia Yellow Pages listing of the mark, STOUFFER'S CONCOURSE HOTEL, as a restaurant. In addition, two excerpts concerning a company named Benihana from PR NEWSWIRE, a proprietary service available through the LEXIS/NEXIS Research Database, have been submitted. The latter provide in relevant part as follows:

[T]he summer and early fall months are the low point of frozen food sales throughout the industry and that, inasmuch as this part of Benihana's business has become such a significant factor in the company's overall performance . . . [FN5].

Benihana National Corp. owns and operates 16 teppanyaki-style restaurants under license from its parent, Benihana of Tokyo, Inc. . . . [FN6].

These excerpts may fail to indicate the mark under which these goods and services are marketed, but even though evidence of their sale under the same mark would make a stronger case, the fact that both food products and restaurant services originate with a common source is probative of the perceptions of individuals in the trade. Sterling Drug Inc. v. Sebring, 515 F.2d 1128, 185 USPQ 649, 652 (CCPA 1975). Further we find that the frozen food package and telephone directory listing establish that similar marks, in this case STOUFFER'S and STOUFFER'S CONCOURSE HOTEL, are used for both food products and restaurant services.

**\*3** In addition, this Board and the Court above has found relatedness of the goods and services and a likelihood of confusion in a number of cases involving food services and foods of the same kind as those involved here. See, e.g., In re H.J. Seiler Co., 289 F.2d at 674, 129 USPQ at 347 [Customers of SEILER'S food catering services held likely to believe that SEILER'S bacon, bologna, dried beef, boneless butts, ham, luncheon roll, meat loaf, pork roll, sausage and scrapple in the grocery store comes from the same source]; In re Best Western Family Steak House, Inc., 222 USPQ at 827 [Customers of BEEFMASTER restaurants held likely to believe that BEEF MASTER frankfurters and bologna originate with, are produced by or are in some way associated with the same source as that of the restaurants]; Marriott Corp. v. Top Boy International, Inc., 165 USPQ 642, 643 (TTAB 1970), aff'd 470 F.2d 641, 176 USPQ 209 (CCPA 1973) [It being common knowledge that hamburger sandwiches are sold in drive-in restaurants, the public

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



(Cite as: 1987 WL 124293, *3 (Trademark Tr. & App. Bd.))

is likely to assume an association between TOP BOY hamburger sandwiches and BIG BOY drive-in restaurants.]

In the most recent of our decisions, Best Western Family Steak House, we placed weight on the fact that there was no restriction in the identification of services in the BEEFMASTER restaurant services application and that, consequently, it could be fairly presumed that all kinds of foods were served in applicant's restaurants, including the same type of food as that named in registrant's registration. In that appellant's description is also unlimited, the same presumption is applicable here. Indeed, we cannot rule out the possibility that registrant's restaurants specialize in Italian sausage, the very product that appellant sells. See In re Denisi, 225 USPQ 624, 625 (TTAB 1985).

Appellant's argument that its sales of sausage are to 'grocery or supermarket level establishments' is to no avail. The identification 'Italian sausage' is also unrestricted as to trade channels, hence we must presume retail sales of sausage under the APPETITO mark are included.

We are not unaware of the fact that, to persons who understand the meaning of APPETITO, this term when applied to appellant's goods probably suggests 'appetizing Italian sausage.' However, presuming, as we must, that registrant's services include restaurants specializing in Italian dishes, [FN7] the commercial impression of the same mark applied to registrant's services, i.e. 'appetizing Italian restaurants,' is markedly similar. See, e.g., Mohawk Rubber Co. v. Mobiliner Tire Co., Inc., 217 USPQ 929, 933 (TTAB 1981).
Decision: The refusal of registration is affirmed.

J. E. Rice
D. B. Allen
R. F. Cissel
Members, Trademark Trial and Appeal Board

FN1. Application Ser. No. 423,405, filed April 27, 1983, claiming dates of first use and first use in commerce of July 1, 1966. The drawing is lined for the colors red and green. The word 'appetito' is an Italian word meaning 'appetite.'

FN2. Registration No. 1,250,699, issued September 6, 1983, claiming a date of first use of December 28, 1974 and a date of first use in commerce of January 1, 1980.

FN3. Registration No. 1,259,650, issued November 29, 1983, claiming a date of first use of December 28, 1974 and a date of first use in commerce of January 1, 1980. The abbreviation 'Inc.' and the design of a sandwich have been disclaimed.

FN4. Applicant also argues that registrant's activities in Arizona are geographically separate from its activities in the New York City metropolitan area, North Carolina, and Florida. Although this argument has merit in a dispute over the use of trademarks, it has none in a proceeding such as this involving the right to a geographically unrestricted registration because such a registration under the federal Trademark Act accords a registrant prima facie exclusive rights in the registered mark for the goods or services recited in the registration throughout the United States regardless of its actual extent of use. Trademark Act, Section 7(b) 15 USC s 1057(b) (1976; See e.g. Giant Food,

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works




**(Cite as: 1987 WL 124293, \*3 (Trademark Tr. & App. Bd.))**

Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983) ; Amcor, Inc. v. Amcor Industries, Inc., 210 USPQ 70, 77 (TTAB 1981). As such, the geographical extent of applicant's and registrant's activities is not a proper factor for consideration here, and applicant's alternative request for a geographically restricted registration cannot be considered outside a concurrent use proceeding.

FN5. 'Benihana National Earnings, PR Newswire, November 15, 1985.

FN6. 'Benihana Earnings,' PR Newswire, November 27, 1985. The Board notes that these excerpts have not been authenticated by submitting documentation of the field of the computerized search. In re Gagliardi Bros., Inc., 218 USPQ 181 fn. 1 (TTAB 1983). In addition, because evidence from proprietary news services is not presumed to have circulated among the general public, its probative value regarding attitudes among purchasers is limited. In re Men's Professional Tennis Council, 1 USPQ 2d 1917 fn. 5 (TTAB 1987).

FN7. The validity of the presumption is reinforced by the fact that in one of the cited registrations there is depicted, as part of the mark, a sandwich which appears to be of the kind generally known as an Italian sub.
  1987 WL 124293 (Trademark Tr. & App. Bd.), 3 U.S.P.Q.2d 1553
END OF DOCUMENT

Copr.  (C) West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.                                                                    Westlaw.

Search Result                     Rank(R) 1 of 1

1988 WL 252674 (Trademark Tr. & App. Bd.)
**(Cite as: 1988 WL 252674 (Trademark Tr. & App. Bd.))**

Trademark Trial and Appeal Board
Patent and Trademark Office (P.T.O.)

IN RE PEDRO RUIZ-TAGLE DECOMBE
Serial No. 592,586
July 20, 1988

Beveridge, DeGrandi & Weilacher for applicant

Julie B. Seyler
Trademark Examining Attorney
*1 Law Office 2
(John C. Demos, Managing Attorney)

Before Sams, Rooney and Simms
Members

Opinion by Rooney
Members

   An application was filed by Pedro Ruiz-Tagle Decombe to register the mark
shown below for fresh fruits. Use since February 2, 1986 was alleged.
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
   Registration was finally refused under Section 2(d) in view of the existence
of a registration for the mark CAPRICE for biscuits, cookies, wafers and candy.
[FN1] The Examining Attorney believes that the similarity in the marks and the
close relationship of the goods support a finding of likelihood of confusion.
   This case is similar in some ways to the case of In re Mars, Incorporated
decided in 1984 by the Court of Appeals for the Federal Circuit (222 USPQ 938).
There the court reversed the Board's finding and held that there was no
likelihood of confusion between the mark CANYON used for fresh citrus fruits and
the same mark CANYON for candy bars. The court noted in that case that, in the
absence of evidence on the issue of likelihood of confusion, the decision-making
process involves mere opinion and that, in its opinion, confusion was not
likely.
   The difference in this case is that the Examining Attorney has provided
evidence in the form of copies of Lexis/Nexis printouts assertedly showing that
applicant's and registrant's products are complementary insofar as they are
often served and eaten together; and that there is a trend among food
distributors to enter the packaged fresh produce market. In support of her
position, the Examining Attorney also cited In re Martin's Famous Pastry Shoppe,
Inc., ___ F.2d ___, 223 USPQ 1289 (Fed.Cir.1984) finding MARTIN'S for wheat bran
and honey bread confusingly similar to MARTIN'S for cheese, and Midwest Biscuit
Company v. John Livacich Produce, Inc., 203 USPQ 628 (TTAB 1979) refusing
registration of VISTA for fresh strawberries, avocados and vegetables in view of
the same mark registered for cookies and crackers.
   Applicant refutes the evidence saying that fresh produce is not sold in stores
or advertised by brand name; that those who might see a trademark on the

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252674, \*1 (Trademark Tr. & App. Bd.))**

packaging therefor would not be likely to be confused; that the Lexis/Nexis article from the New York Times, November 12, 1986, cited by the Examining Attorney, merely indicates what some large, well-known companies expect to be doing in the future; and that the article also supports applicant's position in saying that "most fresh produce comes to stores from farms through regional wholesalers who make little or no effort to promote a brand name or support it with advertising" and "... the nation's produce sections are teeming with fresh fruits and vegetables of uncertain lineage". Applicant also noted that registrant, during the prosecution of its application, successfully refuted the citation of the mark CAPRICE DES DEUX on a background crest, for cheese, by arguing that the Examining Attorney had dissected the cited mark in determining the question of likelihood of confusion and noting that the marks and goods of registrant and applicant therein were different. It is applicant's position that the Examining Attorney in this case also has dissected its mark and that registrant's goods are more related to cheese than they are to fresh fruits.

**\*2** The marks in this case are almost identical.  All that there is which might render them less than identical is a design feature in applicant's mark, which it characterizes as a "distinctive 'V' design", and the stylized script. We note that registrant's mark is printed in simple block-letter form. With such a presentation, registrant is free to use its mark in any type of print or script. As to the presence of the "V" design, the test for likelihood of confusion is not whether the marks would cause confusion when viewed on a side-by-side basis, in which case, the viewing public would have an opportunity to compare the marks more carefully and possibly note the presence in one of a design feature which does not appear in the other. Instead, in all likelihood, one mark would be viewed at one time and place and the other at a subsequent time and/or place. Under these circumstances, it is the verbal portion of the mark which would be remembered. Simple designs such as shown in applicant's mark would not usually be remembered, especially when one is confronted by essentially the same word mark. See In re Solar Energy Corporation, 217 USPQ 743 (TTAB 1983) and Cooper Industries, Inc. v. Repcoparts U.S.A., Inc., 218 USPQ 81 (TTAB 1983).

Applicant argues that in refusing registration, the Examining Attorney has dissected the marks and failed to consider the marks in their entireties. We do not believe that to be so. Rather, the Examining Attorney has considered that the word portion of the mark is the more significant and afforded it the proper weight in deciding the question of likelihood of confusion. This clearly is a legitimate way to analyze the issue and we agree with the Examining Attorney that **little weight** should be afforded a relatively nondistinctive design in the face of two otherwise identical word marks. See Giant Food, Inc. v. Nation's Food Service, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed.Cir.1983).

Accordingly, we find that, if used on similar or related goods, these marks would be likely to confuse.

Turning to the goods, applicant concedes that goods of different types are sold in the same stores but notes that there is no per se rule with respect to food products and the marks used thereon.

In support of its position, applicant asks that the Board take judicial notice that almost all fruits are displayed in stores without trademarks on them. With regard to that request, the Board is limited as to the subject matter of which it may take judicial notice and this particular subject matter does not fall within those limits. [FN2] Apart therefrom, saying that "almost" all fruits are sold without a trademark affixed thereto does little for applicant's position.

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252674, \*2 (Trademark Tr. & App. Bd.))**

As applicant has noted, a number of fruits are sold with the marks attached thereto. For instance, such well known trademarks as CHIQUITA, SUNKIST and DOLE are quite visible in the fresh produce departments of stores on bananas, oranges and pineapple, respectively. There is no reason why other fruits and vegetables might not be so marked. Furthermore, as also noted by applicant, fruits and vegetables are frequently shipped in boxes or cartons with a mark applied to the outside of them.

   **\*3** Applicant discounts the possibility of confusion of store employees who might see these marked cartons, saying that it cannot be imagined that such persons would assume that fresh produce and cookies or crackers would have come from the same source. Applicant not only qualifies this conclusion by assuming that the stockpersons are not high school students working after school or on weekends, but offers no reason why stockpersons, high school students or otherwise, could not be confused. Applicant also discounts the likelihood of confusion of purchasing agents and distributors of food products indicating that these people are knowledgeable and sophisticated in the field. As the Examining Attorney has countered, being knowledgeable and/or sophisticated in a particular field does not necessarily endow one with knowledge and sophistication in connection with the use of trademarks. See In re Pellerin Milnor Corporation, 221 USPQ 558 (TTAB 1983). Nor does it guarantee knowledge of the range of products of the parties with whom one is dealing. In addition to the foregoing categories of persons who encounter the marks on the boxes or cartons of fresh produce, there is also the trucker or other transporter of produce who would be exposed to the marks in this manner. With regard to the foregoing, it is noted that likelihood of confusion is not limited to purchasers of the goods in question but may occur at any stage of the distribution process. See In re Optica International, 196 USPQ 775 (TTAB 1977) and In re Arctic Electronics Co., Ltd., 220 USPQ 836 (TTAB 1983).

   As to the purchasers, while they may or may not see the cartons, boxes or baskets in which produce is shipped, we have noted that at least some fresh produce is clearly individually marked with trademarks. In addition, the Examining Attorney has submitted a copy of an article taken from The New York Times, November 12, 1986, entitled "Bumper Crop of Brand Names" stating, in part, as follows:

   Some of the largest food companies--Campbell Soup, Kraft, Pillsbury, Dole, Del Monte and others--are seeking to enter or expand their presence in the fresh produce business with a host of new brand names ...

      ...

   The frontier is no longer sparsely settled. Campbell already sells its own brand of fresh mushrooms and is working on tomatoes and lettuce. Del Monte is expanding its brand name tropical fruit business. And Kraft, Pillsbury and Dole are all test-marketing packaged pre-cut vegetables ...

      ...

The Examining Attorney also urges that we take into account the "overlapping corporate nexus" between major food companies. Included in the Examining Attorney's submission are excerpts of articles from Business Wire, February 3, 1986, referring to Del Monte Fresh Fruit Co. as an operating division of Nabisco Brands Inc.; PR Newswire, February 10, 1987, referring to strong financial results for 1986 for the cookie, cracker, nuts and fresh fruit businesses of Nabisco Brands; The Los Angeles Times, August 23, 1987, again referring to Del Monte Fresh Fruit, a Nabisco subsidiary and another such reference in The New

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works



**(Cite as: 1988 WL 252674, \*3 (Trademark Tr. & App. Bd.))**

York Times, February 12, 1986.

   **\*4** Applicant seeks to cast doubt on the Examining Attorney's submission by offering other parts of the November 12, 1986 New York Times article which state that "... Except for a handful of widely known brand names, the nation's produce sections are teeming with fresh fruits and vegetables of uncertain lineage" and indicating that retailers and others are skeptical about new brand names in the produce section because the success of SUNKIST, CHIQUITA and DOLE will be hard to duplicate and that, in addition, "many of the newer brand-name items are meant to be sold in packages" but "consumers generally prefer unpackaged produce ...".

   While much of what the New York Times article is discussing is prospective, the discussion nevertheless does support the Examining Attorney's position that some produce is currently sold under brand names, a fact conceded by applicant, and that there is an effort underway to continue and to expand that practice. Applicant does not refute that information but merely argues that some doubts have been raised as to the success of such an effort, points out that the article indicates consumer resistance to packaged produce and that produce markets still feature unmarked goods. None of these arguments changes the ultimate fact that trademarked produce has and increasingly does appear alongside the unmarked species and that information relating to this situation is readily available to consumers. Moreover, the fact that a number of fresh fruits and/or vegetables are currently being marketed by brand name cannot have escaped the attention of even the most casual shopper.

   In addition, there is evidence of complementary use. The Examining Attorney has offered additional Lexis/Nexis material to support her position showing that the goods of both parties are served and eaten together and thus are complementary to one another. One such example, an excerpt from an article in The Washington Post, January 21, 1987 provides the information that cookies and fresh fruits are served together as desserts. Complementary use is clearly another factor to be considered and, in fact, the complementary use of crackers, cookies and fresh fruits was a consideration in finding likelihood of confusion in the VISTA case, supra.

   Finally, considering that the mark CAPRICE DES DEUX with a crest design is significantly different from registrant's mark, registrant's argument in its application to register CAPRICE, that the use on cheese of CAPRICE DES DEUX is unlikely to cause confusion with its mark used on biscuits, cookies, wafers and candy, does nothing to bolster applicant's argument against likelihood of confusion between the marks and goods in this case.

   In view of the foregoing, we conclude that there is sufficient relationship between the goods of applicant and those of registrant such that their sale under these marks is likely to cause confusion as to source. Any doubts which we may have had have been resolved in favor of the registrant. See In re Pneumatiques, Caoutchouc Manufacture et Plastiques Kleber-Colombes, 179 USPQ 729 (CCPA 1973).

   **\*5** Accordingly, the refusal to register is affirmed.

J. D. Sams
L. E. Rooney
R. L. Simms
Members, Trademark Trial and Appeal Board

          Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works




**(Cite as: 1988 WL 252674, *5 (Trademark Tr. & App. Bd.))**

FN1. Registration No. 1,392,539 issued May 6, 1986 claiming first use in March 1979 and reciting ownership of Greek Registration No. 84719/84 issued May 30, 1983.

FN2. The Board takes judicial notice of definitions in dictionaries of the English language and in generally recognized technical trade dictionaries. See Marcal Paper Mills, Inc. v. American Can Co., 212 USPQ 852 (TTAB 1981).
  1988 WL 252674 (Trademark Tr. & App. Bd.)
END OF DOCUMENT

Copr.  (C) West 2004 No Claim to Orig. U.S. Govt. Works

221 U.S.P.Q. 1012
1984 WL 63101 (Trademark Tr. & App. Bd.), 221 U.S.P.Q. 1012
(Cite as: 221 U.S.P.Q. 1012)
< KeyCite Citations >

**Page  1**

## Bridgestone Tire Company Limited
### v.
## Bridgestone Trading Company

Patent and Trademark Office Trademark
Trial and Appeal Board

Decided Mar. 30, 1984

United States Patents Quarterly Headnotes

### TRADEMARKS
**[1] Identity and similarity – How
determined – Considering goods (§
67.4057)**
Likelihood of confusion must be found if
public is likely to believe that opposer has
expanded its use of mark when mark is used
on any item that comes within description of
goods set forth by applicant.

### TRADEMARKS
**[2] Class of goods – Particular cases –
Similar (§ 67.2073)**
Confusion is likely when identical marks are
used on shoes, and on tires, bicycles, sporting
goods, and clothing items.

*1012 Trademark opposition No. 65,605, by
Bridgestone Tire Company Limited, against
Bridgestone Trading Company, application,
Serial No. 274,218, filed Aug. 13, 1980.
Opposition sustained; Krugman, Member,
dissenting with opinion.

Sughrue, Mion, Zinn, Macpeak & Seas,
Washington, D.C., for Bridgestone Tire
Company Limited.

Beveridge, DeGrandi & Kline, Washington,
D.C., for Bridgestone Trading Company.

Before Rice, Simms, and Krugman,
Members.

Simms, Member.

Bridgestone Tire Company Limited, a
Japanese corporation, has opposed the
application filed by Bridgestone Trading

Company, an Ohio corporation, to register
BRIDGESTONE for shoes. [FN1] As grounds
for opposition, opposer asserts that applicant's
mark is identical to opposer's previously used
mark BRIDGESTONE for shoes; that opposer
owns United States registrations for
BRIDGESTONE for all kinds of rubber tires
and tubes for automobiles, auto-bicycles, or
any other vehicles, [FN2] and for BS *1013
BRIDGESTONE and design for conveyor
belts, transmission belts, rubber dock fenders,
rubber buffers and nonmetallic hose pipes;
[FN3] that opposer has previously used the
mark through a related company in connection
with shoes and a variety of sporting
equipment; that BRIDGESTONE is the
dominant and distinguishing feature of
opposer's trade name; that the trademark
BRIDGESTONE and opposer's trade name
have become well known in the trade as a
result of widespread and continuous use
thereof; and that applicant's mark so
resembles opposer's previously used
trademark and trade name as to be likely,
when applied to applicant's goods, to cause
confusion, to cause mistake or to deceive.

Applicant, in its answer to the opposition,
has denied the salient allegations therein.

The record consists of the pleadings, the file
of applicant's application, opposer's two
pleaded registrations relied on by opposer,
applicant's answers to certain discovery
requests relied on by opposer and testimony
taken by both parties. [FN4] Both parties have
filed briefs on the case and opposer has filed a
reply brief. Both parties were represented at
an oral hearing held before this panel.

Opposer took the testimony of Ronald J.
O'Brien, vice president of advertising and
sales promotion of Bridgestone Tire Company
of America, Inc., a wholly owned United
States subsidiary of opposer. Mr. O'Brien
testified that opposer is the fourth largest
rubber company in the world, having been
founded in Japan in 1931. While the
Bridgestone Tire Company of America, Inc.
was founded in 1967, opposer since 1956. The

COPR. © 2004 The Bureau of National Affairs, Inc.




221 U.S.P.Q. 1012
(Cite as: 221 U.S.P.Q. 1012, *1013)

tires are manufactured in Japan and distributed by the U.S. subsidiary to over 1000 independent dealers across the country. Aside from tires, opposer has also sold a variety of rubber products in this country under the mark BRIDGESTONE including braided hose, conveyor belting for industrial use and rubber screens. Since 1980, opposer through another subsidiary has sold bicycles under the BRIDGESTONE mark in this country.

The testimony also indicates that since 1978 a wide variety of promotional items bearing the mark BRIDGESTONE has been distributed to the dealers handling opposer's tires. According to opposer's exhibits, these items include sweaters, jumpsuits, jackets, golf shirts, work shirts, tote bags, vests, western hats, wallets, stocking caps, picnic hampers, beverage holders, seat cushions, various desks and office supplies including letter openers, pens, pencils, clocks, address books, cigarette lighters, etc. In 1981, close to 53,000 promotional items were distributed through opposer's tire dealers. In addition, thousands of BRIDGESTONE jackets have been distributed over the years. Tennis and golf balls bearing the mark BRIDGESTONE have also been used at tennis and golf events, more fully discussed below. Finally, the testimony indicates that in September 1982, opposer shipped a number of golf shoes bearing the mark BRIDGESTONE from Japan to this country. These shoes were subsequently test-marketed at a California golf shop. Although opposer has sold BRIDGESTONE shoes in Japan for many years, the California shipment comprises the only shoes bearing the mark which opposer has sold in this country. [FN5]

Opposer's United States sales have shown marked increases over the last few years. In 1980 sales were over $175 million.

Opposer's tires have been advertised by literature distrubuted through the tire dealers as well as advertisements placed in national trade and consumer publications such as Sports Ilustrated and Time and on network television. In 1980, over $6 million was spent in advertising in this country. Opposer also promotes its name by sponsoring a variety of sporting events, some under its name, including tennis and golf tournaments, automobile and go-cart races, rodeos, and soccer and fishing events. At many of these events, its mark is prominently displayed on billboards or in official programs. As indicated above, BRIDGESTONE tennis balls have been used at some of the tennis tournaments. BRIDGESTONE T-shirts have also been given away at some of the tennis and racing events. Finally, opposer exhibits its tires at numerous trade shows including those for trucks, over-the-road and off-road vehicles, motorcycles and automotive parts. Also, opposer has exhibited its tires and conveyor *1014 belts at trade shows for mining equipment for at least the last 10 years.

Applicant took the testimony of Gregg M. Hatfield, its corporate administrator. Applicant's witness testified that applicant corporation was formed in April or May of 1980; that the first sale of BRIDGESTONE shoes was in July 1980 (over two years before opposer's sale of BRIDGESTONE shoes in this country); and that applicant imports its shoes and sells them to discounters and distributors. In addition, applicant's interrogatory answers reveal that applicant's shoes include athletic shoes, work and leisure wear, hiking shoes, sandals, house slippers and waterproof footwear; that over $700 in sales was achieved in 1981 while advertising expenses exceeded $11,000; and that applicant was aware of opposer's mark when it began use in 1980.

By its registrations and testimony, opposer has established its priority with respect to the mark BRIDGESTONE for tires for vehicles of all kinds, conveyor belts, transmission belts, hoses and other rubber products, bicycles, golf and tennis balls and the numerous promotional items indicated above. Since the respective marks are identical, the only question before us is whether the public is likely to be confused as to source upon encountering applicant's mark on shoes. We believe that confusion is very likely.

[1] While opposer did not commence using the mark BRIDGESTONE on shoes in this

COPR. © 2004 The Bureau of National Affairs, Inc.




country until after applicant's use, we believe that opposer's use of the mark on tires, bicycles, tennis and golf balls, and on a wide variety of promotional items including clothing, together with the established renown and long use of this arbitrary mark demonstrate that purchasers, upon encountering applicant's BRIDGESTONE mark on shoes, are likely to mistakenly believe that this is another product produced, sponsored or otherwise associated with opposer. It is true that opposer's evidence on the extent of use of BRIDGESTONE on many of the promotional items was imprecise, but we nevertheless believe that the testimony and exhibits are adequate to demonstrate substantial and continuous distribution of some of the items of clothing (for example, jackets) since before applicant's use. Compare Squirtco v. Tomy Corp., 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983). Such use no doubt has the effect of promoting opposer's tires but we have also recognized that the use of a mark on promotional items of clothing serves to identify the opposer as the source of the apparel to the recipients or purchasers thereof. Hurst Performance, Inc. v. Torsten Hallman Racing, Inc., 207 USPQ 671, 675 (TTAB 1980) and cases cited there. Opposer's collateral product uses give credence to opposer's argument that the public has been "conditioned" to expect a variety of products to come from opposer and establish to our satisfaction that the public is likely to believe, when it encounters shoes bearing the mark BRIDGESTONE, that opposer has exp nded its use of the mark, directly or perhaps under license, to shoes. Moreover, opposer's use of a well-recognized sports figure (Lee Trevino) prominently featured in many of opposer's tire advertisements coupled with the use of the BRIDGESTONE name in connection with numerous sporting events and some sporting goods (tennis and golf balls) enhance the likelihood of confusion when the mark BRIDGESTONE is applied to some of applicant's goods, such as athletic or golf shoes. Of course, likelihood of confusion must be found if the public is likely to believe that opposer has expanded its use of the mark when the mark is used on *any item* that comes

within the description of goods set forth by applicant. Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Finally, while opposer's items of clothing are now distributed only through its tire dealers, opposer's bicycles and balls may well be sold in the same channels of trade, e.g. retail sporting goods stores, as some of applicant's shoes.

[2] While applicant places much emphasis on its argument that shoes are not products within opposer's natural area of expansion, suffice it to say that we believe that purchasers are likely to be confused as to the source of applicant's shoes when identical marks are used on these products and on opposer's tires, bicycles, sporting goods and clothing items. If we had any doubt on this question, it would be resolved in opposer's favor. Squirtco v. Tomy Corp., supra.

## Decision
The opposition is sustained and registration to applicant is refused.

FN1 Application Ser. No. 274,218, filed Aug. 13, 1980, claiming use since July 7, 1980.

FN2 Reg. No. 711,233, issued Feb. 14, 1961; Sections 8 and 15 affidavits filed; renewed.

FN3 Reg. No. 1,098,579, issued Aug. 8, 1978.

FN4 Applicant took the testimony of Mr. Gregg M. Hatfield and a copy of the deposition was timely served on counsel for opposer. However, the deposition was not received by the Board and counsel for applicant was so advised during the oral hearing. Subsequent to the oral hearing, the deposition (with exhibits) was filed and, accordingly, said deposition is considered to be of record.

FN5 Applicant has objected to those portions of opposer's testimony which do not make clear whether opposer's BRIDGESTONE products were offered for sale in this country. That objection is well taken and our discussion of the evidence deals only with those goods demonstrated to be offered in this country.

COPR. © 2004 The Bureau of National Affairs, Inc.



221 U.S.P.Q. 1012
(Cite as: 221 U.S.P.Q. 1012, *1014)

Page   4

Krugman, Member, dissenting

I disagree with the result reached by the majority and I would dismiss the opposition. In my view, none of the goods sold under the "BRIDGESTONE" mark by opposer is sufficiently related to applicant's "BRIDGESTONE" shoes as to result in a likelihood of confusion as to origin or source. In this regard, the record reflects that opposer is primarily *1015 known as a tire company. The overwhelming percentage of sales and advertising expenditures is in connection with opposer's tires, which has resulted in opposer becoming a leader in the tire industry. Opposer's sponsorship of various sporting events and the promotional use of the mark "BRIDGESTONE" for golf and tennis balls relate primarily to opposer's tire business and such promotion reinforces people's perception of opposer as a tire company. On the record presented herein, I am not persuaded that continuous use of BRIDGESTONE on tires results in likelihood of confusion as to source when the same mark is used on shoes, a field totally removed from tires.

While opposer manufacturers and sells a variety of industrial and marine products under the BRIDGESTONE mark, these are far removed from applicant's shoes sold through the channels of trade normally associated with shoes, such as shoe stores, department stores and the like.

While the argument could be made that opposer's "BRIDGESTONE" bicycles and some of applicant's "BRIDGESTONE" shoes could be sold in the same sporting goods stores, it is my view that the products are diverse enough to preclude likelihood of confusion from their contemporaneous use under the identical mark. Moreover, the record shows that opposer's Bridgestone Bicycle subsidiary was founded in the United States after the date of first use established by applicant on shoes with bicycles being subsequently sold under the BRIDGESTONE mark later in 1980 or 1981.

While opposer has commenced at least a token use of the mark BIRDGESTONE in

connection with shoes, this shipment of shoes commenced subsequent to the opposition being filed and is entitled to very little weight.

What opposer is left with then is its sale of promotional items, including jackets and other clothing articles upon which BRIDGESTONE appears. Opposer has shown that these promotional clothing items have been distributed since 1978. However, the record shows that these items are sold not to consumers but, rather, to opposer's tire dealers who give them away to purchasers of opposer's tires. These promotional items are given away for the purpose of promoting opposer's tires and promoting opposer as a tire company. Unlike the Hurst Performance, Inc. case, supra, opposer's tires and its promotional giveaway items are not in the same field and I believe that customers familiar with opposer's tires and even those tire customers who are recipients of opposer's promotional clothing given away to promote opposer's tires would not, upon seeing applicant's shoes sold in a shoe store, sporting goods store, department store or the like, be likely to ascribe a common source or origin to the respective goods.

I would dismiss the opposition and allow the registration of applicant's mark.

P.T.O. T.T.A.B.

221 U.S.P.Q. 1012

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.





231 U.S.P.Q. 857

1986 WL 83737 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 857

(Cite as: 231 U.S.P.Q. 857)

< KeyCite Citations >

**Page    1**

**Harley-Davidson Motor Company, Inc.**
**v.**
**Pierce Foods Corporation**

Patent and Trademark Office Trademark
Trial and Appeal Board

Decided August 27, 1986

United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Class of goods – Particular cases – Not similar (§ 67.2071)**
Opposition – In general (§ 67.571)

Motorcycle manufacturer's claim, in trademark opposition action regarding its registered "Harley" marks, asserting that banners which were prominently displayed in food service areas of owner group events and which bore "Harley Owners Group" ("HOG") insignia are trademarks, because display of banners or posters where goods are sold is equivalent, for use requirement puposes, to affixation of mark to goods for purpose of creating technical trademark rights, is rejected, since members availing themselves of such services would treat presence of group's insignia merely as indication of sponsor of services and not as trademark for each individual item served.

**TRADEMARKS**
**[2] Class of goods – Particular cases – Not similar (§ 67.2071)**

Persons who have knowledge of opposer's long use and extensive promotion of "Harley-Davidson" mark for motorcycles, parts, and accessories, who are also aware of close association of nicknames "Harley" and "HOG" for these goods, and who have encountered expansion of commercial activities under these symbols to unrelated products and services, are apt to assume that applicant's "Harley-Hog" pork products sold in same channels of trade are being sold under license from opposer.

*858 Trademark opposition No. 70,159, between Harley Davidson Motor Co., Inc., and

Pierce Foods Corporation, application Serial No. 453,186, filed November 17, 1983. Opposition sustained.

Fred Wiviott, Milwaukee, Wis., for Harley-Davidson Motor Co., Inc.

Laurence R. Brown, Arlington, Va., for Pierce Foods Corporation.

Before Allen, Krugman and Cissel, Members.

Allen, Member.

Pierce Foods Corp. (hereinafter, "Applicant" or "Pierce") has filed an application for registration of the term HARLEY-HOG for "pork". [FN1] Harley-Davidson Motor Co., Inc. (hereinafter, "Opposer" or "Harley-Davidson") has opposed registration, alleging that it has previously used the marks HARLEY-DAVIDSON and/or HARLEY in the sale of motor vehicles, parts and accessories therefor, and a wide range of consumer products; [FN2] that the mark HARLEY-DAVIDSON has been used on or in connection with the aforementioned goods since 1906 and the mark HARLEY since in or before 1982; that opposer is the owner of numerous registrations of HARLEY-DAVIDSON for motorcycles, motorcycle parts and accessories, and a wide variety of consumer products, including, *inter alia,* [FN3] "model kits of motorcycles"; [FN4]"vehicles -- namely, motorcycles and golf carts"; [FN5]"parts and service manuals for motorcycles and golf carts, parts catalogs for motorcycles and golf carts, newsletters and magazines dealing with motorcycles, calendars, posters, and decals"; [FN6]"jewelry -- namely, necklaces, pins, finger rings and earrings"; [FN7]"motorcycle brake fluid and engine treatment additives, paint, motorcycle cleaners and polish, and lubricating oil and grease"; [FN8]"sun glasses and protective helmets for motorcyclists, and clothing -- namely, jackets, pants, shirts, T-shirts, vests, jeans, riding suits, bandannas, rain suits, shorts, nightgowns, halters, underwear, tank tops, sweatshirts, night shirts, socks, gloves, hats, caps and boots"; [FN9] and a long list of

COPR. © 2004 The Bureau of National Affairs, Inc.




motorcycle parts, motorcycle parts made of metal, motorcycle electric parts, accessories, and nonmetal hardware in Classes 6,7, 9, 11, 12 and 17; [FN10] that the word HARLEY is the dominant portion of opposer's mark HARLEY-DAVIDSON and opposer's motorcycles have been called HARLEYS or HARLEY by motorcycle purchasers, riders, and others involved in the motorcycle trade and opposer has come to be known by the public as "HARLEY"; that opposer's motorcycles have become known to motorcycle riders and to the public generally as HARLEY HOGS; that HOG has become synonymous with opposer's motorcycles; that opposer has formed an association of HARLEY-DAVIDSON motorcycle owners which operates under the acronym H.O.G. for "*H* og *O* wners *G* roup," publishes a newspaper for association members called "HOG TALES" and has adopted an official *859 symbol for the group comprising an eagle design, the acronym HOG, and the association name, "Harley Owners Group", all of which activities have created a close association in the minds of the purchasing public of the words HOG and HARLEY with opposer; that opposer's and applicant's goods are advertised and sold to the same customers and in the same channels of commerce; and that the mark applicant seeks to register so resembles opposer's marks HARLEY and HARLEY-DAVIDSON that confusion is likely, especially in that purchasers are likely to assume that applicant's goods originate with opposer, or are endorsed by or in some way associated with opposer.

In its answer, applicant has admitted opposer's prior use of HARLEY-DAVIDSON; that this mark has been used since 1906 for motorcycles; and that opposer owns the pleaded registrations; but has denied all other allegations of the opposition. As an affirmative defense, applicant has alleged that opposer is guilty of misuse of its marks by using its economic wealth to "expand unduly the exclusion of marks beyond the confines and scope of the HARLEY-DAVIDSON monopoly granted . . . to restrict the term HARLEY-HOG for pork . . . ." [FN11]

The record consists of status and title copies of the registrations pled by opposer, referred to, *supra*, at notes 4-10, submitted with its notice of reliance; trial testimony given by four witnesses on behalf of opposer, including 127 exhibits introduced in connection therewith; [FN12] an excerpt listing subscribers surnamed "Harley" from the Northern Virginia C&P Telephone Directory, copies of certain third-party registrations of marks comprising "HARLEY" in whole or in part, and an excerpt from applicant's price list, submitted by applicant with its notice of reliance filed October 31, 1985. [FN13] The material submitted by opposer during the period for rebuttal testimony is excluded as not constituting proper rebuttal. [FN14]

Both opposer and applicant have filed briefs and both were represented at a hearing during which oral arguments of the issues was heard by this panel. For the reasons which follow, we sustain the opposition and refuse registration of HARLEY-HOG to applicant.

Harley-Davidson was founded in 1903 and is the only remaining manufacturer of motorcycles in the United States. Its sales of motorcycles and motorcycle parts and accessories during the years 1974 to June 1985, all under the HARLEY-DAVIDSON trademark, have amounted to more than 2.1 billion dollars. Over the same period, Harley-Davidson spent approximately 60 million dollars in advertising its products. We are persuaded by opposer's evidence that HARLEY-DAVIDSON is a well-known trademark in the field of its principal products.

In addition to motorcycles, and motorcycle parts and accessories, Harley-Davidson and its licensees sell under the HARLEY-DAVIDSON trademark a large number of diverse consumer products. This part of opposer's business had its beginnings in the sale of articles which had a close relationship to motorcycling, stimulated in part by the fact that many owners of motorcycles have considered their motorcycles as more than just vehicles, *860 and motorcycling as more than just a means of transportation. Thus, as a

COPR. © 2004 The Bureau of National Affairs, Inc.

Westlaw.                                                                        Westlaw.

consequence of this special attraction, from an early date, motorcycle manufacturers promoted the use of their trademark and corporate symbols in connection with motorcycle racing, motorcycle rallies and motorcycle clubs. The formation of motorcycle clubs, frequently limited in membership to owners of particular brands led to a camaraderie which quite naturally resulted in the promotion and sale of accessories of all kinds, wearing apparel, protective gear, etc., bearing the motorcycle trademark. It is clear from the evidence that opposer was no exception to the development of these promotional opportunities and, indeed, was one of the leading companies in the use of its trademarks in connection with collateral products. In fact, the sale of collateral products under the HARLEY-DAVIDSON trademark has been extensive in terms of the volume of sales and expansive in terms of the variety of products added to the line of collateral goods over the years.

Beginning in 1982, Harley-Davidson launched an expanded marketing program for the promotion and sale of collateral products bearing the HARLEY-DAVIDSON mark. This program had a dual purpose. The first was to combat the increasing amount of unauthorized third-party use of Harley-Davidson's trademarks by infringers seeking to capitalize on the popularity of these marks. To fulfill this purpose, the expanded licensing program was coupled with substantially increased trademark enforcement activities. The second purpose was profit-oriented, the objective being to add to opposer's revenue from direct sales of motorcycles and related products, royalty income from the sale of unrelated products by licensees.

As a result of the licensing program, the sale of consumer products under the mark HARLEY-DAVIDSON was expanded to include such diverse products as wallets and pouches, drinking cups and pitchers, key fobs, jewelry, mugs, cookie jars, wall plaques, knives, belt buckles, belts, boots and boot cream, ashtrays, bumper stickers, glue, clocks, cigarette lighters, books, posters, playing cards, matches, banks, sun glasses, beer, wine coolers, chocolate bars, numerous clothing items for men, women and children, including leather and denim jackets, pants and vests, cloth jackets, shirts, T-shirts, sweatshirts, riding suits, rain suits, caps, aprons, pajamas, gloves, knit hats, scarves, leg warmers, suspenders, boots, and hats.

The principal marketing mode for this expanded line appears to have been by catalog sales, based on catalog distribution twice a year to approximately one million motorcycle owners. Sales to motorcyclists have also been carried out through opposer's dealers. However, with the launching of the licensing program, opposer's retail channels of trade have expanded from the motorcycle dealerships into general merchandising stores such as *Target, K-Mart, Sears Roebuck, J. C. Penney,* and highway rest stops. Its advertising has likewise expanded from motorcycle publications to publications in general circulation such as *Playboy, Penthouse, Hot Rod, Car Craft, National Lampoon, Sports Illustrated, Rolling Stone* and *Motor Trend.*

There is no doubt, based on opposer's evidence, that HARLEY is perceived by relevant purchasers as the dominant portion of the HARLEY-DAVIDSON trademark. This fact is demonstrated in the first instance by the widespread use of HARLEY as a nickname for opposer's motorcycles, and in the second instance by opposer's own use of it as a trademark for motorcycles and motorcycle parts, and as a trade name in advertising and promotional materials to indicate HARLEY-DAVIDSON motorcycles and related goods. The uses of HARLEY by the public as well as by opposer have been so extensive that, to an appreciable number of persons, there is no doubt that HARLEY is synonymous with HARLEY-DAVIDSON.

We are also persuaded by the evidence that the word HOG has come to be known among motorcycle enthusiasts and, to some extent, among the general public, as a nickname for opposer's motorcycles. Apparently the nickname originated some thirty years ago rather spontaneously from owners who facetiously described their HARLEY-

COPR. © 2004 The Bureau of National Affairs, Inc.

Case 3:04-cv-00465-JGH   Document 11-3   Filed 08/20/04   Page 37 of 42 PageID #: 154

DAVIDSON motorcycles as "HOGS" due (some think) to their large and imposing appearance compared to competitive motorcycles (particularly the early big Harley-Davidson models such as the *Electra Glide* Series) and the fact that HARLEY-DAVIDSON motorcycles were frequently loaded with accessories of all kinds. Thus, a so-called "fully dressed" HARLEY-DAVIDSON motorcycle was referred to as a "Harley Hog".

Opposer has capitalized on the popularity of this nickname in a variety of ways. For example, it has promoted and sold items such as banks, cookie jars and drinking mugs, all in the shape of a Hog and all bearing the HARLEY-DAVIDSON trademark. The sale of such items has been substantial. Another item sold by opposer is a bumper sticker with the phrase, "Have You Hugged Your Hog Today?" Clothing has been sold bearing the phrase, "I Love My Hog Harley." Tents erected by opposer at motorcycle rallies and races have been designated "Hog Centers," *861 indicating places where HARLEY owners attending these events can gather to socialize and have refreshments such as beer, soft drinks and hot dogs. Opposer has even used the term HOG and a Hog Bank as a theme in a major advertising campaign. [FN15]

Also as a direct consequence of the association between the word HOG and Harley-Davidson, motorcycle owners' club was formed and sponsored by opposer utilizing the initials H.O.G. and the name *"H* arley  *O* wners  *G* roup" to designate the club. Since it was founded, the H.O.G. club has sponsored over 180 motorcycle events mostly in conjunction with national motorcycle races or meets. The term HOG is extensively used in connection with the activities of the club, and as the name of its publication, named HOG TALES. It also forms an important part of the club's insignia reproduced below,



which is used on banners displayed at the HOG club events, on arm patches, pins, decals, as a trademark for miscellaneous products (e.g., rings, sports shirts, charms, watches, baseball caps, plaques with brass hooks, desk clocks, belt buckles) sold by the club, and in a large variety of other ways.

In the absence of any testimony by applicant, we know nothing about its goods and activities other than what can be ascertained or presumed from the application file and the one document, applicant's price list, which we have treated as stipulated evidence, *supra*, note 14. The specimen labels demonstrate use of HARLEY-HOG by applicant on pork grill patties, a ready to fry ground pork product, seasoned with barbecue sauce. However, in that the identification of goods is "pork", with no limitations as to the kind of products comprised therein, we must presume, in determining the issues before us, that all kinds of pork products are included in applicant's registration request. In applicant's price list, the product is listed with the following description:

Harley Hog(R) .  Here's a new king-of-the-road!  A superbly delicious old plantation Southern-style sweet and sour barbecue sauce is blended into the tender pork (processed from high quality market type hogs to 80% lean from ground shoulders and loins) to make this formed "rounded-rib" shape cutlet a hot grill favorite. Pan fry or grill in six minutes.  "Harley" was the hit of the 1983 National Frozen Food Convention.

It is of interest to note that on the page of the price list which was offered in evidence by applicant, there are several other pork products bearing names (all claimed as trademarks) which constitute "plays" on the words HOG or PIG, namely, COUNTRY-PIG,

COPR. © 2004 The Bureau of National Affairs, Inc.

PRIME-PIG, HOG-WILD, PIG WICH and HOT HOG.

The only contested issue before us is whether HARLEY-HOG so resembles the marks previously registered and/or used by opposer as to be likely when applied to applicant's pork, to cause confusion, mistake or deception.

In arguing that confusion is likely, opposer devoted a considerable portion of its brief and oral argument to the proposition that it had acquired prior technical trademark rights in the combination of HOG and HARLEY OWNERS GROUP for food products, including pork, and that the contemporaneous use of that combination of marks and applicant's mark HARLEY HOG is likely to result in public confusion. We are not persuaded by this part of opposer's argument.

[1] The only basis for opposer's claim of trademark rights in HOG/HARLEY OWNERS GROUP is the display of the "Harley Owners Group" club insignia, reproduced, *supra*, on large banners at events sponsored by the club. These banners were displayed prominently in the food service areas of the H.O.G. tents at which opposer served club members a variety of food and beverages, including hot dogs, pork barbecue and other meat dishes. *862 The food served at these events was complimentary to dues-paying members of the "Harley Owners Group".

The legal foundation for opposer's claim rests on an interpretation of part of the definition of "use in commerce" of a trademark which was an innovation with the 1946 Lanham Act, namely, that use of a mark on a "display associated with the goods" is equivalent to affixation of the mark to the goods or packages therefor for the purpose of creating technical trademark rights. There is no question, of course, as the decisions cited by opposer, reply brief, 3, have held, [FN16] that the display of a mark on banners or posters located in retail establishments where the goods are sold satisfies the use requirement of the statute under this added language. However, opposer's analysis ignores the

requirement that the display be an *associated* display. Thus, it is an over simplification of the definition to conclude that a mark is used in commerce whenever it is displayed on a poster or banner so long as the goods in respect of which trademark rights are being claimed are also present at the same general location. In order to satisfy the definitional requirement, it is also necessary that the display of the alleged mark be such that purchasers would relate it to the goods, whether or not they are in proximity to the display. *See, e.g.,* Car-X Service Systems, Inc. v. Exxon Corp. 215 USPQ 343, 345 (TTAB 1982), and cases cited therein. In *Car X,* noting that purchasers of products and services at gasoline service stations are well aware of the fact that numerous products are sold there under brand names other than the name of the service station, we concluded that purchasers would not automatically and directly associate the service station name with such products as oil filters and batteries. Similarly here, it seems to us that H.O.G. members availing themselves of the food services provided by opposer would treat the presence of the club's insignia on the banners at the same location merely as an indication of the sponsor of those services and not as a trademark for each of the individual items of food and drink served to the members at the sponsored event. Accordingly, we conclude that this use of the combination of HOG and HARLEY OWNERS GROUP is not a technical trademark use of these terms for pork products.

In reaching the above conclusion, we do not suggest that the diverse uses of HOG and HARLEY in relation to activities of the "Harley Owners Group", including consumer products sold on which the club insignia is used, do not have an impact on the likelihood of confusion issue. Thus, while the use on the H.O.G. tent banners does not constitute trademark use for the food products served in the tents, there is no question that use of this insignia is use in advertising of the restaurant services rendered by opposer to members of the "Harley Owners Group". Thus, the use of HOG and HARLEY in connection with these services is but another of the myriad

COPR. © 2004 The Bureau of National Affairs, Inc.



commercial activities of opposer in which these symbols are associated with opposer and opposer's goods.

[2] The above point leads us to consider what, in our view, is the crux of the likelihood of confusion issue in the instant case, namely, whether persons having knowledge of the long used and extensively promoted HARLEY-DAVIDSON mark for motorcycles and parts and accessories therefor, being also aware of the close association of the nicknames HARLEY and HOG for these goods, and having more recently encountered the expansion of Harley-Davidson's commercial activities under these symbols to unrelated products and services sold and promoted in ordinary consumer channels of trade, are apt to assume, erroneously, that HARLEY-HOG pork products sold in the same channels of trade are being sold under that mark under a license from opposer. We conclude that this genre of confusion is likely.

Although it may not always have been the case, there is now no question under our trademark law, as interpreted by the Court above and this Board, that likelihood of confusion must be found if the public, being familiar with a senior party's use of a mark for particular goods, and seeing the mark on an item which comes within the description of goods set forth in a junior party's application, is likely to believe that the senior party has expanded its use of the mark, directly or under license, to such items. *E.g.*, Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); Squirtco v. Tomy Corp., 697 F.2d 1034, 216 USPQ 937 (Fed. Cir. 1983); Berghoff Restaurant v. Washington Forge, Inc., 225 USPQ 603, 608 (TTAB 1985); Broadway Catering Corp. v. Carla Inc., 215 USPQ 462, 465 (TTAB 1982); Bridgestone Co. v. Bridgestone Trading Co., 221 USPQ 1012, 1014 (TTAB 1984); Hurst Performance, Inc. v. Torsten Hallman Racing, Inc., 207 USPQ 671, 675 *863 (TTAB 1980). The last of the above cited decisions is particularly apposite on its facts to the case before us. Hurst Performance had long used the letter "H" as a trademark identifying high performance racing vehicles

and had expanded its use of this well knowledge mark to a variety of automotive products as well as unrelated goods (e.g. T-shirts, caps, embroidered patches, wearing apparel, etc.) which were promoted and sold to racing enthusiasts in ordinary channels of trade. Based on this expanded use of the mark, albeit its primary significance was in regard to high performance racing vehicles, the Board was persuaded that applicant's use of the letter "H" on wearing apparel for racing, namely, pants and gloves, would likely be mistakenly attributed to the owner and the registrant of the same mark for high performance automobiles.

In many of the above cases, the fact that the purpose behind the expanded use of the mark on collateral goods was promotional was held immaterial if, in fact, there was a likelihood of confusion due to the use of the mark for the collateral goods. *E.g. Squirtco*, supra, 216 USPQ at 940. The *Squirtco* court also rejected defendant's arguments of nonlikelihood of confusion because the goods described in the applicant were, in fact, sold in limited channels of trade rather than to ordinary purchasers, since such limitation was not set forth in the application for registration. Thus, applicant's contention that its HARLEY-HOG pork products are sold only in institutional channels of trade to restaurants is to no avail.

The third-party registrations and telephone directory listings introduced by applicant, apparently to show that HARLEY lacks distinctiveness, is not probative evidence of nondistinctiveness. As the court above has made clear in numerous decisions, the only probative value of third-party registrations in a proceeding concerning the question of confusing similarity, absent a showing that the marks subject of the third-party registrations are in use, is to show the meaning of a mark, or of a portion thereof, in the same way that dictionaries are used. *See,* cases collected in Bottega Veneta, Inc. v. Volume Shoe Corp., 226 USPQ 964, 968 (TTAB 1985). Accordingly, although "Harley" is unquestionably a surname, the name of one of the founders of opposer, the fact of its registration on the Principal Register, *supra,*

COPR. © 2004 The Bureau of National Affairs, Inc.





Case 3:04-cv-00465-JGH   Document 11-3   Filed 08/20/04   Page 40 of 42 PageID #: 157

note 12, and the absence of any evidence of use of this surname for any other goods, totally rebuts any claim of nondistinctiveness. The telephone directory listings are likewise immaterial absent any proof of the proprietary use of the surnames for other goods.

More significantly, it seems to us, applicant's price list is totally inconsistent with applicant's weakness claim in that the listing in this price list for HARLEY-HOG unquestionably demonstrates that applicant itself considers the mark HARLEY-HOG to indicate opposer's motorcycles. Although there is no testimony concerning this listing -- applicant having offered none --, there is no other conceivable explanation for the juxtaposition of HARLEY-HOG with the sentence, "Here's a new king-of-the-road!" than that applicant adopted this mark believing it would be associated with Harley-Davidson products. In the light of this evidence, applicant's argument that HARLEY is nondistinctive is disingenuous.

That the mark HARLEY-HOG used on pork products is likely to be associated as to source with opposer is also corroborated by the fact that opposer's uses of HARLEY and HOG in relation to its collateral goods frequently have been whimsical in character (e.g., HOG piggy banks, T-shirts bearing the phrase, "I LOVE MY HOG HARLEY," "the HOG Tales" publication, etc.). Because of these uses, a person having knowledge of them would not be surprised to see HARLEY-HOG used in connection with hot dogs or similar products, and the association with opposer of the mark so used would also be not at all surprising.

The likelihood of confusion is further enhanced by the fact that opposer's line of products has been extended to include such goods as beer, wine coolers and chocolate bars. While these products are different than pork, the fact that beer and hot dogs or pork sausages are frequently consumed together, for example, is significant. *See, e.g., Berghoff Restaurant,* supra, 225 USPQ at 608.

Finally, we reject applicant's argument that its use of HARLEY-HOG is not damaging to opposer. While opposer's market for its collateral goods consists primarily of motorcycle owners, this market is not insignificant. For example, as we pointed out, opposer's catalogs are circulated to more than one million motorcycle owners, clearly an appreciable number of purchasers. If applicant's HARLEY-HOG pork is of poor quality, the ill will may seriously impair Harley-Davidson's reputation. Indeed, opposer's launching of its licensing program with a view to expanding use of its marks on collateral goods was stimulated in part by concern over unauthorized uses by others. Accordingly, there is no question that the appropriation of HARLEY-HOG by applicant is a *864 serious intrusion on opposer's good will. In fact, if there were any doubt about this, it seems to us the fact that applicant adopted the mark believing it would be associated with opposer is, in and of itself, strong evidence of the likelihood of confusion. From such evidence, damage may be presumed. See, *e.g., Time, Inc.* v. Ultem Publications, 96 F.2d 164, 37 USPQ 559, *per curiam* (2d Cir. 1938); *Broadway Catering,* supra 215 USPQ at 465. As the court in *Time* said:

"Imitation may supply the place of proof; the plagiarist's motive can only be of some advantage to himself, which is most likely to be, in part at any rate, the likelihood that his wares will be taken as [the] first comer's."

Decision: The opposition is sustained and registration to applicant is refused.

FN1 Serial No. 453,186, filed November 17, 1983.

FN2 Among the goods opposer allegedly sells under one or both of these marks are the following: motorcycles, motorcycle parts, clothing, jewelry, first-aid kits, medallions, sun glasses, battery chargers, protective motorcycle crash helmets, and luminous signs, electric lamps, key fobs, posters, paper decals, playing cards, wallets, decorative wall plaques, mirrors, mugs, drinking cups, towels, T-shirts, jackets, blue jeans, sweat shirts, underwear, night shirts, bandannas, headwear, socks, boots, aprons, belts, suspenders, embroidered patches, belt buckels [sic], lapel pins, ashtrays, cigarette lighters, tank tops, halters, panties, hats, caps, candy,



cleaners, polish, lubricating oil, grease, leather dressing, brake fluid, engine treatment additives, printed manuals, newsletters, magazines calendars, gloves, mittens, rainsuits, knives, clocks, drinking glasses, pitchers, trays, Christmas tree ornaments, children's clothing, beer steins, piggy banks, books, toys, and radios. In addition, as a natural expansion of these goods, opposer has sold food and beverage items such as beer and chocolate under its marks.

FN3 Recitation of the particulars of registrations alleged by opposer herein has been limited to those which were subsequently made of record in this proceeding. See, *infra,* opposer's notice of reliance filed August 29, 1985.

FN4 Registration 947,170, issued November 14, 1972; affidavit §8 accepted, §15 received.

FN5 Registration No. 1,078,871, issued December 6, 1977; affidavit §8 accepted, §15 received.

FN6 Registration No. 1,219,955, issued December 14, 1982.

FN7 Registration No. 1,223,355, issued January 11, 1983.

FN8 Registration No. 1,230,734, issued March 15, 1983.

FN9 Registration No. 1,234,404, issued April 12, 1983.

FN10 Registration No. 1,255,091, issued October 25, 1983.

FN11 In its answer, applicant made a variety of other allegations labeled affirmative defenses. However, these are deemed relevant only to support applicant's denials of opposer's allegations, and they will be so treated. The misuse defense has not been the subject of any evidence by applicant and is probably a frivolous pleading in view of the barrenness of applicant's record and its failure even to attend and question opposer's witnesses at the taking of their trial testimony.

FN12 Among opposer's exhibits is a copy of its registration of HARLEY for "motorcycles." (Registration No. 1,352,679, issued August 6, 1985) *See,* Piehl deposition, exhibit 119. It appears that a

status and title copy of this registration could not be secured by opposer in time to be submitted with its notice of reliance. Although not pleaded, absent any objection by applicant, we treat the opposition as having been amended to include this registration as one of those relied upon by opposer. FED. R. CIV. P. 15(b) (1985).

FN13 Other documentary materials submitted with applicant's notice of reliance were excluded by our interlocutory decision mailed January 8, 1986 determining opposer's contested motion to exclude this evidence on the ground that the documents submitted did not fall under any of the categories of documents which may be introduced by means of a notice of reliance. Trademark Rule 37 CFR § 2.122(e) (1985). The price list was one of the items held inadmissible under the rule. However, in that opposer specifically did not object to its admission, see motion filed November 12, 1985, p. 3, and since applicant has offered it, we treat the price list as part of the record as if its admission had been stipulated.

FN14 The material, an excerpt from the December 2, 1985 issue of *Forbes* containing an article headed "Harley's Hogs," is clearly case-in-chief material, not rebuttal. *See, e.g.,* Sigma Chemical Co. v. Medical & Technical Summaries, Inc., 144 USPQ 688 (TTAB 1965). To introduce this evidence opposer's only recourse was to move to reopen its testimony period for the purpose of introducing the newly discovered evidence. The rebuttal period cannot be used for case-in-chief material since that procedure leaves applicant with no opportunity to introduce evidence in rebuttal.

FN15 Interestingly, the main advertising message was: "A Harley may be called a Hog. But don't be confused. There's no better place to put your money." The idea of the ad was to promote the fact that HARLEY-DAVIDSON motorcycles were economical.

FN16 Cited are: Roux Laboratories, Inc. v. Clairol Inc., 427 F.2d 823, 166 USPQ 34 (CCPA 1970) and In re Kahn's Sons Co., 343 F.2d 475, 145 USPQ 215 (CCPA 1965).

P.T.O. T.T.A.B.

231 U.S.P.Q. 857

COPR. © 2004 The Bureau of National Affairs, Inc.




231 U.S.P.Q. 857
(Cite as: 231 U.S.P.Q. 857, *864)

Page   9

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.



