231 U.S.P.Q. 484
1986 WL 83712 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 484
(Cite as: 231 U.S.P.Q. 484)
< KeyCite Citations >

**Page   1**

The Black and Decker Manufacturing
Company
v.
Big Yank Corporation

Patent and Trademark Office Trademark
Trial and Appeal Board

Decided August 28, 1986

As amended September 17, 1986

United States Patents Quarterly Headnotes

TRADEMARKS
[1] Class of goods -- Particular cases -- Similar (
§ 67.2073)
Identity and similarity -- Words -- Similar (§
67.4117)
   Concurrent use of "Work-Mates," and "Work-
Mates by Big Yank," for shirts, jackets, and
pants, and "Workmate," for combined portable
workbench and vise, is likely to cause
confusion.

   *484 Trademark opposition No. 65,281, by
The Black and Decker Manufacturing
Company, *485 against Big Yank
Corporation, application, Serial Nos. 257,370
and 257,371, both filed April 9, 1980.
Opposition sustained.

   Mercer L. Stockwell, Jamie Johnson, and
Rogers, Hoge & Hills, all of New York, N.Y.,
and Edward D. Murphy, Towson, Md., for The
Black and Decker Manufacturing Company.

   Donald J. Fitzpatrick and Ronald L.
Aylward, both of St. Louis, Mo., for Big Yank
Corporation.

   Before Sams, Rice, and Simms, Members.

   Simms, Member.

   The Black and Decker Manufacturing
Company has opposed applications of Big
Tank Corporation to register the marks
WORK-MATES and WORK-MATES BY BIG
YANK for "men's, women's and children's

apparel, namely work shirts, jackets and
pants." [FN1] Opposer asserts that applicant's
marks for its items of clothing so resemble
opposer's previously used and registered mark
WORKMATE for combined portable
workbench and vise [FN2] as to be likely to
cause confusion.  Opposer also asserts that it
has previously used the mark WORKMATE
on certain accessories including clamp
attachments, saw and mitre guides, router and
shape guides and drill guides. Applicant has
denied the essential allegations of the
opposition and has asserted as an affirmative
defense that opposer does not have exclusive
rights to use the mark WORKMATE since
very similar terms are registered to others.

   The record of this case consists of testimony
(and exhibits) taken by both parties, a
discovery deposition of the president of
applicant's advertising agency, relied upon by
opposer's notice, discovery responses of both
parties relied upon by notice, printed
publications and official records relied upon by
applicant by notice, status and title copies of
opposer's pleaded registration, and the
application files.

   Because opposer is relying upon a
registration, there is no issue with respect to
priority.  The only issue before us is whether
applicant's marks as applied to the goods set
forth in the applications so resemble opposer's
previously used and registered mark as to be
likely to cause confusion.  We find that
confusion is likely.

   Since 1974, opposer has used the mark
WORKMATE for portable workbenches
(which opposer calls work centers) and various
accessories and attachments. Sold in hardware
stores, home centers, catalog showrooms,
discount stores, mass merchandising outlets
and drugstores, over three million
WORKMATE work centers and more than one
million WORKMATE attachments have been
sold.  This has amounted to over $200 million
in sales.  Opposer has spent over $25 million
on the promotion of its WORKMATE products
since their introduction, most of which has

COPR. © 2004 The Bureau of National Affairs, Inc.



Case 3:04-cv-00465-JGH   Document 11-4   Filed 08/20/04   Page 2 of 37 PageID #: 161

been spent on television advertising. Opposer's goods have been advertised in do-it-yourself magazines such as *Popular Mechanics* and magazines of general interest such as *Newsweek* and *Better Homes and Gardens.* Opposer's goods have also appeared at trade shows.

The testimony also reveals that opposer has engaged in cooperative promotions with other manufacturers. For example, opposer and Loctite Corporation promoted opposer's WORKMATE products and Loctite's DURO adhesives together whereby a customer purchasing a WORKMATE workbench would receive certain WORKMATE clamps free of charge as well as certain DURO Products. Another cooperative program was entered with The Coca-Cola Company. Finally, the evidence demonstrates that opposer received a number of unsolicited requests for licenses to use the house mark BLACK & DECKER and other marks including WORKMATE for such goods as work clothing. One such proposal was given serious consideration by opposer over a number of months, with proposed labels, advertising and sample products developed, but was eventually rejected. Opposer also received an unsolicited inquiry from a trademark licensing company requesting an opportunity to represent opposer in licensing opposer's marks on such goods as "shirts, pants, outerwear, socks and footwear." While opposer never entered into any license arrangement, it does appear that opposer has distributed to the trade, its sales people and in some instances to the public in connection with sales promotion programs such items of clothing as knit hats, aprons, caps and belts bearing the mark BLACK & DECKER. The BLACK & DECKER apron was offered to the public in a direct mailing to 400,000 customers in 1982. Also, in connection with a fall 1982 campaign of television advertising, 400 WORKMATE windbreaker jackets were distributed to certain key buyers as promotional items. Market research which opposer had conducted prior to this litigation revealed that among a target market of men over 25 in households having two or more power tools the unaided recognition level of *486 opposer's mark was about 85%, the

target market comprising approximately one half of the households in the United States.

With respect to applicant's mark, the testimony reveals that the mark was conceived in late 1978 to suggest a series of coordinated work apparel. Labels were prepared in 1978 and 1979 and the mark was first used on goods recited in this application in March 1980. Despite the fact that applicant has expended virtually no money in connection with the advertising or promotion of its products, the sales over the years have exceeded $60 million. Applicant's goods are sold through mass merchandisers such as K-Mart and other retail outlets.

Much testimony and argument has centered on a letter written on January 18, 1980 by Bernard Stoll, the president of applicant's advertising agency, to opposer. That letter, which seeks to associate applicant's workwear with opposer's WORKMATE products, is excerpted below:

> We are considering a national campaign for carpenter, work, etc. pants that will be called WORKMATE. The idea is to use the Black & Decker Workmate logo that would go on the back pocket of the pants (as enclosed). I am sure you are aware of the tremendous popularity of the use of designer names in the same manner. This takes the idea a step further -- tying the pant in with a major company engaged in the work and hobby field. Since there is a specific style that is selling well ("carpenter" pants), I thought this would be a natural promotional opportunity. This is not a gimmick promotion since Big Yank has been a major company in the work and apparel field for 75 years.
>
> I personally chose Black & Decker because of the quality of your company and the recognition of the product name . . .

Mr. Stoll proposed that opposer authorize use of its WORKMATE trademark. Six weeks later, opposer informed applicant's advertising agency that it did not wish to have its marks used on goods not produced and marketed by

COPR. © 2004 The Bureau of National Affairs, Inc.

 

231 U.S.P.Q. 484
(Cite as: 231 U.S.P.Q. 484, *486)

Page 3

it. When called to testify, Mr. Stoll could not recall if he had told applicant that he was writing or had written such a letter to opposer, although at one point he said he might have. Applicant takes the position that this letter from its advertising agency was written neither with its knowledge or approval.

Applicant's record also includes testimony of an officer of Midmark Corporation, a successor in interest to an entity with whom opposer settled an opposition proceeding. That settlement led to the registration by Midmark's predecessor of the mark WORKMATE for the following attachments to earthmoving equipment: "power actuated trenching units, backhoes, backfill blades, boring units and vibratory plows" (Registration No. 1,139,167, issued September 2, 1980). Finally, applicant's testimony reveals there have been no reported instances of actual confusion.

[1] While the issue of likelihood of confusion is not without doubt, we believe this record supports a finding that confusion is likely as a result of applicant's use of the marks sought to be registered for workshirts, jackets and pants. The similarities in the marks of the parties far outweigh their differences. Applicant's mark WORK-MATES differs only by the addition of a hyphen and the letter "s". Moreover, the addition of the phrase "BY BIG YANK" to the mark WORK-MATES does not, under the circumstances of this case, detract from the likelihood of confusion. That is, potential purchasers of applicant's clothing may well expect that a company under license to produce clothing for opposer would identify itself on any tags or labels affixed to goods.

There is no doubt that the goods of the parties are specifically different. However, it is not necessary that the goods be similar or competitive to support a holding of likelihood of confusion, it being sufficient that they are so related or that conditions surrounding their marketing are such that they are encountered by the same persons who, because of the relatedness of the goods and the similarities of the marks, would believe mistakenly that the goods originate from or are in some way associated with the same producer. Hercules Inc. v. National Starch and Chemical Corp., 223 USPQ 1244, 1247 (TTAB 1984). In this regard, while not conclusive to the outcome of this case, we note that the goods of the parties do travel in some of the same channels of trade, including mass merchandising outlets and, in some instances, general merchandise hardware stores that also sell work clothing. Moreover, opposer's argument that applicant's work clothing may be worn by a user of opposer's workbenches is not without some persuasiveness.

This record also supports the fact that a number of companies have licensed relatively well-known marks (for example, COCA-COLA, CHAMPION, FIRESTONE, DUNLOP, GOODYEAR, etc.) in connection with clothing. While this record does not establish the fact that applicant authorized its advertising agency's proposed license arrangement with opposer ("a natural promotional opportunity"), it does at least buttress our belief that purchasers may associate work *487 clothes, offered under very similar marks, with opposer's WORKMATE products. Also entitled to consideration is the fact that opposer has distributed a number of items of apparel bearing the house mark BLACK & DECKER and the product mark WORKMATE. See Squirtco v. Tomy Corp., 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983) and Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986 (CCPA 1981). Finally, the fame of opposer's trademark should also be considered inasmuch as it may increase the likelihood of belief that applicant's apparel is produced or sponsored by opposer. Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984). A strong mark is more likely to be remembered and more likely to be associated by consumers with a greater variety of goods.

Decision: The opposition is sustained and registration to applicant is refused.

FN1 Serial Nos. 257,370 and 257,371, both filed April 9, 1980, claiming use since March 14, 1980.

COPR. © 2004 The Bureau of National Affairs, Inc.





231 U.S.P.Q. 484
(Cite as: 231 U.S.P.Q. 484, *487)

Page   4

    FN2 Registration No. 1,057,371, issued February 1,
    1977, Sections 8 and 15 affidavits filed.

P.T.O. T.T.A.B.

231 U.S.P.Q. 484

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.





Not Reported in F.Supp.
1995 WL 241875 (S.D.N.Y.)
**(Cite as: 1995 WL 241875 (S.D.N.Y.))**
< KeyCite Red Flag >

Only the Westlaw citation is currently
available.

United States District Court, S.D. New York

INTERNATIONAL STAR CLASS YACHT
RACING ASSOCIATION, Plaintiff,
v.
TOMMY HILFIGER U.S.A., INC., Defendant.

No. 94 Civ. 2663 (RPP).

April 26, 1995.

Ross & Hardies, New York City by J. Joseph
Bainton, for plaintiff.

Gursky & Blau, New York City by Steven B.
Blau, for defendant.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District
Judge.

*1 Plaintiff International Star Class Yacht
Racing Association (the  "Association") brings
this action for damages and injunctive relief
against Defendant Tommy Hilfiger U.S.A.,
Inc. ("Hilfiger") pursuant to Section 43(a) of
the Lanham Act, 15 U.S.C. § 1125, Section
368-d (Injury to Business Reputation and
Dilution) of the New York General Business
Law, and common law trademark
infringement and unfair competition. [FN1]
Jurisdiction of the Court is invoked under the
Lanham Act and 28 U.S.C. §§ 1332 and
1338(b) in that this action arises under an Act
of Congress relating to trademarks, and
Plaintiff is asserting state law claims in
conjunction with said trademark infringement
claims.   Venue is pled in this district
pursuant to 28 U.S.C. § 1391(b) and (c).

The Complaint charges common law
trademark infringement and unfair
competition, false designation of origin under
Section 43(a) of the Lanham Act, and injury to
business reputation and dilution of trademark
under Section 368-d of the New York General

Business Law, arising out of the Defendant's
causing the words "Star Class" and the
emblem "*" to be placed on its garments
which Plaintiff asserts infringes on its emblem
and non-registered trademark "Star Class."
Trial was held on January 9 and 10, 1995.

This Opinion and Order constitutes the
Findings of Fact and Conclusions of Law of
the Court.

*Background*

Plaintiff is a not-for-profit corporation duly
organized and existing in Illinois in 1922 and
with its principal place of business in that
state. Stip.Facts at ¶ (II)(A).   Defendant is a
corporation duly incorporated and existing in
the state of New Jersey.  *Id.* at ¶ (II)(B).

Prior to the formation of the Association, a
man named George Corry, together with other
yachting enthusiasts, designed a small yacht
for racing in 1910 to improve on another class
of small yachts called the "Bug," and named
the new boat the "Star."   Pl.Ex. 1 (C. Stanley
Ogilvy, *A History of the Star Class* [Association
1991] ) at 8.   The first "Star" was built in Port
Washington, New York, and the following
year the first 22 Star yachts ordered to be
built according to the new design were
delivered to buyers.  *Id.*   The single design was
important to racing enthusiasts since it sought
to eliminate the equipment variable in racing
and to increase the importance of a two-person
crew's prowess in sailing races confined to
boats of that class.

Since 1911 over 7700 Star boats have been
built and almost 2000 are still in use
throughout the world.   The Association,
whose stated object is "to promote, develop
and govern Star Class racing throughout the
world, under uniform rules," Stip.Facts at ¶
(IV)(B), has prospered accordingly.   It is
divided into twenty districts, each comprising
a group of fleets in a given locality, and
consisting of nine districts in North America,
six in Europe, three in South America, and
one each in Australia and Africa.   These

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *1 (S.D.N.Y.))

Page 2

districts include 170 fleets with over 2000 members.   In the United States there are almost 600 members.   Tr. at 49 (Burgess); 203 (MacCausland). [FN2]

*2 The Association does not manufacture, build or sell Star yachts, Stip.Facts at ¶¶ (IV)(G-H), but maintains a register of existing "Star Class" boats.   In order to be registered, a builder must purchase from the Association an official set of plans and specifications and an identification number for the boat.   Tr. at 86-105 (MacCausland).   The builder's methods must be approved before construction begins. After construction the boat is measured and weighed by Association representatives, and the Association issues a measurement and weight certificate and a vessel number if its specifications are met.   The boat's sails must also comply with strict measurement and construction requirements, and must display the vessel's number and the "Star Class" number and Emblem, a solid red five-point star (unless the owner's racing record warrants the display of a solid green, blue, silver or gold five-point star).   "A yacht is eligible and considered to be in the Star Class only if it has been properly registered, conforms to measurement rules and is owned by a qualified active or life member recorded at the time as in good standing with the Association."   Stip.Facts at ¶ (IV)(E) (Rules of the Association at ¶ 2.1).   The Association supports itself by charges to boat manufacturers for the use of design plans, royalty fees for certifications, and by the dues of its members.

In addition to Star Class races conducted by each fleet, the Association holds annual championships and other regattas around the world.   Before any championship race the weight and measurements of each Star Class entry are checked.   With the exception of 1976, Star Class yachts have raced in each Summer Olympic game since 1932.   These races receive considerable media coverage. *See* Plaintiff's First Request to Take Judicial Notice, Volumes One and Two, Filed July 1, 1994.

The Association publication "Log of the Star

Class," first published in 1922, contains records of all Star Class regattas, the Star Class constitution and by-laws, a set of Star Class racing rules and a register of the existing Star Class yachts.   *See* Pl.Ex. 2 ("1993 Log of the Star Class").   The "Log of the Star Class" specifies the manner in which Association and fleet officers are to wear the appropriate solid five-point star on their caps and sleeves.   *See* Opinion and Order dated November 30, 1994 at 3-4.   The Association sells "Star Class" flags and decals to its members and advertises and sells through the annual publication of "Log of the Star Class," and the Association's monthly newsletter "Starlights," neckties, blazer patches and lapel pins featuring its emblem, the solid five-point red star, and the Association's initials I.S.C.Y.R.A. or a sail motif ("class merchandise").   Gross sales of class merchandise in 1992 was $10,388 at a cost of $5,076, and in 1993 sales were $11,783 at a cost of $6,271.   Stip.Facts at ¶ (IV)(L); Def.Ex. F at SC000114.

The Association also permits host yacht clubs holding regattas under the sanction of the Association to defray their costs by selling t-shirts, sweatshirts, caps, jackets and other related items which bear the marks in issue or variations thereof ("collateral items") as part of the promotion of the racing events. Stip.Facts at ¶¶ (IV)(M-N).   The Association does not intend to become a commercial manufacturer or seller of clothes or apparel items.   Stip.Facts at ¶ (IV)(O).

*3 Hilfiger is an extremely successful designer and distributor of high quality men's clothing.   Hilfiger's sales exceeded 227 million dollars in the year ending March 31, 1994.   Pl.Ex. 87 at 17.   Hilfiger is among the two or three most successful promoters of lines of men's sports clothing today, ranking with Ralph Lauren.   Tr. at 287 (Leeds).   The Defendant's garments bear labels prominently displaying the name "Tommy Hilfiger."   The colors of Defendant's clothing are predominantly red, white and blue.

The words "Star Class" were used in the first and only instance by Defendant in the Tommy

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *3 (S.D.N.Y.))

Hilfiger(R) 1994 Spring Collection, particularly on garments in its Nantucket Line. Hilfiger marketed the Nantucket Line as "classic nautical sportswear" containing "authentic details taken from the sport of competitive sailing" and "elements and patterns taken directly from actual racing sails." Pl.Ex. 70. Plaintiff's Exhibit 88, a book about sailboat racing admittedly used by Defendant in research for its Nantucket line, contains pictures of yachts with sails bearing the registered trademark of North Sails, an approved sailmaker for Star Class yachts. *See* Tr. at 230 (Sondag Dep.). The North Sails trademark depicted is an "N" and an "S" contained in a circle. A mark similar to that of North Sails was placed on some of the Nantucket Line clothing, but bearing the letters "T" and "H" instead of "N" and "S," and not as a label of origin but in the form of a decoration on the sides of garments. The garments also were decorated with a diminutive "burgee" (a burgee is a yachting flag usually denoting a yacht club) bearing the initials "T.H.," and the words "Star * Class." *See* Def.Exs. 26, 28, 31, 32, 33. The words "Tommy Hilfiger(R)" were prominently placed on all garments.

The Defendant did not call any witnesses to the stand to deny that its use of the emblem, a five-point red star, was derived from observations of Plaintiff's mark, or that the term "Star Class" was not similarly utilized. Accordingly, the Court may draw the inference that Defendant intentionally copied the unregistered marks in question. *See Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981) (negative inference drawn that infringement of copyrighted design was willful because defendant's president failed to testify). There is no showing, however, that the marks were known by the Defendant or its agents as trademarks of the Association. The Defendant did present evidence that it had ordered a trademark search of "Star Class" by its outside attorneys; that the search conducted was for federal and state trademarks; that the search did not reveal Plaintiff's use of the mark; and that Defendant was advised by its attorneys in August 1993, prior to using the

mark, that the search did not reveal that "Star Class" was a trademark and thus "proposed use of this mark ... [is] not necessarily rule[d] out...." Pl.Ex. 74 (letter regarding "Trademark Screening Searches" from Neil Burstein to Kathleen Luparello at Tommy Hilfiger U.S.A., Inc.). This is some evidence contradicting Plaintiff's claim that the Defendant intended to use a trademark belonging to another, namely Plaintiff.

*Discussion*
A. *LANHAM ACT CLAIM*

*4 Section 43(a) of the Lanham Act proscribes "false designation of origin" in relation to goods or services. 15 U.S.C. § 1125(a). [FN3] A plaintiff must first demonstrate that its mark deserves protection under the Lanham Act in order to allege infringement. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992). "[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 112 S.Ct. 2753, 2757 (1992) (citations omitted).

The central issue in a trademark dispute is generally whether there is a likelihood of confusion between the two marks. *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 579 (2d Cir.1991). A trademark owner may receive judicial protection if "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* at 579-80 (quoting *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)). [FN4] Judge Friendly specified a nonexclusive list of factors to consider when examining the likelihood of confusion between two dissimilar products:
[1] the strength of [the prior owner's] mark, [2] the degree of similarity between the two marks, [3] the likelihood that the prior owner will bridge the gap [between the two products], [4] actual confusion, [5] the reciprocal of defendant's good faith in





Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *4 (S.D.N.Y.))

adopting its own mark, [6] the quality of defendant's product, and [7] the sophistication of the buyers. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820 (1961). No single factor is determinative, "[r]ather a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Importers and Distributors, Inc.,* 996 F.2d 577, 584 (2d Cir.1993) (citation omitted). The *Polaroid* factors will be examined to evaluate the likelihood of confusion between the parties' marks.

*1. Strength of Plaintiff's Mark*

The first step in determining whether an unregistered mark is entitled to protection is to categorize the strength of the mark according to the nature of the term itself. "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos,* 112 S.Ct. at 2757 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 [2d Cir.1976] ). Suggestive, arbitrary and fanciful marks are entitled to protection as inherently distinctive, while descriptive marks are eligible for protection only after acquiring distinctiveness referred to as "secondary meaning," and generic marks are ineligible for protection. *Id.*

*\*5 Analysis of the distinctiveness of Plaintiff's marks is complicated by their use in a fashion similar to that of licensed trademarks or certification marks because they designate that boats built by various manufacturers meet specifications set by the Association, and thus the usual test for secondary meaning which examines the link by consumers of goods to a specific source is not directly applicable. Secondary meaning is normally acquired when "the mark comes to identify not only the goods, but the source of those goods, even though the relevant consuming public might not know the name of the producer." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217,

1221 (2d Cir.1987); *see also Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786 (5th Cir.1983) (secondary meaning arises when the mark comes "to be known by the public as specifically designating that product."). Plaintiff's mark may be analyzed as analogous to a certification mark, and "[a] certification mark is distinctive if prospective purchasers recognize the mark as an indication that a particular person, whether known or anonymous, has certified that the goods or services meet the standards established for authorized use of the mark." *Restatement Third, Unfair Competition* § 11, cmt. b (1995). [FN5] Widespread recognition of "Star Class" boats in media reports and their continuing popularity (albeit on a much smaller scale than Defendant's fame) more than 70 years after the original design indicate that prospective purchasers of "Star Class" boats do recognize the mark as an indication that the boats have been certified, even though prospective purchasers' knowledge of the Association or its role may be limited.

Plaintiff argues that its marks are arbitrary and deserving of the highest level of trademark protection due to its continuing efforts to ensure the quality and standards of yachts identified by these marks. *See* Tr. at 86-105 (MacCausland). However, the word "class" is a generic term, and the "Star Class" mark is closer to a superlative designation of the boat since the word "star" adopted for the boat and its graphic symbol are commonly used to denote excellence. *See* Opinion and Order dated November 30, 1994 at 9-10; *McCarthy on Trademarks and Unfair Competition* § 15.02(2) (1993) (the hypothetical mark "Best" on milk would be a self-laudatory and descriptive term, but it could acquire distinctiveness by developing a secondary meaning to consumers). "[L]audatory words, such as 'best,' 'outstanding,' or 'supreme' cannot of their own force indicate the source or origin of the labelled goods.... 'Common expressions which can indicate nothing but high quality surely would not be indicative of origin to the purchasing public.' " *Supreme Wine Co. v. American Distilling Co.,* 310 F.2d 888, 889 (2d Cir.1962) (citations omitted) ("supreme" lacked distinctiveness, originality

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *5 (S.D.N.Y.))

and uniqueness, and required compelling proof of secondary meaning for trademark protection); *see also Murphy v. Provident Mutual Life Ins. Co. of Philadelphia*, 923 F.2d 923, 927 (2d Cir.1990) ("Marks that are laudatory and that describe the alleged qualities or characteristics of a product or service are descriptive marks."), *cert. denied*, 502 U.S. 814 (1991); *In re Royal Viking Line A/S*, 216 U.S.P.Q 795 (TTAB 1982) (registration of the term "World Class" refused as a descriptive mark rather than one indicating origin).

*6 Extensive third party use of a mark also weighs against a finding that the mark is strong. *Lang*, 949 F.2d at 581. A recent decision noted that 196 federally registered trademarks utilized a five pointed star symbol, and concluded that an inference of such a mark's strength "is somewhat rebutted by the prevalence of similar five pointed star symbols used to decorate athletic clothing and footware." *Starter Corp. v. Eurostar Inc.*, 28 U.S.P.Q.2d 1844, 1846 (C.D.Cal.1993) (sharing of star symbol and term was not sufficient to find confusing similarity where marks were visually dissimilar, evidence of actual confusion was weak, and defendant adopted the mark in good faith); *see also Sun Banks of Florida v. Sun Federal Savings & Loan*, 651 F.2d 311, 316-17 (5th Cir.1981) (widespread use of term "sun" militated against finding of confusion); Pl.Ex. 79 (Trademark Research Report by Thomson & Thomson of the mark "Star Class"); Tr. at 313-17 (Burstein) (search revealed thousands of marks incorporating the term "star"). "[S]uch marks as a star or the sun in word or picture are of such long standing in the business world and have been used in so many lines of business that neither can be considered the exclusive mark of one manufacturer or tradesman so as to deny its use by others." 3 Callmann, *Law of Trademarks* § 82.1(1) at 765-66 (quoted in *Sun Banks*, 651 F.2d at 317). Extensive third-party use of "star" and its graphic symbol weakens the inherent distinctiveness of the mark and indicates that the mark's primary meaning is laudatory and therefore descriptive.

Defendant argues that Plaintiff's marks are generic and thus not entitled to protection

under the Lanham Act. For unregistered marks, the burden of proving non-genericness is on the proponent of trademark rights where the opponent contends that the term was in common usage as a generic term before its alleged use as a trademark. *Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95 (2d Cir.1989). Defendant maintains that because Star yachts were produced for racing beginning in 1911, prior to the formation of the Association in 1922, the term "Star Class" had already become part of the public domain and thus a generic mark. Although Defendant's argument might have been effective in 1922, it is not the proper basis for evaluating the distinctiveness of Plaintiff's mark today because by definition secondary meaning arises only after a mark is already in use, and the strength of marks and their secondary meaning may change over time. [FN6] *See* Section (A)(1)(a), *infra*. Plaintiff's evidence at trial showed that the Association has taken action to object to unauthorized use of the mark "Star Class" when used in connection with sailboats. Pl.Exs. 100-01. Efforts by the Plaintiff to maintain quality and control of the boat's specifications distinguish the mark "Star Class" from the Thistle mark, which was held to have "passed into the lexicon of the boating industry" for its failure to control third-party use of the designation. *See Thistle Class Association v. Douglas & McLeod, Inc.*, 198 U.S.P.Q. 504 (TTAB 1978); Tr. at 86-105 (MacCausland).

*7 Defendant also contends that mention of "Star Class" without reference to pictures in Plaintiff's Exhibit 88 (*Stars and Stripes, The Official Record, America's Cup XXVIII* [Dennis Connor Sports, Inc.1992] ), a publication by a recognized authority in sailboat racing, indicates generic use by using the term as "a common descriptive name for the product," thus estopping the Plaintiff from claiming that the mark is distinctive. Def. Post-Trial Mem. at 3-6; Pl.Ex. 88 at 61, 63, 69, 72, 95, 144, 147, 148; *see also Birtcher Electro Medical Systems, Inc. v. Beacon Laboratories, Inc.*, 738 F.Supp. 417, 420 (D.Colo.1990) (plaintiff's use of mark as a noun indicated its genericness). This book however was not published by the Plaintiff. Although newspaper and magazine





Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *7 (S.D.N.Y.))

use of a term in a generic sense is a strong indication of the general public's perception that the term is a generic name, *American Thermos Products Co. v. Aladdin Industries, Inc.,* 207 F.Supp. 9, 20 (D.Conn.1962), *aff'd,* 321 F.2d 577 (2d Cir.1963); *Loctite Corp. v. National Starch & Chemical Corp.,* 516 F.Supp. 190 (S.D.N.Y.1981), "[i]t is the use and understanding of the term in the context of purchasing decisions, however, that determines the primary significance of a designation."     *Restatement Third, Unfair Competition* § 15, cmt. c (1995). [FN7] The buyers of products in competition with those of Defendant are in the market for sports leisure wear, not sailboats, and no evidence of consumers' use of the term "Star Class" in the context of such purchasing decisions indicates that Plaintiff's marks are generic.

  After considering these indicators of distinctiveness, the mark "Star Class" is found to be descriptive rather than suggestive, and secondary meaning must be established for Plaintiff's marks to be protected under trademark law.

     a. *Secondary Meaning of "Star Class"*

  Usually secondary meaning is acquired when " 'the mark comes to identify not only the goods, but the source of those goods,' even though the relevant consuming public might not know the name of the producer." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987) (citing *20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 815 F.2d 8, 10 [2d Cir.1987] ). However, since the Association does not produce any goods, and the "Star Class" marks function similarly to certification marks, the appropriate test is whether consumers of men's sportswear associate the Plaintiff's marks with the "mode of manufacture, quality, accuracy or other characteristics" that in sum comprise the "Star Class" boat's specifications as defined by the Association.     *See* 15 U.S.C. § 1127; *see also* note 5, *supra.*

  "[P]roof of secondary meaning entails vigorous evidentiary requirements" and the proponent bears the burden of showing that

secondary meaning existed at the time of the alleged infringement. *20th Century Wear, Inc.,* 747 F.2d at 90 (citation omitted).    Factors to be considered in determining whether secondary meaning exists for a mark include: (1) advertising expenditures;    (2) consumer studies linking the mark to a source;    (3) unsolicited media coverage of the product;    (4) sales success;    (5) attempts to plagiarize the mark;    and (6) length and exclusivity of the mark's use. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985);    *see also Centaur Communications, Ltd.,* 830 F.2d at 1222.

  **\*8** "The plaintiff is not required to establish that *all* consumers relate the product to its producer;    it need only show that a substantial segment of the relevant consumer group makes this connection."    *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 168 (2d Cir.1991) (emphasis in original) (citing *Centaur Communications, Ltd.,* 830 F.2d at 1222). Defendant argues that the relevant group of consumers in this case consist of "all actual and prospective purchasers of defendant Tommy Hilfiger(R) products."    Def.Post-Trial Mem. at 8.    This is too broad a group.    "In evaluating confusion in a trademark infringement case, it is important to remember that the courts are dealing with confusion as to source, and that the only 'relevant population' is potential purchasers of the junior user's goods or services."    *Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 546 (S.D.N.Y.1991) (citing *Lobo Enterprises, Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 77 [S.D.N.Y.1988] ) (Haight, J.) (relevant population in trademark case consisted of rap music fans who were "consumers of the junior user's services" since the junior user was a rap music performer);    *cf. Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 30-31 (1st Cir.1989) (relevant population consisted of "the general public that is the market for shirts commemorating the Boston Marathon."). Here the Defendant's sales literature for the Nantucket Line described the clothing as "classic nautical sportswear with a variety of authentic details taken from the sport of competitive sailing...."    Pl.Ex. 70.    Thus the segment of the population for whom the Defendant's sales strategy was designed to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *8 (S.D.N.Y.))

appeal--those clothing purchasers likely to be enticed by the nautical theme of Defendant's clothing--and not all actual and prospective clothing purchasers would appear to be the relevant population.  Such persons might have some familiarity with the Plaintiff and be more prone to confusion regarding sponsorship or association between the marks. *See* Opinion and Order dated November 30, 1994 at 13.  The composition of the relevant population of consumers at which Defendant aimed its advertising increases the likelihood of confusion among a significant segment of that population as to any association with or sponsorship of Defendant's clothing by Plaintiff.

### (1) *Advertising Expenditures*

Secondary meaning for the "Star Class" marks is not supported by advertising expenditures by the Association.

### (2) *Consumer Studies*

"[I]t is significant that [the Plaintiff] did not undertake a consumer survey, a failure which strongly suggests that a likelihood of confusion cannot be shown." *E.S. Originals Inc. v. Stride Rite Corp.,* 656 F.Supp. 484, 490 (S.D.N.Y.1987) (Sprizzo, J.);  *see also Reebok Int'l v. K-Mart Corp.,* 849 F.Supp. 252, 268-69 (S.D.N.Y.1994).  Indeed, Plaintiff has not offered evidence to show that the International Star Class Yacht Racing Association is widely known to persons interested in purchasing sportswear with a nautical ambiance.  This factor weighs against secondary meaning for Plaintiff's marks.

### (3) *Unsolicited Media Coverage*

*9 Unsolicited media coverage of the "Star Class" marks is extensive (*see* Plaintiff's First Request to Take Judicial Notice, Volumes One and Two, filed on July 1, 1994) and is evidence of secondary meaning for this design of racing sailboats and to some extent the plaintiff in this action.  *See also Int'l Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1086 (7th Cir.1988).  These media reports indicate that secondary meaning exists for Plaintiff's marks based on

the boat's specifications as set and controlled by the Association because prospective purchasers of racing sailboats appear to recognize the mark as an indication that a particular entity certified the boats as meeting standards established for its authorized use in competition.    *See Restatement Third, Unfair Competition* § 11, cmt. b (1995).

### (4) *Sales Success*

The sales success of this yacht based on recognition of the "Star Class" marks over more than 70 years and their continued importance in sailboat racing is evidence of secondary meaning of the mark as designating this design of racing sailboats.

### (5) *Attempts to Plagiarize Plaintiff's Marks*

As discussed above, the Court infers that the alleged copying of Plaintiff's mark was an intentional act, but does not find that Defendant intended to copy a trademark owned by another.  This "imitative intent can help support a finding of secondary meaning." *Bristol-Myers Squibb Co.,* 973 F.2d at 1042 (citing *Centaur Communications, Ltd.,* 830 F.2d at 1224);  *Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,* 471 F.Supp. 392 (S.D.N.Y.1979).

### (6) *Length and Exclusivity of Use*

The "Star Class" marks have been used for more than seven decades, and exclusivity of their use on sailboats is indicated by the Association's letter to Catalina Yachts in January 1992 seeking to enforce its sole use of "Star" as a mark, thus supporting secondary meaning of the mark with respect to yachts. *See* Pl.Exs. 100-01.  The connotation attributable to the "Star Class" marks due to efforts by the Association supports a finding of secondary meaning among sailboat racing enthusiasts.

Defendant argues that the limited sales of Class Merchandise by the Association of Class Merchandise diminishes any claims of consumer confusion related to the parties' marks.  However, "the relatively small size of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *9 (S.D.N.Y.))

Page   8

a senior user's advertising budget or sales volume will not diminish the strength of its valid mark, and the scope of protection will not be narrowed because of such evidence." *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1132 (2d Cir.1979) (citation omitted).

The "Star Class" marks have acquired secondary meaning over the past 70 years as a result of work by the Association and its . members to promote the boat's characteristics, and thus the marks are sufficiently distinctive to be eligible for trademark protection as designating these sailboats.

2. *Similarity between the Parties' Marks*

**\*10** The second *Polaroid* factor evaluates the risk of confusion from similarity between the two marks. "[I]n assessing the similarity of two marks, it is the effect upon prospective purchasers that is important.... It is sufficient if the *impression* which the infringing product makes upon the consumer is such that [the consumer] is likely to believe the product is from the same source as the one [known] under the trade-mark." *McGregor-Doniger,* 599 F.2d at 1133-34 (citing Restatement of Torts § 728, Comment b at 591, and *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 494 [S.D.N.Y.1968] ) (emphasis in original); *see also Restatement Third, Unfair Competition* § 21(a)(i) (1995) (overall impression created by conflicting designations is to be considered in comparing the degree of similarity between the marks). In *McGregor-Doniger* the district court was held to have properly considered the effect of differently presented marks, and the plaintiff's frequent and close association of its brand and manufacturing names reduced the likelihood of confusion with defendant's similar brand name also used as a source identification. 599 F.2d at 1134. Defendant argues that the prominent location of "Tommy Hilfiger" on the label should prevent confusion. Since this is not a case concerning competing goods, but rather an issue of false association, juxtaposition of "Tommy Hilfiger" does not avoid confusion regarding an endorsement by the Association.  Although prominent placement of "Tommy Hilfiger" on the top of

Defendant's label serves to distinguish the parties' marks, a consumer may nevertheless infer an agreement between Defendant and the Association to use the words "Star Class" in conjunction with a red star (the "Star Class Insignia") on the label.  *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204- 5 (2d Cir.1979) (public's belief that mark owner sponsored or approved its use satisfies the confusion requirement); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981) (likelihood of confusion existed as to source or sponsorship of toy car by television show); *Int'l Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir.1988) (presence of defendant's mark did not reduce likelihood of confusion as to sponsorship).  The potential for confusion is fostered in this case by the nautical theme and sailing-type flag containing "TH" above the number 42 on Defendant's label.

3. *Will the Association "Bridge the Gap?"*

The current sales of related merchandise by the Association are at a minimal level, and the Association stipulated that it has no intent to market or license its marks for use on clothing sold to the general public.  *See* Stip.Facts at ¶ (IV)(O).  This factor does not support the likelihood of confusion between the parties' marks.

4. *Actual Confusion*

A showing of actual consumer confusion is strong proof of the fact of a likelihood of confusion between contested marks.  "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204-5 (2d Cir.1979) (citations omitted).  The Fifth Circuit applied a test of confusion in circumstances similar to those in the instant case by asking whether "purchasers purchased [Defendant's merchandise] as a direct result of the presence of [Plaintiff's] emblem ...

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

 

Case 3:04-cv-00465-JGH  Document 11-4  Filed 08/20/04  Page 13 of 37 PageID #: 172

Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *10 (S.D.N.Y.))

Page  9

believing that the [merchandise] was in any way endorsed, sponsored, approved or otherwise associated with [Plaintiff]...." *Supreme Assembly, Order of Rainbow for Girls v. J.H. Jewelry Co.*, 676 F.2d 1079, 1084 (5th Cir.1982) (testimony by organization member that she did not know or care about connection of jewelry to plaintiff organization failed to show consumer confusion); *cf. Boston Professional Hockey Assoc., Inc. v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004 (5th Cir.) (consumer knowledge of mark's source and origin in plaintiff meets confusion/mistake/ deception requirement, confusion as to product source not required), *cert. denied*, 423 U.S. 868 (1975). [FN8]

A plaintiff normally has the burden of showing that many consumers are likely to be misled by the defendant's infringement. *Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.)*, 544 F.2d 1167, 1175 (2d Cir.1979). However, upon a proper showing of a defendant's deliberate conduct to engage in a deceptive commercial practice, the plaintiff need not introduce evidence of actual consumer confusion, and in such circumstances the burden shifts to the defendant to demonstrate an absence of consumer confusion. *Resource Developers, Inc. v. Statute of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir.1991). The Second Circuit has explained that:

*11 Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion. In determining a defendant's intent, "actual or constructive knowledge" of the prior user's mark or dress may indicate bad faith. Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith. *Paddington Corp. v. 996 F.2d at 586-87* (citations omitted) (district court's finding was clearly erroneous that bad faith was absent in copying trade dress of competing brand of ouzo with the apparent aim of securing customers).

The "Star Class" name and insignia may have been obtained from Defendant's

research, and thus expropriated to benefit the clothes' "nautical" design. However, the Defendant also had a trademark search conducted prior to its use of Plaintiff's unregistered trademark. Tr. at 307-10 (Burstein); Pl.Ex. 74. Furthermore, no evidence showed that Defendant acted with the aim of securing customers who were customers or members of Plaintiff's organization. Although Defendant intentionally sought "authentic details taken from the sport of competitive sailing" and researched "coffee-table books" including Plaintiff's Exhibit 88, Tr. at 230 (Sondag Dep.), Plaintiff has not made a proper showing of deliberate conduct by Defendant to engage in a deceptive commercial practice which would shift the burden to the Defendant to demonstrate the absence of consumer confusion. *See Resource Development*, 926 F.2d at 140 (plaintiff could not utilize this burden-shifting doctrine because it failed to establish intent to deceive); *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1565 (Fed.Cir.1987) ("[A]n inference of 'bad faith' requires something more than mere knowledge of a prior similar mark."); *cf. Gucci America, Inc. v. Action Actionwear, Inc.*, 759 F.Supp. 1060, 1065 (S.D.N.Y.1991) ("Where the evidence 'shows or requires the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up ... then the adopter has indicated that he expects confusion and resultant profit.' " [citation omitted] ); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 130 (S.D.N.Y.1989) (defendant "deliberately copied [plaintiff's] Trademarks with ... the intent to improve their competitive position" and thus actual confusion was presumed).

*12 The only evidence presented by Plaintiff at trial of actual or likely confusion was the testimony of Richard Burgess, a member of the Association who has never purchased any of Defendant's merchandise. [FN9] Tr. at 60 (Burgess). Burgess testified that after he saw "Star Class" on Hilfiger items for sale in a department store he inquired of the Association whether an agreement had been

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *12 (S.D.N.Y.))

Page   10

entered with Hilfiger regarding the use of Plaintiff's mark. Tr. at 28-32 (Burgess). The confusion Burgess described concerned the existence of a royalty agreement and is not directly relevant to the trademark infringement claim in this action which concerns purchase decisions in the mistaken belief that Plaintiff sponsored, approved or was otherwise associated with Defendant's merchandise. Tr. at 30 ("I asked ... if the star class cut a deal for royalties of some sort with Tommy Hilfiger."), *see also Supreme Assembly,* 676 F.2d at 1084. In any event, "[g]iven significant volume of sales over time, isolated instances of actual confusion may be disregarded as *de minimis." Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 386 (S.D.N.Y.1985) (emphasis in original, citation omitted) (court discounted as "de minimis" the testimony of a single witness with a possible bias who did not purchase the defendant's magazine but described his initial confusion after seeing it displayed), *aff'd mem.,* 788 F.2d 3 (2d Cir.1986). Defendant called Allan Zwerner, Senior Vice President of Burdines, who purchased $24.5 million worth of Defendant's products in 1994 for 40 retail stores, and testified that he never received any reports of confusion as to possible sponsorship or affiliation with Plaintiff. Tr. at 266 (Zwerner). Evidence of actual confusion between the parties' marks may be discounted in the instant action as "de minimis." This factor does not support a likelihood of confusion between the parties' marks.

*5. Defendant's Good Faith in Adopting the Mark*

Intentional copying gives rise to a presumption of a likelihood of confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir.1987); *cf. Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986) (intent largely irrelevant concerning the likelihood of confusion). An inference of bad faith is bolstered if the junior user, with knowledge of the senior user's mark, "proffered no credible innocent explanation" for its choice of the mark. *Centaur,* 830 F.2d at 1228. Defendant's imitative intent is also shown by its admitted intentional imitation of the North Sails logo.

However, there is no showing that Defendant intended to copy a trademark. *See* Section (A)(4), *supra.* This factor may support a likelihood of confusion between the parties' marks.

*6. Quality of Defendant's Product*

Plaintiff did not present evidence showing that the quality of Defendant's products contributed to confusion between the marks, and this factor does not support the likelihood of confusion between the parties' marks.

*7. Sophistication of the Buyers*

**\*13** Usually sophistication of consumers weighs against potential confusion in distinguishing between contested marks. *See Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1007 (2d Cir.1983). However, the issue in this case concerns the likelihood of confusion as to affiliation, sponsorship or approval of Defendant's goods by the Association, and increased sophistication of the relevant consumers may actually increase the potential for such confusion. This factor does not weigh against the likelihood of confusion.

*8. Other Factors*

The *Polaroid* factors are not exhaustive, and since the Court acts as a court of equity in infringement cases other equitable factors may be taken into consideration, including relative harm to the junior user as opposed to relative benefit to the senior user that would result from the requested relief. In this case Defendant has not shown the harm from an injunction against use of the "Star Class" marks to be significant, and the harm to Plaintiff from confusion by the use of its marks in a market related to competitive sailing could deprive Plaintiff of potential economic benefit. Furthermore, many of the problems of proof and the limited quantum of confusion shown in this case are traceable to the small size of Plaintiff's organization. However, it would be unfair to base protection of an organization's mark solely on the size of its membership, and the alleged infringement

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works




Case 3:04-cv-00465-JGH   Document 11-4   Filed 08/20/04   Page 15 of 37 PageID #: 174

Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *13 (S.D.N.Y.))

Page  11

must be viewed in this context. Thus, a balance of the equities favors action protecting the Plaintiff's marks against infringement in a market linked to competitive sailing.

In sum, four of the *Polaroid* factors do not support a likelihood of confusion between the parties' marks, and four factors support the likelihood of confusion to varying degrees. After weighing these factors together, the Court finds some likelihood of confusion between the contested marks, but only de minimis or negligible actual confusion.

## B. *RELIEF FOR PLAINTIFF UNDER THE LANHAM ACT*

A plaintiff who seeks money damages must introduce evidence of actual consumer confusion, while a plaintiff seeking injunctive relief need only prove a likelihood of confusion. *Resource Developers, Inc. v. Statute of Liberty-Ellis Island Foundation, Inc.,* 926 F.2d 134, 139 (2d Cir.1991).

### 1. *Injunctive Relief*

Plaintiff has shown that a likelihood of confusion exists between the two marks, and is therefore entitled to injunctive relief. Defendant is ordered to cease production and sale of clothing bearing the mark "Star Class" in its Nantucket line, however Defendant is not enjoined from use of the star symbol. *See Star Bedding Co. v. Englander Co.,* 239 F.2d 537, 542-43 (8th Cir.1957) (trademark incorporating a star did not give bedding company a general monopoly on the use of this symbol).

### 2. *Monetary Damages*

Plaintiff argues that an award of Defendant's profits from the Nantucket Line is an appropriate award for infringement of the "Star Class" marks, and is necessary to deter such infringement. *See George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1539 (2d Cir.1992) ("By awarding the profits of a bad faith infringer to the rightful owner of a mark, we promote the secondary effect of deterring public fraud regarding the source and quality

of consumer goods and services."), *cert. denied,* 113 S.Ct. 510 (1992). However, the evidence at trial did not show such bad faith infringement by Defendant. Furthermore, Plaintiff did not prove actual confusion as required to recover money damages. *Resource Developers,* 926 F.2d at 139; *Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.,* 737 F.Supp. 826 (S.D.N.Y.1990). Because the evidence of actual confusion was "de minimis" in this case, Plaintiff has not met the requirements for an award of monetary damages, and Plaintiff's claim for monetary damages is denied.

## C. *RELIEF FOR PLAINTIFF UNDER STATE LAW*

### 1. *Unfair Competition*

*14 "The state law cause of action for unfair competition shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement, including proof of actual confusion to recover damages, and proof of a likelihood of confusion for equitable relief." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 576 (2d Cir.1993) (citations omitted). Plaintiff's failure to show actual confusion between the parties' marks renders its claim of unfair competition defective, and judgment will be entered in favor of Defendant on this claim.

### 2. *Dilution*

A claim of dilution under New York's anti-dilution statute, N.Y.Gen.Bus.L. § 368-d requires the establishment of three elements: (1) distinctiveness of the mark either from its distinctive quality or from secondary meaning; (2) likelihood of dilution by the blurring of product identification or the tarnishing of an affirmative association a mark has come to convey; and (3) predatory intent of the junior user. *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 42 (2d Cir.1994). Likelihood of confusion is not required for relief under Section 368-d. *Id.* However, Defendant's clothing was not shown to have blurred Plaintiff's product identity or tarnished its marks. Furthermore, no evidence showed



Case 3:04-cv-00465-JGH Document 11-4 Filed 08/20/04 Page 16 of 37 PageID #: 175

Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *14 (S.D.N.Y.))

Page 12

Defendant intended to promote its product in using the mark "Star Class." *Id.* at 46. Thus Plaintiff's claim of dilution under state law is denied, and judgment will be entered for Defendant on this claim.

### D. *Award of Attorneys Fees*

In "exceptional cases," a court may award attorneys fees to the prevailing party for a violation of the Lanham Act. 15 U.S.C. § 1117(a). "When bad faith infringement is shown, a district court is authorized to award attorney fees on the basis that an 'exceptional case' has been established." *Goodheart Clothing, Inc. v. Laura Goodman Enterprises, Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (citations omitted). Defendant was not shown to have infringed Plaintiff's marks in bad faith, and the Court finds that the instant dispute is not an "exceptional case" justifying the award of attorneys fees.

### Conclusion

Plaintiff's claim for injunctive relief is granted, but judgment is to be entered for Defendant on all other claims by Plaintiff.

IT IS SO ORDERED.

FN1. Plaintiff's motion to amend the Complaint to substitute Tommy Hilfiger U.S.A. for Tommy Hilfiger, Inc. was granted on the eve of trial.

FN2. References to transcript pages of the trial held on January 9 and 10, 1995 will appear in this Opinion and Order as "Tr. at ----."

FN3. Section 43(a)(1) of the Lanham Act prohibits any person from using
in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ... by another person[.]
15 U.S.C. § 1125(a)(1).

FN4. A non-profit corporation may also have unfair use of its name enjoined to protect related property rights. *See Cape May Yacht Club v. Cape May Yacht Club and Country Club,* 86 A. 972 (N.J.Ch.1913), *Girls Clubs of America, Inc. v. Boys Clubs of America, Inc.,* 683 F.Supp. 50 (S.D.N.Y.), *aff'd mem.,* 859 F.2d 148 (2d Cir.1988).

FN5. Collective marks are similar to certification marks in many respects, and may be eligible for trademark protection even if unregistered. *See Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 193 n. 8 (3d Cir.1990) ("[I]t is entirely possible for a collective trademark to legitimately function as a certification mark, or vice versa."); *Int'l Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912 (9th Cir.1980) (no infringement of unregistered collective mark since consumers were not misled about origin, sponsorship or endorsement of defendant's jewelry), *cert. denied,* 452 U.S. 941 (1981).

FN6. Defendant's argument is also undercut by availability of the common law certification mark which provides equitable rights in "a mark to certify ... mode of manufacture, quality, accuracy or other characteristics of such goods or services," and may eventually arise from successful promotion of a mark. 15 U.S.C. § 1127; *see also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,* 647 F.2d 200, 202 n. 1 (D.C.Cir.1981) (Ginsburg, J.) (common law certification marks designated wine from a region in Germany) (citing *Florida v. Real Juices, Inc.,* 330 F.Supp. 428 [M.D.Fla.1971] ).

FN7. Dictionary definitions may also be an indication of genericness. *Murphy Door Bed Co.,* 874 F.2d at 101. *Webster's Third New International Dictionary* (Merriam-Webster 1986) defines "star" as:
10: one of a class of international one-design sharp-chined racing sloops that are Marconi rigged and approximately 22 feet 9 inches in overall length with a sail area of 281 square feet[.]
There is no mention of Plaintiff or its certification role.

FN8. The Ninth Circuit observed "that there is some danger that the consumer may be more likely to infer endorsement or sponsorship when the consumer is a member of the group whose collective mark or




Not Reported in F.Supp.
(Cite as: 1995 WL 241875, *14 (S.D.N.Y.))

Page  13

trademark is being marketed.   Accordingly, a court must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's product and the trademark owner."   *International Order of Job's Daughters,* 633 F.2d at 919.

FN9. The Second Circuit noted that a likelihood of confusion may rest upon "the probability that potential purchasers would be misled into an initial interest in [the defendant].   Such initial confusion works a sufficient trademark injury."   *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 260 (2d Cir.1987) (citation omitted).     However, Burgess was not shown to be even a potential purchaser of Defendant's merchandise.     Tr. at 60 (Burgess testified that he had never purchased any Hilfiger merchandise).   The remainder of Plaintiff's evidence about confusion between the marks consisted of the receipt of inquiries from several members as to whether Plaintiff had made a sponsorship deal with Defendant.     Tr. at 125 (MacCausland).     MacCausland also testified that Defendant's competitor Nautica(R) has made such a deal with the sponsors of the America's Cup.   Tr. at 75, 214-15 (MacCausland);   *see also* Pl.Ex 89 at 40; Pl.Ex. 106.

1995 WL 241875 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





## § 16:4   Ownership is governed by priority of use—first use controls

The cases are legion to the effect that for inherently distinctive marks, ownership is governed by priority of use.[1] For such marks, the first to use a designation as a mark in the sale of goods or services is the "owner" and the "senior user." These marks are given legal protection against infringement immediately upon adoption and use in trade: "A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed and the goods are sold. . . . Priority of user alone is controlling."[2] Apart from the concept of constructive use,[3] it is not registration, but only actual use of a designation as a mark that creates rights and priority over

**[Section 16:4]**

[1] Trade-Mark Cases, 100 U.S. 82, 25 L. Ed. 550 (1879); Columbia Mill Co. v. Alcorn, 150 U.S. 460, 37 L. Ed. 1144, 14 S. Ct. 151 (1893); Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 60 L. Ed. 713, 36 S. Ct. 357 (1916); United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 63 L. Ed. 141, 39 S. Ct. 48 (1918); Neva-Wet Corp. v. Never Wet Processing Corp., 277 N.Y. 163, 13 N.E.2d 755 (1938); Western Stove Co. v. Geo. D. Roper Corp., 82 F. Supp. 206, 80 U.S.P.Q. 393 (D. Cal. 1949); New England Duplicating Co. v. Mendes, 190 F.2d 415, 90 U.S.P.Q. 151 (1st Cir. 1951); Younker v. Nationwide Mut. Ins. Co., 175 Ohio St. 1, 191 N.E.2d 145, 137 U.S.P.Q. 901 (1963); Blanchard Importing & Distributing Co. v. Charles Gilman & Son, Inc., 353 F.2d 400; 147 U.S.P.Q. 263 (1st Cir. 1965), cert. denied, 383 U.S. 968, 16 L. Ed. 2d 308, 86 S. Ct. 1273, 149 U.S.P.Q. 905 (1966); Junior Food Stores, Inc. v. Jr. Food Stores, Inc., 226 So. 2d 393 (Fla. 1969); Field Enterprises Educational Corp. v. Cove Industries, Inc., 297 F. Supp. 989, 161 U.S.P.Q. 243 (E.D.N.Y. 1969); Evergreen State Amusement Co. v. S. F. Burns & Co., 2 Wash. App. 416, 468 P.2d 460 (1970); D. & M. Antique Import Corp. v. Royal Saxe Corp., 311 F. Supp. 1261, 166 U.S.P.Q. 302 (S.D.N.Y. 1969); National Chemsearch Corp. v. Chemtek Corp., 170 U.S.P.Q. 110 (T.T.A.B. 1971); Geo. Washington Mint, Inc. v. Washington Mint, Inc., 349 F. Supp. 255, 176 U.S.P.Q. 251 (S.D.N.Y. 1972); Caesars World, Inc. v. Caesar's Palace, Inc., 179 U.S.P.Q. 14 (D. Neb. 1973); Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736 (D. Colo. 1980); Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1047, 50 U.S.P.Q.2d 1545, 1551 (9th Cir. 1999) ("It is axiomatic in trademark law that the standard test of ownership is priority of use."). See cases at §§ 11:62–11:65.

[2] Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 131 U.S.P.Q. 55 (2d Cir. 1961). See Sutton Cosmetics (P. R.), Inc. v. Lander Co., 455 F.2d 285, 172 U.S.P.Q. 449 (2d Cir. 1972) (priority of use after mark abandoned by another). Compare Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 207 U.S.P.Q. 89 (2d Cir. 1980) (first shipments within one day after another party abandoned; concurrent use permitted).

[3] See § 16:15 et seq.

others.[4] The United States, unlike many civil law nations, has a rule of priority that is based on first-to-use, not first-to-register.

Fanciful and arbitrary marks,[5] as well as suggestive marks,[6] and inherently distinctive designs, symbols,[7] and trade dress[8] do not need proof of secondary meaning or consumer recognition in order to obtain common law protection or federal registration. As the Second Circuit has stated: "The presumption that a fanciful word or mark becomes distinctive and identifies the source of goods on which it is used immediately after adoption and bona fide first use is basic in trademark law."[9] The U.S. Supreme Court has observed that suggestive, arbitrary and fanciful word marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and entitled to protection."[10] Thus, the Court concluded:

> The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.[11]

[4] *See, e.g.,* Great Basin Brewing Co. v. Healdsburg Brewing Co., 44 U.S.P.Q.2d 1751 (D. Nev. 1997) ("Ownership of a trademark is established by *use* of the mark, not by federal registration thereof."); United We Stand America, Inc. v. United We Stand America, N.Y., Inc., 128 F.3d 86, 44 U.S.P.Q.2d 1351 (2d Cir. 1997) ("The owner's right to bar infringing use does not depend on registration prior to the infringer's use."). *See* §§ 16:18, 19:3.

[5] *See* §§ 11:5–11:14.

[6] *See* §§ 11:62–11:65.

[7] *See* § 7:25.

[8] *See* § 7:90.

[9] Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 131 U.S.P.Q. 55 (2d Cir. 1961). *Accord* Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 15 F.2d 920 (8th Cir. 1926); National Shoe Stores Co. v. National Shoes of New York, Inc., 213 Md. 328, 131 A.2d 909, 113 U.S.P.Q. 380 (1957); Walter Baker & Co. v. Delapenha, 160 F. 746 (C.C.D.N.J. 1908); Waldes v. International Mfrs.' Agency, Inc., 237 F. 502 (D.N.Y. 1916) (L. Hand, J.); Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 146 U.S.P.Q. 566 (7th Cir. 1965).

[10] Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 120 L. Ed. 2d 615, 112 S. Ct. 2753, 23 U.S.P.Q.2d 1081, 1083 (1992).

[11] Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 120 L. Ed. 2d 615, 112 S. Ct. 2753, 23 U.S.P.Q.2d 1081, 1084 (1992).

§ 16:44      — Modern view
§ 16:45      Dissolution and change of performing groups
      C.   DEALER'S MARKS
§ 16:46      Dealer's trademarks
§ 16:47      Dealer's service marks
      D.   TRADEMARK OWNERSHIP AS BETWEEN
           MANUFACTURER AND DEALER: DOMESTIC AND
           FOREIGN
§ 16:48      Domestic disputes
§ 16:49      Foreign disputes

# I.  ACQUISITION AND PRIORITY

## A.  ACQUIRING LEGAL RIGHTS IN A BUSINESS SYMBOL

### § 16:1  Priority at common law

Apart from the concept of a constructive use,[1] it is not registration, but only actual use of a designation as a mark that creates rights and priority over others.[2] Whereas most civil law nations follow the rule that ownership and priority go to the party who was first to file an application or obtain a registration, in the United States, the rule of priority is that ownership and priority go to the party who was first-to-use. The only exception is that since 1989, priority of use can be obtained by filing an application for federal registration, which, upon registration, confers a "constructive use" date of first use. But that "constructive use" priority can always be defeated by another party's evidence of a prior actual use.[2.1]

At common law, ownership of trademark or trade dress rights in the United States is obtained by actual use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others.[3] The way to obtain rights in a business symbol is to actually *use* it as a mark. To create trademark or trade dress

---

[Section 16:1]

[1] *See* § 16:15 et seq.

[2] *See* § 16:18.

[2.1] *See* § 16:18.1.

[3] *See* §§ 3:1–3:3, 9:1–9:4, 16:3–16:10, 16:35–16:39.

rights, a designation must be proven to perform the job of identification: to identify one source and distinguish it from other sources. If it does not do this, then it is not protectable as a trademark, service mark, trade dress or any similar exclusive right.[4] With each sale of goods or services under such a business symbol, the seller builds up greater and greater legal rights in that symbol.[5] In the absence of customer recognition of the symbol, the "owner" of the business has no good will, and thus there is nothing for the "trademark" or "trade dress" to symbolize or represent.[6] Of course, once valid trademark rights have been established, these rights can be sold[7] or licensed[8] to others if the good will symbolized by the mark is kept intact.

In certain circumstances, the prior use of a slightly different version or format of the mark can be "tacked on" to the present version in order to claim priority of use over a rival. This is permitted if the new form of the mark creates the same commercial impression as the old version.[9]

## § 16:2   Federal constructive use priority

For applications for federal registration filed on or after November 16, 1989, a constructive use priority dates from the date of filing of the application. However, this priority is contingent on the later successful registration of the mark.[1] Thus, under the new procedure inaugurated on November 16, 1989, a firm can get an early priority date by filing an intent to use application in the U.S. Patent and Trademark Office (PTO). Then the applicant has some time to actually use the mark and obtain a federal registration.[2] This procedure enables a company to "reserve a mark" before actually using it in trade. As soon as the application is on file in the PTO, it will be included in the data base available to others who search before they file or use. Thus, others may be deterred merely by the presence of an intent to use application on file.

[4] See discussion at § 3:3.
[5] See §§ 11:73–11:78.
[6] See §§ 2:15, 19:108–19:122.
[7] See §§ 18:1–18:9.
[8] See §§ 18:38–18:41.
[9] See § 17:26.
[Section 16:2]
[1] See discussion at §§ 16:15–16:18, 26:37–26:40.
[2] See §§ 19:12–19:31.

eight lines of printed matter under the trademark IVORY. The Examiner stated that the federal Act: "clearly does not contemplate that the public will be required or expected to browse through a group of words or scan an entire page to decide that a particular word or words are intended to identify the product of applicant."[2]

When a label or advertisement contains a cluttered morass of claimed marks in many words, slogans and designs, no one of these things is likely to make a significant trademark impression on customers.[3]

## § 7:8   Multiple marks of multiple owners

In addition to the situation of a product having multiple marks owned by one firm, a product may also have multiple marks owned by different firms. The most common example is the familiar manufacturer's mark and merchant's mark combination in which one product has one mark identifying the manufacturer and another mark identifying the retail merchant.[1]

Such multiple marking is entirely appropriate so long as the separate identifying function of both marks is apparent to customers, either explicitly or implicitly.[1.1] Thus, for example, a lawn mower manufactured by Yard-Man, Inc. and exclusively retailed by Sears, Roebuck & Co. can properly be identified as "Product of Yard-Man, Inc., Jackson, Michigan for Sears, Roebuck & Co."[2] Another example of multiple mark and owner usage is a promotional item such as a T-shirt imprinted with both the mark of a university and the mark of the apparel manufacturer.[3] Similar are toys or other items whose

---

[2] Ex parte Procter & Gamble Co., 96 U.S.P.Q. 272 (Chief Examiner 1953).

[3] In re Morganroth, 208 U.S.P.Q. 284 (T.T.A.B. 1980)(newspaper ad contained "such a morass of figures and printed matter" and claimed service marks that a portion of a slogan was held to occupy only a "subordinate position . . . hardly likely to make any impact much less a significant impression": registration refused). See § 3:3.

[Section 7:8]

[1] Regarding "merchant's marks" see § 16:46 – 16:47.

[1.1] Safe-T Pacific Co. v. Nabisco, Inc., 204 U.S.P.Q. 307 (T.T.A.B. 1979); Educational Development Corp. v. Educational Dimensions Corp., 183 U.S.P.Q. 492 (T.T.A.B. 1974); Amica Mut. Ins. Co. v. R.H. Cosmetics Corp., 204 U.S.P.Q. 155 (T.T.A.B. 1979). See Lefkowitz, "Double Trademarking," 73 Trademark Rep. 11 (1983).

[2] Yard-Man, Inc. v. Getz Exterminators, Inc., 157 U.S.P.Q. 100 (T.T.A.B. 1968).

[3] See University of Pittsburgh v. Champion Products, Inc., 686 F.2d 1040, 215 U.S.P.Q. 921 (3d Cir. 1982), cert. denied, 459 U.S. 1087, 74 L. Ed. 2d

sponsorship is identified by a motion picture title or character name as well as by the name of the manufacturer of the item. [4]

In holding that the name of a performing group can be a trademark for sound recordings even though the mark of the record producer also appears, the Federal Circuit observed that, "The marks of different entities may, of course, appear on a single product where they serve separate functions; for example, manufacturer/distributor, ingredient/product, licensor/licensee." [5]

## B. TYPES OF MARKS

### § 7:9   Letters as marks

Like any other symbol, an individual letter or a group of letters, not forming a recognizable word, can function as a mark. [1] An arbitrary arrangement of letters may qualify for trademark protection like any other type of "arbitrary" or "fanciful" mark, without need for proof of secondary meaning. [2] The types of use which may infringe various letter combination marks are discussed elsewhere in this treatise. [3]

---

933, 103 S. Ct. 571 (1982), on remand, 566 F. Supp. 711, 219 U.S.P.Q. 834 (W.D. Pa. 1983), superseded by statute as stated in University Book Store v. University of Wis. Bd. of Regents, 33 U.S.P.Q.2d 1385 (T.T.A.B. 1994).

[4] See In re Paramount Pictures Corp., 213 U.S.P.Q. 1111 (T.T.A.B. 1982). See §§ 3:4–3:7, 10:18–10:22.

[5] In re Polar Music International AB, 714 F.2d 1567, n.3, 221 U.S.P.Q. 315 (Fed. Cir. 1983).

[Section 7:9]

[1] Mishawaka Rubber & Woolen Mfg. Co. v. Bata Narodni Podnik, 222 F.2d 279, 105 U.S.P.Q. 432 (C.C.P.A. 1955) ("B" in disc on tire); see Ametek, Inc. v. Acorn Structures, Inc., 167 U.S.P.Q. 185 (T.T.A.B. 1970) (letter "A"); Monsanto Co. v. Milburn Bros., Inc., 167 U.S.P.Q. 296 (T.T.A.B. 1970)(letter "M"); Sterling Drug, Inc. v. M-A Pharmaceutical Corp., 343 F.2d 1016, 145 U.S.P.Q. 287 (C.C.P.A. 1965) ("M-A" drugs); Gulf States Paper Corp. v. Crown Zellerbach Corp., 417 F.2d 795, 163 U.S.P.Q. 589 (C.C.P.A. 1969) ("E-Z" and "CZ"). See Greenberg, "The Streamlined Trademark," 34 Trademark Rep. 107 (1944); Greenberg, "The Grouped Letter Type of Trademark," 37 Trademark Rep. 515 (1947); Letters, Initials or Numerals as Common Law Trademarks, 56 ALR Fed 232; Acronyms & Initialisms Dictionary (4th ed. Crowley & Thomas).

[2] Electronic Communications, Inc. v. Electronic Components for Industry Co., 443 F.2d 487, 170 U.S.P.Q. 118 (8th Cir. 1971), cert. denied, 404 U.S. 833, 30 L. Ed. 2d 63, 92 S. Ct. 80, 171 U.S.P.Q. 321 (1971)("ECI" held arbitrary and fanciful). See § 11:4.

[3] See §§ 23:33–23:35.

### § 24:9.1 — Trademark Rights on Promotional Goods

It has often been held that a company can establish trademark rights in promotional items such as matches, paperweights and wearing apparel if recipients or buyers of the items recognize the company as the authorizing licensing source.[1] Makers of such items as tires[2] and tools[3] can establish trademark rights in promotional wearing apparel on which the mark appears. Thus, the FORD auto company can establish trademark rights on caps on which the FORD mark appears and the Coca-Cola Co. can establish trademark rights on promotional items such as key rings and glasses, as well as wearing apparel, on which the COCA-COLA trademark appears. Because the public is conditioned to expect to see such famous marks used on

---

[Section 24:9.1]

[1] See In re Snap-On Tools Corp., 159 U.S.P.Q. 154 (T.T.A.B. 1968) (manufacturer of industrial tools can register its trademark SNAP-ON for pencils and ball-point pens when the pencils and pens are used as promotional advertising for SNAP-ON tools); Amica Mut. Ins. Co. v. R.H. Cosmetics Corp., 204 U.S.P.Q. 155 (T.T.A.B. 1979) (insurance firm can establish trademark rights as to promotional items such as matches, rulers, paperweights, etc. if recipients recognize the firm as their source, although produced by others); Hurst Performance, Inc. v. Torsten Hallman Racing, Inc., 207 U.S.P.Q. 671 (T.T.A.B. 1980) (use of mark on promotional items establishes trademark rights in such fields of use); In re Phillips-Van Heusen Corp., 228 U.S.P.Q. 949 (T.T.A.B. 1986) (application for 21 CLUB for wearing apparel refused registration on the basis of 21 CLUB for the famous restaurant in New York; Board notes that it is common for a restaurant to license use of its mark on clothing).

[2] Bridgestone Tire Co. v. Bridgestone Trading Co., 221 U.S.P.Q. 1012 (T.T.A.B. 1984) (makers of BRIDGESTONE tires successfully opposed registration of BRIDGESTONE for shoes, Board relying upon tire maker's promotional use of its mark on various items of promotional clothing distributed through its tire dealers; such use not only promoted tire sales, but also identified opposer as the source of the apparel to recipients and purchasers). See Harley-Davidson Motor Co. v. Pierce Foods Corp., 231 U.S.P.Q. 857 (T.T.A.B. 1986) (maker of HARLEY-DAVIDSON motorcycles (nicknamed HOGS) successfully opposed registration of HARLEY-HOG for pork, Board pointing to opposer's promotion use of its marks in serving food to motorcycle owners' club at their meetings).

[3] Black & Decker Mfg. Co. v. Big Yank Corp., 231 U.S.P.Q. 484 (T.T.A.B. 1986) (maker of WORKMATE tools successfully opposed registration of WORK-MATES for work clothing even though opposer had never licensed clothing under that mark, because the public would assume that opposer had in fact licensed clothing for promotional use, as have the owners of other well-known marks such as COCA-COLA, CHAMPION, FIRESTONE, DUNLOP, and GOODYEAR).

© West, a Thomson business, Rel. #28, 12/2003 (TRU)

a plethora of items, the public assumes that these uses are permitted only if licensed, which in turn means, that they will legally have to be licensed.

The PTO permits the registration of a mark as used on promotional goods if a service company (or a producer of goods) puts its mark on promotional items to be used by recipients, such as ball point pens and wearing apparel. In such instances, the mark can be registered for such promotional goods. [4]

## § 24:10 — Decisions that step beyond the line

Some decisions in dictum have made observations about tests of infringement that step over the traditional line of likelihood of confusion as to source, sponsorship, approval, or connection. These decisions potentially expand the scope of trademark rights beyond traditional limits. Generally, these decisions have been mere excursions into new territory and have not provided firm precedent on which to rely.

The Second Circuit in its 1983 *Warner Bros.* decision found secondary meaning and infringement of a toy spin-off from a television series, a finding that was unremarkable. [1] The unusual aspect of the decision was that the court stated that there need be no showing that consumers thought that toys sold by defendant "were sponsored or authorized" by the producer of the TV series. Apparently the court thought that all that was necessary was that consumers "identified" the toy with the TV series and that defendant copied the design elements. [2] While not clearly or elegantly worded, the opinion indicates expansion of the test of "likely confusion" by expanding the test of infringement as to what constitutes confusion as to sponsorship, affiliation or connection.

Building upon the Second Circuit's *Warner Bros.* case, the First Circuit in its 1989 *Sullivan* case created a rebuttable presumption that purchasers are likely to be confused into thinking that the defendant's promotional goods were produced, licensed, sponsored, or endorsed by the producers of an athletic event. Here, the court

[4] *See* § 19:87.
[Section 24:10]
[1] *See* § 10:43. *See, e.g.*, Cadence Industries Corp. v. Kerr, 225 U.S.P.Q. 331 (T.T.A.B. 1985) (owner of rights in comic book character IRON MAN successfully opposed registration for IRON MAN as mark for multi-vitamin mineral supplement).
[2] Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327 (2d Cir. 1983).

§ 17:25   Changes in format of mark: abandonment, priority and tacking-on
§ 17:26   — Continuing commercial impression rule
§ 17:27   — Illustrative applications of the rule
§ 17:28   — Modernization of marks

## I.  INTRODUCTION

### § 17:1  Concept of abandonment

*West Key No. Digests References*

Trade Regulation ⟐  65, 648

**KeyCite™:** Cases and other legal materials listed in KeyCite Scope can be researched through West Group's KeyCite service on WESTLAW®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

Once held abandoned, a mark falls into the public domain and is free for all to use. While acquiescence may bar suit against one person,[1] abandonment opens rights to the whole world. Abandonment paves the way for future possession and property in any other person.[2]

A trademark can be formally abandoned by a firm and this is sometimes done, apparently for tax write-off purposes.[3] But in the litigated cases, the party who once owned trademark rights claims continuing rights in the mark and contests the fact of its abandonment.

Abandonment is an issue of fact, subject to the normal procedural rules governing factual issues, such as the scope of review on

**[Section 17:1]**

[1] *See* §§ 31:41–31:43.

[2] Russell v. Caroline-Becker, Inc., 336 Mass. 161, 142 N.E.2d 899, 114 U.S.P.Q. 84 (1957).

[3] *See, e.g.,* La Maur, Inc. v. Block, 176 U.S.P.Q. 218 (T.T.A.B. 1972); Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 207 U.S.P.Q. 89 (2d Cir. 1980); California Cedar Products Co. v. Pine Mountain Corp., 724 F.2d 827, 221 U.S.P.Q. 1137 (9th Cir. 1984).

appeal.[4]

## § 17:2   Trademark rights in others after abandonment

*West Key No. Digests References*

Trade Regulation ⬡ 422

**KeyCite™:** Cases and other legal materials listed in KeyCite Scope can be researched through West Group's KeyCite service on WESTLAW®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

Once abandoned, a mark may be seized immediately and the person so doing so may build up rights against the whole world.[1] After abandonment, those who then adopt the mark must fight out subsequent priority of use and ownership under the basic rules of trademark priority.[2] However, because their subsequent use of the abandoned mark may well evoke a continuing association with the

[4] Rivard v. Linville, 133 F.3d 1446, 45 U.S.P.Q.2d 1374 (Fed. Cir. 1998) (sustaining the Trademark Board's findings of an abandonment unless they are clearly erroneous).

[Section 17:2]

[1] Sutton Cosmetics (P. R.), Inc. v. Lander Co., 170 U.S.P.Q. 461 (S.D.N.Y. 1971), modified, 455 F.2d 285, 172 U.S.P.Q. 449 (2d Cir. 1972).

[2] Sutton Cosmetics (P. R.), Inc. v. Lander Co., 455 F.2d 285, 172 U.S.P.Q. 449 (2d Cir. 1972); P. Daussa Corp. v. Sutton Cosmetics (P. R.), Inc., 462 F.2d 134, 175 U.S.P.Q. 193 (2d Cir. 1972) (an abandoned mark is "fair game" for the first person to use it); Galt House, Inc. v. Home Supply Co., 483 S.W.2d 107, 174 U.S.P.Q. 268 (Ky. 1972); La Maur, Inc. v. Block, 176 U.S.P.Q. 218 (T.T.A.B. 1972)(parties seeking first use after formal abandonment of IPANA toothpaste mark are governed by general rules of priority of use); Bellanca Aircraft Corp. v. Bellanca Aircraft Eng'g, 190 U.S.P.Q. 158 (T.T.A.B. 1976); Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 207 U.S.P.Q. 89 (2d Cir. 1980) (after formal abandonment by third party, the parties each made first shipments within one day of each other: each allowed use upon sufficiently distinct labels); California Cedar Products Co. v. Pine Mountain Corp., 724 F.2d 827, 221 U.S.P.Q. 1137 (9th Cir. 1984) (court resolved priority as between parties making sales within a few days of each other both before and after a third party's formal abandonment of mark; a sale prior to abandonment by the third party was held "both premature and in bad faith"); Intrawest Financial Corp. v. Western Nat'l Bank, 610 F. Supp. 950, 227 U.S.P.Q. 27 (D. Colo. 1985) (The "First National Bank of Denver" announced in 1982 change of its primary name to "IntraWest Bank of Denver." The court found that there was an abandon-

prior user, those who make subsequent use may be required to take reasonable precautions to prevent confusion.[3] As the Trademark Board summarized the rule: "It is well settled, however, that after a mark has become abandoned, if it is then adopted and used by an entity unrelated to the original owner, the rights to the mark vest with the first to adopt and use it, provided that the new user takes reasonable precautions to prevent confusion."[3.1]

For example, the INDIANAPOLIS COLTS, an NFL professional football team, could prevent the use of the name BALTIMORE COLTS for a Canadian Football League team located in Baltimore. Because the INDIANAPOLIS COLTS were once located in Baltimore and were known before 1984 as the BALTIMORE COLTS, the name, while facially abandoned, could not be used by another football team without causing confusion as to source.[4] The court found that the use of the term BALTIMORE COLTS in this setting "will lead many consumers to believe it designates either the old Baltimore Colts (falsely implying that the Indianapolis Colts are not the

ment of exclusive rights such that another bank could, two months after the name change, change its name to "First National Bank of Denver.").

*See* §§ 16:3–16:10.

[3] Restatement (Third) of Unfair Competition § 30, comment a (1995) ("Although a subsequent user of an abandoned mark will not be subject to liability for trademark infringement, use of the abandoned designation in a manner likely to deceive or mislead a significant number of prospective purchasers may subject the user to liability to the former owner under the general rule proscribing misrepresentations of source stated in § 4. Subsequent users, although free to use the abandoned designation, may thus be required to take precautions necessary to avoid a likelihood of confusion if the designation retains its association with the former user."). *See* Hornblower & Weeks Inc. v. Hornblower & Weeks Inc., 60 U.S.P.Q.2d 1733, 2001 WL 1512024 (Trademark Trial & App. Bd. 2001) (Opposer HORNBLOWER & WEEKS was first to use the HORNBLOWER mark in the investment field after applicant's family had ceased use of the name for 15 years. Opposer made no representation to the public that it was a successor to the previous abandoned use of HORNBLOWER, which applicant was attempting to revive.).

[3.1] In re Wielinski, 49 U.S.P.Q.2d 1754, 1998 WL 998961 (Trademark Trial & App. Bd. 1998)(applicant, an organization for collectors of DIAMOND T antique vehicles, could register the DIAMOND T mark for its activities and items because the original vehicle manufacturer was defunct and had abandoned the DIAMOND T mark more than thirty years previous.).

[4] Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 31 U.S.P.Q.2d 1811 (7th Cir. 1994).

LOSS OF RIGHTS                                          § 17:2

successor to the Baltimore Colts) or that the new Baltimore team is
an NFL team (or is approved by or affiliated with the NFL) or the
Indianapolis Colts." [5] The court later characterized its *Indianapolis*

### *[Text Continued on Page 17-5]*

---

[5] 31 U.S.P.Q.2d at 1817. A preliminary injunction against use of the
names "Colts," "Baltimore Colts," or "Baltimore CFL Colts" in connection
with the playing of professional football, broadcasts of games and sale of
related merchandise was affirmed.

not be confused, arcade customers who use the two machines are likely to be confused. "The notion that likelihood of confusion is limited to purchaser confusion is simply not correct." [14] However, the CAFC has cautioned that for items sold to businesses, only those users who might influence future purchases can be considered in determining the likelihood of confusion. [15]

Confusion of suppliers can also furnish a basis for a finding of infringement. [16]

## § 23:8  — Confusion as to affiliation, connection or sponsorship

The confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation,

[14] In re Artic Electronics Co., 220 U.S.P.Q. 836, 1983 WL 51896 (T.T.A.B. 1983). *Accord:* Montgomery v. Noga, 168 F.3d 1282, 49 U.S.P.Q.2d 1961 (11th Cir. 1999) (owner of mark identifying picture-reading software which was incorporated without permission into defendant's photo CD-ROM product, was not claiming that defendant used the term VPIC to induce prospective buyers of defendant's CD-ROM. Rather, plaintiff "is claiming that *users* of the defendants' discs would be likely to be confused about either the source or the license status of VPIC and thus would be unlikely to pay him the required licencing fee for their individual use of his program in connection with the defendants' discs. Such user confusion, if properly proven, is an appropriate basis for a finding of likelihood of confusion under section 43(a).")

[15] Electronic Design & Sales, Inc. v. Electronic Data Systems Corp., 954 F.2d 713, 21 U.S.P.Q.2d 1388, 1392 (Fed. Cir. 1992) (a nurse in a physician's office who is confused as to the source of defendant's possibly defective electrical equipment and also processes patient's Blue Cross insurance claims is not in a position to influence Blue Cross's purchase of plaintiff's computer services).

[16] Powder River Oil Co. v. Powder River Petroleum Corp., 830 P.2d 403, 23 U.S.P.Q.2d 1037, 1047 (Wyo. 1992) (reversing a grant of summary judgment for defendant: "The view that infringement requires a likelihood of confusion among customers is too restrictive. . . . If a likelihood of confusion among suppliers . . . exists, it deserves consideration as a relevant factor in determining infringement."); Champions Golf Club v. Champions Golf Club, 78 F.3d 1111, 38 U.S.P.Q.2d 1161 (6th Cir. 1996) (actual confusion among suppliers to golf course should not have been down-graded by district court on the ground that only confusion among player-customers of golf course was relevant; evidence of actual confusion among suppliers is relevant and must be considered).

connection or sponsorship.[1]

This broad scope of "confusion" was codified in 1989 in Lanham Act § 43(a). A federal claim under Lanham Act § 43(a) for infringement of an unregistered mark is triggered by a use which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the user with the senior user.[2]

In many cases, if consumers think that approval is needed for the use of a trademark on certain goods, then approval via a license is required.[2.1] However, the kind of approval confusion required for infringement will vary with the circumstances. For example, if all that the defendant has done is reproduce the plaintiff's trademark as a "clip art" logo embedded in a computer program for possible reproduction by end users, the kind of confusion of approval needed to constitute infringement is not confusion that the owner of the mark approved this reproduction of its logo in the defendant's computer program. What is needed for infringement is confusion that the owner of the mark approved of this brand of software.[2.2]

Confusion can result even if plaintiff's product is no longer being made. The shape of a classic FERRARI sports car made from 1969 to 1974 was protected as distinctive trade dress as against the maker of a replica car. While the purchaser of an unauthorized replica knows it is not a genuine car, he may think that it is sponsored, approved or licensed by Ferrari. Also, Ferrari's reputation for rarity and quality could be damaged if non-purchasers who see the replica on the road

---

[Section 23:8]

[1] See §§ 24:5–24:12; Champions Golf Club v. Champions Golf Club, 78 F.3d 1111, 38 U.S.P.Q.2 d 1161 (6th Cir. 1996) (In case of alleged confusion between two golf courses, both named CHAMPIONS, the issue is not whether golfers are confused about which course they are playing on, but rather, whether the courses are affiliated. "[T]his is the ultimate question to be answered in the likelihood of confusion inquiry. . . . The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation between the two clubs [both named CHAMPIONS]."); Hartman, "Subliminal Confusion: The Misappropriation of Advertising Value," 78 Trademark Rep. 506 (1988).

[2] Lanham Act § 43(a), 15 U.S.C.A. § 1125(a). See §§ 27:12–27:23.

[2.1] See discussion at § 24:9.

[2.2] Medic Alert Foundation U.S., Inc. v. Corel Corp., 43 F. Supp. 2d 933, 937, 51 U.S.P.Q.2d 1024 (N.D. Ill. 1999) ("Here, where the use of the allegedly infringing mark is . . . hidden inside a computer program, any confusion as to perceived permission does not constitute necessarily confusion as to perceived endorsement." No infringement was found.).

think it looks cheap or in disrepair.[3]

### § 23:9  — Call to mind is not confusion

"Confusion" means more than that the junior user's mark merely "calls to mind" the senior user's mark. As Judge Rich observed:

> The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, the two marks. . . . Seeing a yellow traffic light immediately "calls to mind" the green that has gone and the red that is to come, or vice versa; that does not mean that confusion is being caused. As we are conditioned, it means exactly the opposite.[1]

For example, no likelihood of confusion was found between the senior user's DON'T LEAVE HOME WITHOUT THEM slogan for travelers' checks and the junior user's DON'T DO-IT-YOURSELF WITHOUT US slogan for do-it-yourself retail stores services for home improvement materials. While the junior user's mark may call to mind the senior user's famous mark, this alone is not sufficient for

---

[3] Ferrari S.p.A. Esercizio Fabriche Automobili e Corse v. McBurnie, 11 U.S.P.Q.2d 1843, 1989 WL 298658 (S.D. Cal. 1989); Ferrari S.p.A. Esercizio Fabriche Automobili E Corse v. Roberts, 944 F.2d 1235, 20 U.S.P.Q.2d 1001, 1009–1010 (6th Cir. 1991) ("The Lanham Act, however, was intended to do more than protect consumers at the point of sale. . . . Ferrari's reputation in the field could be damaged by the marketing of [defendant's] replicas . . . despite the absence of point of sale confusion.").

[Section 23:9]

[1] In re Ferrero, 479 F.2d 1395, 178 U.S.P.Q. 167 (C.C.P.A. 1973). *Accord* University of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., 703 F.2d 1372, 217 U.S.P.Q. 505 (Fed. Cir. 1983) (likelihood of confusion "means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another"); Viacom International Inc. v. Komm, 46 U.S.P.Q.2d 1233, 1998 WL 177474 (T.T.A.B. 1998)(while the mark MY-T-MOUSE THE SOFTWARE THAT MAKES YOUR MOUSE A MOUSE THAT TYPES! for software that creates an on-screen keyboard usable by the computer mouse could bring to mind MIGHTY MOUSE for a cartoon character merchandised for use on toys, which could include computer toys and games, this does not mean that a likelihood of confusion exists). *See* Jacobs v. International Multifoods Corp., 668 F.2d 1234, 212 U.S.P.Q. 641 (C.C.P.A. 1982); Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 218 U.S.P.Q. 1 (6th Cir. 1983); Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 210 U.S.P.Q. 547 (9th Cir. 1981).

*But compare* Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, n.4, 19 U.S.P.Q.2d 1491 (9th Cir. 1991) (results of a "call to mind" survey question were held to support a finding of likely confusion).

fast-food restaurant would be likely to believe that opposer [who is the owner of a supermarket chain] owned, sponsored or supplied that business."[2] Of course, the test of infringement is likelihood of confusion, not just whether the marks themselves are "confusingly similar."[3]

### § 23:5   Whose confusion and about what?—customer and potential customer confusion

*West Key No. Digests References*

Trade Regulation ☞ 24, 336

**KeyCite™:** Cases and other legal materials listed in KeyCite Scope can be researched through West Group's KeyCite service on WESTLAW®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

The most common and widely recognized type of confusion that creates infringement is purchaser confusion of source which occurs at the time of purchase: point of sale confusion. But point of sale confusion does not mark the outer boundaries of trademark infringement. The vast majority of courts recognize post-sale confusion, which may occur among those who see an infringing mark in use by an owner who were not confused at the time they bought the product.[1] Similarly, initial interest confusion which is dispelled by the

---

[2] Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570, 218 U.S.P.Q. 390, 394 (Fed. Cir. 1983). *See* Fisons Horticulture v. Vigoro Indus., Inc., 30 F.3d 466, 31 U.S.P.Q.2d 1592 (3d Cir. 1994) (using the term "confusingly similar" in both senses: to refer to similarity between the marks and to overall likelihood of confusion); Madison Reprographics, Inc. v. Cook's Reprographics, Inc., 552 N.W.2d 440, n.6, 41 U.S.P.Q.2d 1905, n.6 (Wis. App. 1996) ("The trial court used the term 'deceptively similar' in addition to 'likelihood of confusion.' We understand the court to have used these terms interchangeably.").

[3] Myrurgia, S. A. v. Comptoir de La Parfumerie S. A. Ancienne Maison Tschanz, 441 F.2d 673, 675, 169 U.S.P.Q. 587, 588 (C.C.P.A. 1971). *See* In re West Point-Pepperell, Inc., 468 F.2d 200, 175 U.S.P.Q. 558 (C.C.P.A. 1972) (the test is "not whether people will confuse the marks but whether the marks will confuse people").

[Section 23:5]

[1] *See* § 23:7.

time of purchase can also be actionable.[2] Reverse confusion is a type of infringement and occurs when the junior user's advertising swamps the market and customers are likely to be confused into thinking that the senior user's goods or services are those of the junior user.[3]

Source confusion is not the boundary, for actionable confusion includes confusion as to affiliation, connection or sponsorship.[4] However, the junior user's mark which merely calls to mind the senior user's mark is not an infringement.[5] Similarly, every merchant is entitled to use another's mark, not to identify the junior user's product, but to truthfully identify the senior user's goods or services in advertising in a way that does not cause a likelihood of confusion.[6]

At issue in most cases is the likely confusion of members of the relevant class of customers and potential customers.[7] Those customers may be consumers, professional purchasers or wholesalers or retailers.[8] A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market. For example, in a case concerning similar marks used on recreational sailboats, the possible confusion of a person who has no interest in boats at all is not relevant.[9]

[2] *See* § 23:6.

[3] *See* § 23:10.

[4] *See* § 23:8.

[5] *See* § 23:9.

[6] *See* § 23:11.

[7] *See* §§ 23:91–23:94; Electronic Design & Sales, Inc. v. Electronic Data Systems Corp., 954 F.2d 713, 21 U.S.P.Q.2d 1388, 1390 (Fed. Cir. 1992) (purchaser confusion is the "primary focus" and in the case of goods and services that are sold, "the enquiry generally will turn on whether actual or potential 'purchasers' are confused").

[8] *See* Russ Berrie & Co. v. Jerry Elsner Co., 482 F. Supp. 980, 205 U.S.P.Q. 320 (S.D.N.Y. 1980) (confusion of retailers alone is infringement); Bishop v. Hanenburg, 39 Wash. App. 734, 695 P.2d 607, 226 U.S.P.Q. 362 (1985)("Not only is a supplier a member of the public, but if a supplier is confused by similar businesses with identical names, the consuming public is likely to be similarly confused."); §§ 23:100–23:103.

[9] *See* Estee Lauder, Inc. v. The Gap, Inc., 108 F.3d 1503, 42 U.S.P.Q.2d 1228 (2d Cir. 1997) ("The test, however, is not whether confusion is possible; nor is it whether confusion is probable among customers who are not knowledgeable."); Clinique Laboratories, Inc. v. Dep Corp., 945 F. Supp. 547, 552 (S.D.N.Y. 1996) ("When comparing marks to determine the likelihood of consumer confusion, 'the correct test is whether a consumer who is some-

Post-sale confusion is also actionable. For example the general public who observe another wearing or using a counterfeit of a prestige branded product may be confused into thinking that it is the genuine article. This can damage the good will and reputation of the prestige product and cause a loss of sales. [9.1]

In-house, private use where the trademark is not seen publicly is not sufficient to constitute infringement. [10]

Post-sale inspection of goods does not necessarily cure an initial confusion of source created in an oral order placed over the telephone. As the Ninth Circuit remarked: "Even if a customer realized at the time of delivery that the pens delivered were not the pens supposedly ordered, the customer might decide not to bother to return and exchange the pens at that late stage." [11]

The probable confusion of the senior user's customers should also be considered. The Second Circuit said that it was error for the district court only to consider likely confusion of customers of the junior user, a fur retailer in Chicago. The court should also have considered the possibility that retail customers of the senior user, a designer and wholesaler of fur garments, would mistakenly believe that their supplier had gone into the retail end of the business and was now competing with them. [12]

---

what familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone.' "); § 32:159 .

[9.1] Hermes Intern. v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 55 U.S.P.Q.2d 1360 (2d Cir. 2000)(defendant sold copies of plaintiff's HERMES' high-fashion accessories and informed buyers that the goods were copies. "[A] loss occurs when a sophisticated buyer purchasers a knockoff and passes it off to the public as the genuine article, thereby confusing the viewing public and achieving the status of owing the genuine article at a knockoff price."). See § 23:7.

[10] Meta-Film Associates, Inc. v. MCA, Inc., 586 F. Supp. 1346, 222 U.S.P.Q. 211 (C.D. Cal. 1984) (while defendant considered plaintiff's title as a possible title for a television series, defendant never used the title publicly; such a "limited internal use" is not infringement). Author's Comment: While the court did not state the reason for this holding, it is because such a private, in-house use cannot confuse the public, who were never exposed to it.

[11] Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 230 U.S.P.Q. 791 (9th Cir. 1986).

[12] Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 5 U.S.P.Q.2d 1262 (2d Cir. 1987). Accord: First Jewellery Co. of Canada, Inc. v. Internet Shopping Network LL, 53 U.S.P.Q.2d 1838, 2000 WL 122175 (S.D. N.Y. 2000) (actionable confusion is created in that customers of plaintiff FIRST JEWELRY (a jewelry wholesaler) will mistakenly be led to think by defendant's

As to those few customers who do not care about brands and do not pay any attention to them, such "brand indifferent" customers do not count in the equation of likelihood of confusion.[13]  Similar is the totally careless customer who cares about brands but exercises less than "ordinary" care and is easily confused by almost any minimal level of similarity.[14]  The test of infringement cannot be a mere "possibility" of confusion, because "[m]any consumers are ignorant or inattentive, so some are bound to misunderstand no matter how careful a producer is."[15]

An infringing trade name that is likely to confuse investors is also an infringement.[16]  As the Second Circuit observed: "[I]nvestors

---

similar domain name <www.firstjewelry.com> on defendant's retail web site that plaintiff is competing with them by selling to the public. Preliminary injunction granted.). See § 24:53.

[13] See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 204 U.S.P.Q. 808 (9th Cir. 1979); Spangler Candy Co. v. Crystal Pure Candy Co., 235 F. Supp. 18, 143 U.S.P.Q. 94 (N.D. Ill. 1964), aff'd, 353 F.2d 641, 147 U.S.P.Q. 434 (7th Cir. 1965); Chun King Sales, Inc. v. Oriental Foods, Inc., 136 F. Supp. 659, 108 U.S.P.Q. 400 (D. Cal. 1955), aff'd in part and rev'd in part, 244 F.2d 909, 113 U.S.P.Q. 404 (9th Cir. 1957); Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 52 U.S.P.Q.2d 1035 (7th Cir. 1999), on remand to, 2000 WL 1428665 (S.D. Ind. 2000)("Customers who do not care about the source of goods are not considered in the determination whether there is a likelihood of confusion."). See also Chips 'n Twigs, Inc. v. Chip-Chip, Ltd., 414 F. Supp. 1003, n.11, 190 U.S.P.Q. 361 (E.D. Pa. 1976) (while some consumers may not rely on mark in purchasing, if they later become unhappy with the goods, they might then notice the mark and decide not to buy such goods in future: an injury as great as confusion in purchasing); Stern, "Buyer Indifference and Secondary Meaning in Unfair Competition and Trademark Cases," 32 Conn. B.J. 381 (1958 ); §§ 8:8–8:14.

[14] Fotomat Corp. v. Cochran, 437 F. Supp. 1231, 194 U.S.P.Q. 128 (D. Kan. 1977) (court must determine whether in addition to "general confusion" of non-brand conscious customers confusion is likely among brand-conscious customers); S. S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 202 U.S.P.Q. 545 (1st Cir. 1979) (noting that survey showed a 5.7 percent level of general background noise of confusion between any two sellers). See §§ 23:91–23:94.

[15] August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 35 U.S.P.Q.2d 1211 (7th Cir. 1995).

[16] Waterman-Bic Pen Corp. v. Beisinger Industries Corp., 321 F. Supp. 178, 169 U.S.P.Q. 163 (S.D.N.Y. 1970) (court found a likelihood of confusion between plaintiff's use of BIC on ball point pens and defendant's proposed use of BIC as a stock market ticker symbol; investors in defendant's stock might assume "in an era of extreme corporate diversification, that defendant is part of plaintiff's corporate structure"); Communications Satellite Corp. v.

might be confused about the affiliation between two similarly named companies and might very well alter their behavior based on that confusion."[17]

## § 23:6  — Initial interest confusion

Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.[1] Most courts now recognize the initial interest confusion theory as a form of likelihood of confusion which can trigger a finding of infringement.[1.1] In one of the first cases

Comcet, Inc., 429 F.2d 1245, 1251 (4th Cir. 1970) ("The likelihood of confusion among investors is an adequate predicate for relief. . . . And this is so, even if the infringer has not yet issued its stock."); Koppers Co. v. Krupp-Koppers GmbH, 517 F. Supp. 836, 210 U.S.P.Q. 711 (W.D. Pa. 1981) (likely confusion of investors).

[17] Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 51 U.S.P.Q.2d 1183 (2d Cir. 1999) (such infringement was found by the use of similar names of investment management companies.). See Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 60 U.S.P.Q.2d 1609 (3d Cir. 2001) ("Investor confusion may well threaten a party's business or goodwill if it would likely deter or inhibit a company's ability to attract investors and raise capital." But here, investors were held unlikely to be confused by the parties' similar CHECKPOINT names and stock symbols ("CKP" on the NYSE and "CHKP" on the NAS-DAQ) because the products were different, investors were sophisticated and careful and the shares were traded on different exchanges.).

[Section 23:6]

[1] See Bruzga, "Sophisticated Purchaser Defense Avoided Where Pre-Sale Confusion is Harmful," 78 Trademark Rep. 659 (1988).

[1.1] Second Circuit: Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 2 U.S.P.Q.2d 1677 (2d Cir. 1987) ("Such initial confusion works a sufficient trademark injury." In this case the likelihood that an oil trader might listen to a cold call from "Pegasus Petroleum," mistakenly thinking it was related to Mobil Oil, is a kind of "confusion" sufficient for infringement even though the oil trader would soon be unconfused and not actually enter into a business transaction with Pegasus in a confused state of mind.); Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 514-15, 30 U.S.P.Q.2d 1721 (S.D.N.Y. 1993) (a recognized type of confusion is when "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase"; dictum).

Third Circuit: SecuraComm Consulting, Inc. v. SecuraCom Inc., 984 F. Supp. 286, 45 U.S.P.Q.2d 1576 (D.N.J. 1997), rev'd on other grounds, 166 F.3d 182, 186, 49 U.S.P.Q.2d 1444 (3d Cir. 1999), appeal after remand, 224 F.3d 273, 55 U.S.P.Q.2d 1820 (3d Cir. 2000) (finding that the initial interest confusion of customers of large scale security systems defeats the sophisti-