UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

THE HONORABLE ORDER OF KENTUCKY COLONELS, INC.

PLAINTIFF,

V. CIVIL ACTION NO. 3:04CV-465-H

BUILDING CHAMPIONS, LLC, d/b/a KENTUCKY COLONELS BASKETBALL

DEFENDANT.

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Building Champions, LLC ("Building Champions"), by counsel, in support of its Opposition to Plaintiff's Motion for Preliminary Injunction, states as follows:

**INTRODUCTION**

Plaintiffs extraordinary demand for injunctive relief where Building Champions uses its own stylized service mark on T-shirts and other basketball-related merchandise is completely unwarranted. Plaintiff has finally conceded, as it must, that there exists a secondary source doctrine under trademark law which acknowledges that use of a mark as ornamentation on a T-shirt or other novelty or souvenir item can be of a special nature which inherently tells the purchasing public the secondary source of the product - as opposed to the actual manufacturer of the product. Plaintiff has already acknowledged that there is no likelihood of confusion between Plaintiffs use of the "KENTUCKY COLONELS" term and Building Champions' use of its "KENTUCKY COLONELS"

service mark for basketball services[1]. Accordingly, there can be no confusion where the same service mark appears on a T-shirt in a manner clearly depicting the basketball team as its source.

Based on the arguments and evidence set forth to date, it is crystal clear that Plaintiff will not succeed on the merits of its trademark infringement claim. As such, Plaintiff has not met its burden of proving the first element required for Plaintiff to be afforded the drastic relief it seeks in the form of a preliminary injunction. In addition, Plaintiff has failed to establish that it will suffer irreparable harm and yet, Defendant and the public will suffer immeasurably by such a result. Building Champions respectfully requests that the Court deny Plaintiff's motion for injunctive relief.

The Court has specifically requested additional briefing on the legal significance of (i) secondary source and (ii) genericness in the trademark context. The following sets forth the legal significance of both concepts.

**ARGUMENT**

**A. Secondary Source**

Where a mark is used to identify and distinguish a product or service, a mark can also serve to identify and distinguish a secondary source as an indication of sponsorship or authorization from a known entity. *See In re Expo '74*, 189 U.S.P.Q. 48 (T.T.A.B. 1975) (EXPO '74 registered as a mark for T-shirts by promoters of 1974 World's Fair; as used on T-shirts, EXPO '74 can and did serve a trademark function as an indication of origin.) In addition, the court in *In re Olin Corp.*, 181 U.S.P.Q. 182, 182 (T.T.A. B.

[1] A trademark is a source-identifying word, name, symbol, device (or any combination thereof) for distinguishing a product. *See* 15 U.S.C. §1127. A service mark is the same thing used to distinguish a service. *Id.* Building Champions currently owns two federal service marks for basketball-related services: (1) App. No. 78391004 for KENTUCKY COLONELS (word mark) and (2) App. No. 78433951 for KENTUCKY COLONELS LOUISVILLE (stylized design mark).

1973) stated, "It is a matter of common knowledge that T-shirts are 'ornamented' with various insignia . . . [and that] the ornamentation of a T-shirt can be of a special nature which inherently tells the purchasing public the source of the T-shirt, not the source of the manufacture but the secondary source." As the court further noted,

> "Thus, the name 'New York University' and an illustration of the Hall of Fame, albeit it will serve as ornamentation on a T-shirt will also advise the purchaser that the university is the secondary source of the shirt. It is not imaginable that Columbia University will be the source of an N.Y.U. T-shirt. Where the shirt is distributed by other than the university, the university's name on the shirt will indicate the sponsorship or authorization by the university . . . In the case before us, the T-shirt is ornamented with applicant's trademarks, and considering the nature of T-shirts, that particular ornamentation can serve as an indication of a secondary source of origin. The manner sought to be registered is an arbitrary symbol and can and does function as a trademark. As used on the T-shirts, we conclude that the mark serves as an identifier of a secondary source and as such is registrable. " *Id.*

*See also In re McDonald's Corp.*, 199 U.S.P.Q. 702 (T.T.A.B. 1978) (McDONALD'S and "Golden Arches" registered for clothing); *In re Snap-On Tools Corp.*, 159 U.S.P.Q. 254 (T.T.A.B. 1968) (SNAP-ON mark for tools registered for promotional pens and pencils).

To show that a proposed mark that is used in an ornamental manner also serves a secondary source-identifying function, an applicant seeking a trademark registration must show the following: (1) ownership of a U.S. registration on the Principal Register of the same mark for *other goods or services* based on use in commerce under §1 of the Trademark Act; (2) non-ornamental use of the mark in commerce on *other goods or services*; or (3) ownership of a pending use-based application for the same mark, used in a non-ornamental manner, for *other goods or services*. TMEP §1202.03(c) (emphasis added). Based on the foregoing, it is without legal dispute that Building Champions has

every right to register "KENTUCKY COLONELS LOUISVILLE (Stylized Design) (App. No. 78433951)" (the "Design Mark") for apparel and other novelty items where such use of the mark serves a secondary source-identifying function. This is simply a, "recognition of today's commercial realties." *See In Re Paramount Pictures Corporation* 217 U.S.P.Q. 292, 293 (T.T.A.B. 1983) (Refusal to register Applicant's "STAR TREK" mark for towels, sheets, pillow cases and comforters reversed. "It is clear that [STAR TREK] performs a trademark function and is recognizable as such to the extent that the public would associate articles on which it appears as having a common origin. We see no reason that its appearance on the goods in applicant's instant application would not evoke the same association as its use on other goods . . . ." *Id.*).

1. <u>Building Champions' Use of the Design Mark on T-Shirts and Novelty Items is an Indication of Secondary Source</u>.

Despite Plaintiff's repeated attempts to divert the Court's attention away from the secondary source doctrine,[2] secondary source identification is the whole point of this dispute. The evidence unquestionably shows that the mark used by Building Champions on the disputed merchandise is none other than the Design Mark. [*See* Transcript from the Preliminary Hearing, dated August 30, 2004, pages 129-133, 151-152 and 155-160.] As the evidentiary record shows, the Design Mark as used by Building Champions on merchandise consists of a distinct design element that includes the prominent use of a basketball design in the red, white and blue colors of the American Basketball Association. *Id.* Unless someone has been living on another planet for the last century,

[2] Plaintiff originally referred to Building Champions' secondary source argument as a "red herring," and "a novel proposition" "frivolous on its face and completely unsupported." [*See* Plaintiff's Supplemental Memorandum, page 8.] In addition, Plaintiff boldly and incorrectly asserted that Defendant cited no authority for "this novel proposition . . . because there is none." *Id.* Plaintiff's misrepresentations of well-established trademark law are troubling to say the least.

no one will think that a T-shirt (or any other novelty item) bearing the Design Mark is associated with anyone other than Building Champions. This is virtually impossible.

Building Champions not only has a legal right to register its Design Mark under the secondary source doctrine of trademark law, it is also without question that the Design Mark is not likely to cause confusion with the Honorable Order's use of the "KENTUCKY COLONELS" term on apparel and related novelty items. Plaintiff is apparently wedded to the notion that it has exclusively appropriated certain classes of goods by registering the term "KENTUCKY COLONELS" in those classes. Plaintiff's position is misguided. The U.S. Patent and Trademark Office ("USPTO") classification system was established for purposes of administrative convenience only. 15 U.S.C. §1112 (2003). The classification system is not determinative of a likelihood of confusion. *See National Football League v. Jasper Alliance Corporation*, 16 U.S.P.Q.2d 1212 (T.T.A.B. 1990). Plaintiff's position that Building Champions cannot register or use its Design Mark for goods in the same category is also flat-out wrong.

Plaintiff 's counsel stated that he would, "bet most of what I have that the Patent and Trademark Office would never, ever register that logo for any of the goods for which we are using the mark." [*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 183.] This is a losing bet based merely on conjecture instead of sound trademark law. The USPTO has already registered marks in very similar fact scenarios as the matter at hand and the Trademark Trial and Appeal Board has ruled in such instances that there is no likelihood of confusion. Consider, for example, *Sharkskins Surf Gear, Inc. v. San Jose Sharks*, 1996 TTAB LEXIS 45. In this case, the San Jose Sharks ("Applicant"), a National Hockey League expansion team, filed trademark applications to

register a certain shark design mark in connection with hockey services (in class 41) and related apparel and team merchandise (in class 25). Sharkskins Surf Gear, Inc. ("Opposer"), a clothing manufacturer, filed an opposition against the hockey team's applications on the basis that the team's use of its mark would cause confusion with its own shark design mark already registered for the same goods in class 25. The TTAB, in dismissing the oppositions, determined that even though the goods of the parties are "legally identical," the marks of the parties, "are not so similar, when they are considered in their entireties, that confusion is likely." *Id.* at 19. In fact, even though the Applicant's mark contained no wording[3], " . . . the connection to the sport of hockey is clearly represented by the hockey stick clenched between the exaggerated teeth of the animal. Applicant's mark unequivocally relates to hockey, but it does so graphically, without any wording." *Id.* at 23. The same must be true where Building Champions distinguishes its mark by the very obvious red, white and blue design of a basketball. It is unnecessary that the word, "BASKETBALL" does not appear. The basketball design itself is enough to distinguish team merchandise from the same merchandise sold by the Honorable Order. As the Administrative Trademark Judges rightly stated:

> " . . . fans or others who closely follow professional hockey and who, as a result of applicant's extensive sales and promotional efforts, want t-shirts showing support for the San Jose Sharks hockey team, will recognize applicant's logo and look for shirts showing a shark and a hockey stick. There is little chance that these purchasers will select opposer's shirts. . . . Even someone who is personally unfamiliar with the team's logo, if he wants to purchase a shirt indicating support for the team, either for himself or as a gift for someone else, would likely expect the mark on such goods to make at least some reference to hockey."

[3] It should be noted further that other word marks and combination word/design marks for "SHARKS" have been registered by the San Jose Sharks in the same clothing categories outside of this TTAB decision. *See, e.g.*, Reg. Nos. 2718724 and 1769354.

*Id.* at 28. The TTAB in this case has clearly stated the obvious.

2. The Honorable Order's Use of the "KENTUCKY COLONELS" Mark is also an Indication of Secondary Source.

Plaintiff has argued two positions on the issue of the goodwill relating to its use of the "KENTUCKY COLONELS" term on clothing and related goods. On one hand, Plaintiff argues that it is now in the for-profit business of branded clothing manufacture. On the other hand, Plaintiff repeatedly acknowledges that the goodwill relating to the sale of its merchandise stems back to the mission and services of the Honorable Order. There is no reliable evidence of the former. There is ample evidence of the latter. Just as Building Champions makes secondary use of its house mark on merchandise related to its basketball team, the Honorable Order makes secondary use of its house mark on merchandise related to its charitable mission. By its own admission, the Honorable Order is using the mark "KENTUCKY COLONELS" in a secondary source identifying function. The Honorable Order has specifically stated,

> ". . .the Trademark Trial and Appeal Board determined that the mark MORK & MINDY was registerable for decals because the mark was not mere ornamentation, but rather an indicator of source (ie, the television series). Such is the case here. The KENTUCKY COLONELS mark as used on The Honorable Order's merchandise clearly has a source-identifying function; it is not 'mere ornamentation' such as, for example, the popular phrase 'HAVE A NICE DAY'." [*See* Plaintiff's Supplemental Memorandum, Page 3.]

In addition, Plaintiff stated that, "The record demonstrates that the Honorable Order, in an effort to increase the funds available to it for charitable distribution, began using KENTUCKY COLONELS as a trademark for a wide variety of merchandise, at least as early as October 21, 2002." [*See* Plaintiff's Supplemental Memorandum, Page 2.] Moreover, the Honorable Order stated that it is using the mark "KENTUCKY

COLONELS" in connection with such items to, "support the Honorable Order's charitable interests."  [*See* Plaintiff's Memorandum, Footnote 1, page 9].

Plaintiff has not, and cannot, demonstrate any use of the "KENTUCKY COLONELS" trademark in the novelty product categories that is disconnected from the primary meaning of the public domain term in its original context.  As pointed out at the preliminary hearing, the specimens of use submitted with the Honorable Order's 2004 Class 25 trademark application, together with the Honorable Order's current use of the "Kentucky Colonels" term on merchandise, clearly evidence the ornamental, secondary source function of the term. [*See* Transcript from the Preliminary Hearing, dated August 30, 2004, pages 18-21, 80 and 116-117.]  The Honorable Order has shown no evidence of trademark use of "KENTUCKY COLONELS" establishing a source of goodwill that is distinct from its primary services and/or attached solely to the novelty products.  The ornamental use of the "KENTUCKY COLONELS" term on novelty merchandise creates a secondary source association in the mind of the public.  The association between the Honorable Order's use of "KENTUCKY COLONELS" for its charitable services and its use of "KENTUCKY COLONELS" on novelty merchandise that supports the services is the same to the public.  Since the "KENTUCKY COLONELS" element of the "HONORABLE ORDER OF KENTUCKY COLONELS" mark is generic, such term is also generic for use on promotional merchandise, such as hats and shirts, where the term relates back to its secondary source.

**B.      Genericness**

"When assessing its strength, a court will place a trademark into one of four categories: generic, descriptive, suggestive, and fanciful." *Daddy's Junky Music Stores,*

*Inc.*, 109 F.3d at 280. "If a mark's primary significance is to describe a type of product rather than the producers, it is generic and is not a valid trademark." *Nartron Corporation v. Stmicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002). Since the Honorable Order uses the mark "KENTUCKY COLONELS" to signify that which it is, i.e., a person appointed a "Kentucky Colonel," such use is generic and not entitled to trademark protection.

1. General Information on Generic Terms.

It is a fundamental principal of trademark law that a generic term can never function as a trademark. *See Nartron Corporation v. Stmicroelectronics, Inc.*, 305 F.3d 397 (6th Cir. 2002) (Court held the term "SMART POWER" in the semiconductor industry to be a generic term because it defines a type of technology that those in the semiconductor industry develop and market.) There is no shield of protection for a mark, even a registered mark which is incontestable, if found to be generic. The Sixth Circuit has noted that the, "appropriate test for genericness is whether the relevant public perceives the term primarily as the designation of the article." *Id.* Building Champions acknowledges that Plaintiff has a valid registration for the mark HONORABLE ORDER OF KENTUCKY COLONELS as ***a whole***. However, the "KENTUCKY COLONELS" element of this mark is not protectible apart from the mark as a whole because the term as used by the Honorable Order is generic and not a trademark at all.

"A proposed mark cannot acquire trademark protection unless the mark is distinctive, that is, unless it serves the traditional trademark functions of distinguishing the applicant's goods from those of others and identifying the source of the goods. The antithesis of a distinctive mark is a 'generic' mark which merely employs the common

name of a product or service or refers to the genus of which the particular product is a species." *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535, 538 (4th Cir. 2004). The "HONORABLE ORDER OF KENTUCKY COLONELS" mark merely incorporates "KENTUCKY COLONELS" as a generic term. In this instance, the element "KENTUCKY COLONELS" describes a type of person, i.e., a colonel. Therefore, the phrase "KENTUCKY COLONELS" is generic. "Because a generic mark, by definition, neither signifies the source of goods nor distinguishes the particular product from other products on the market, a generic term cannot be protected as a trademark or registered as one." *Id.* at 538. For example, the mark APPLE used in connection with an apple is generic while the mark APPLE in connection with a computer is not generic. The Honorable Order uses the mark "KENTUCKY COLONELS" to signify a person appointed by the Governor as a "Kentucky Colonel."

2. Examples of Generic Terms.

The Veterans of Foreign Wars Foundation has a trademark registration to protect its services.[4] The VFW Foundation cannot, however, take the word "VETERANS" from its registered mark and seek trademark protection for just the word "VETERANS." The term "VETERANS" as used by the VFW Foundation is generic and not entitled to trademark protection and the VFW Foundation cannot seek to stop others from using the generic phrase for its primary definition, even in connection with T-shirts and other novelty items. This point is illustrated in a federal case out of the D.C. Circuit.

*Blinded Veterans Association v. Blinded American Veterans Foundation*, 872 F.2d 1035 (D.C. Cir. 1989) involved a case in which the Blinded Veterans Association ("BVA") sought to enjoin the Blinded American Veterans Foundation (the "Foundation")

[4] *See* Reg. Nos. 2,306,415 and 2,350,501.

from using its trademark and any name which included the terms "veterans," "blind" or "blinded." The court determined that the term "BLINDED VETERANS" was generic because it was used, "to denote formerly sighted former warriors." *Id.* at 1041. It is clear then that "KENTUCKY COLONELS" is also generic as used by the Honorable Order to denote honorary colonels of Kentucky appointed as such by the Governor of the Commonwealth.

While BVA did not have a trademark registration for the mark "BLINDED VETERANS," a registration merely shifts the burden of proof as set forth in more detail below. The BVA court noted that, "a generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it." *Id.* at 1039. Moreover, the court noted that, "because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded trademark protection even if it becomes associated with only one source." *Id.* The Governor has appointed "Kentucky Colonels" since the early 1800's. The Honorable Order was formed in the 1930's as an organization of certain "Kentucky Colonels" previously appointed by the Governor. The Honorable Order neither appoints "Kentucky Colonels" nor is involved in the selection process. The term "KENTUCKY COLONELS" has been used by the Commonwealth for nearly 200 years and is still used by the Commonwealth today. Try as it might, there is nothing that the Honorable Order can do to take the generic use of the term "KENTUCKY COLONELS" from the public domain.

The BVA court further noted that it accepted the general principal that, "words which could not individually become a trademark may become one when taken together"

nevertheless, the combination of the terms "blinded" and "veterans" remained generic. *Id.* at 1041. As for Plaintiff's argument that the term "KENTUCKY COLONELS" does not identify the person because the person is actually a man or a woman, such argument is without merit. Courts have reasoned that, "a term need not be the sole designation of an article in order to be generic, the test for genericness is whether the public perceives the term primarily as the designation of the article" and "BLINDED VETERANS" fit that test. *Id.* at 1041. The court noted that, "it is difficult to imagine another term of reasonable conciseness and clarity by which the public refers to former members of the armed forces who have lost their vision." *Id.* Likewise, there is no other term by which to refer to an appointee of the Governor as a "Kentucky Colonel" other than the term "KENTUCKY COLONEL." The court further clarified its position by stating:

> "Just as 'blinded' would be generic when used with 'the blinded persons association' or 'veterans' with 'the veterans association,' so 'blinded veterans' is generic when used to refer to once-sighted persons who served in the armed forces. Separately or together, the terms denote particular types of individuals; 'blinded veterans' simply designates the twice-circumscribed category of people who are both blinded and veterans." *Id.* at 1041.

Such is the case here. The term "KENTUCKY COLONELS" as used in the Honorable Order's mark denotes a type of individual, i.e. an individual who was appointed by the Governor as a "Kentucky Colonel." The phrase "KENTUCKY COLONELS" merely denotes the particular category of people who were given the appointment by the Governor. Since the Governor or the Governor's Office is the only entity which may appoint a "Kentucky Colonel," the term has been in the public domain since around 1813. As noted above, "because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded

trademark protection even if it becomes associated with only one source." *Id.* at 1039. In the case at hand, the term "KENTUCKY COLONELS" is not associated with only one source. The term was originally used by and continues to be used by the Governor and the Commonwealth of Kentucky.

Plaintiff has argued that since it has obtained a trademark registration for the mark "KENTUCKY COLONELS," such mark is necessarily not generic. However, as set forth in more detail in Section B.4 below, a registration merely shifts the initial burden but not the ultimate burden. Further, as demonstrated in the following decisions, just because a mark was registered by the USPTO this does not mean that the mark is not generic. In fact, as some of the following examples illustrate, even incontestable marks can be deemed to be generic. In *Haughton Elevator Company v. Seeberger*, 85 U.S.P.Q. 80 (1950), the mark "ESCALATOR" was deemed generic because it was recognized by the public as the name for a moving staircase and not the source of the product therefore, the Registration No. 34,724 which was issued in 1900 was cancelled. *In re Association of Energy Engineers, Inc.*, 227 U.S.P.Q. 76 (T.T.A.B. 1985), the Board refused registration of the mark "ASSOCIATION OF ENERGY ENGINEERS" because the mark was deemed generic for an organization of engineers specializing in the field of energy. In *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535 (4th Cir. 2004), the court held that the registered mark "FREEBIES," an incontestable registration, was generic and not entitled to trademark protection.

3. Evidence of Genericness.

The Sixth Circuit has noted that, "in deciding genericness, evidence of the relevant public's understanding of a term may be obtained from any competent source."

*Nartron Corporation*, 305 F.3d at 406. Those sources include dictionary definitions, newspapers, publications, generic use by competitors, generic use by the Honorable Order, and use of the term by others in trademark registrations. *Id.*

The following examples illustrate instances in which the Honorable Order has used the phrase "KENTUCKY COLONELS" as a generic term. At the preliminary injunction hearing, Mr. Bastin, Plaintiff's Chief Operating Officer, testified about use of the phrase "KENTUCKY COLONEL" by the Honorable Order where the term was used to refer to a particular individual:

> Q. I'm going to ask you to read the second page of the membership card. I would like you to read the language I circled there.
> A. "Dear Kentucky Colonel." It's written to a specific individual. It was addressed to a specific individual.
> Q. So it's used to identify a person, right?
> A. This particular occasion, yes.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 104.]

In addition, the Honorable Order's own mission statement on its Web site specifically provides the following: (1) "The Honorable Order does not appoint Kentucky Colonels;" and (2) "Membership is open to anyone who has been commissioned as a Kentucky Colonel." [*See* Defendant's Memorandum, Exhibit O.] In each instance noted above, the Honorable Order is using the phrase "KENTUCKY COLONEL" as a generic term, i.e., the individual who has been appointed a "Kentucky Colonel" by the Governor of the Commonwealth. These appointments occurred prior to and after the establishment of the Honorable Order. The original use of the term "KENTUCKY COLONEL" did not originate with the Honorable Order but instead with the Governor. The term is directly associated with the Commonwealth of Kentucky. Thus, the term "KENTUCKY

COLONEL" refers to many individuals who are not associated with or even members of the Honorable Order, as conceded by Mr. Bastin:

> Q. Okay. Not all Kentucky Colonels are members of the
> Honorable Order of Kentucky Colonels, right?
> A. That is a fair presumption.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 102-103.]

For all of the foregoing reasons, the term "KENTUCKY COLONELS" is most certainly generic as used by the Honorable Order.

4. <u>The Ultimate Burden of Proof Rests with the Honorable Order</u>.

Even though the Honorable Order has obtained a trademark registration, such a registration does not protect a mark from being generic. Even an incontestable trademark registration does not protect a mark from challenge on a claim that it is generic. *See Nartron Corporation v. Stmicroelectronics, Inc.*, 305 F.3d 397 (6th Cir. 2002). While the Honorable Order's registration does create a presumption of validity, such presumption is rebuttable and does not preclude Building Champions from demonstrating that the mark is generic. When a mark is federally registered, "there is a presumption that the term is non-generic and the defendant bears the burden of overcoming this presumption." *Nartron Corporation*, 305 F.3d at 405. However, "this presumption is easily overcome upon a showing that a mark is merely descriptive of the type of services offered by the mark holder." *Ashland Oil Company, Inc. v. Olymco, Inc.*, 905 F.Supp. 409, 412 (W.D. Ky. 1994) (The court cancelled the registration for the mark "INSTANT OIL CHANGE" on the Principal Register because the mark was deemed to be a descriptive phrase not entitled to trademark protection which others could not be precluded from using.)

Registration on the Principal Register does not shift the ultimate burden of proof. "A mark's challenger bears the burden of going forward with evidence to meet or rebut the presumption. The ultimate burden of proving mark validity rests with the registrant." *Ashland Oil*, 905 F.Supp. at 412. As set forth herein, Building Champions has produced evidence that the mark "KENTUCKY COLONELS" as used by the Honorable Order is generic. Therefore, the ultimate burden of proof rests with the Honorable Order to prove the validity of its mark.

**C. Building Champions' Design Mark is Not Likely to Cause Confusion**

Even if the Honorable Order's mark is not generic, to prevail on its trademark infringement claims, the Honorable Order must prove that there exists a likelihood of confusion based upon an analysis of the Sixth Circuit factors set forth in *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997). However, not one of the Sixth Circuit factors weighs in favor of the Honorable Order. To prevail on its trademark infringement claims, the Honorable Order must prove that the ***disputed mark*** is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280 (emphasis added). Therefore, the Honorable Order must demonstrate that when the public views the Design Mark on merchandise that the public associates that mark with the Honorable Order. The Design Mark is clearly *not* likely to cause confusion.

Plaintiff has asserted that there is no case law which supports the contention that both parties can use similar and/or identical marks in connection with clothing items and related merchandise. Plaintiff's assertion is wholly without merit. By way of example, the following is a summary of various cases in which courts have held that *identical*

*marks can be used on the same goods*, such as clothing items, without resulting in a likelihood of confusion:

In *Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc.*, 994 F. Supp. 1454 (S.D. Fla. 1998), the court found no likelihood of confusion where a clothing manufacturer with an incontestable trademark registration for "BONGO" in connection with clothing brought an action against a restaurant which used "BONGO" in connection with its café and related merchandise, such as shirts. Plaintiff attempted to argue that since both marks were applied to clothing that there was an overlap in goods and services. However, the court noted that, "the mere fact that Defendants sell some clothing items and Plaintiff specializes in retail apparel does not establish proximity of the goods for the purposes of likelihood of confusion." *Id.* at 1461. Further, the court recognized that, "people are accustomed to clothing items that refer to services and establishments. Consumers are able to establish the difference between clothing with brand labels on them (i.e. "Guess?" jeans) and clothing sold as souvenirs from commercial establishments (i.e. "Plant Hollywood" T-shirts)." *Id.*

Similarly, Building Champions and the Honorable Order are not in the same business. Mr. Bastin, the Honorable Order's Chief Operating Officer, has testified that the mission of the Honorable Order is charitable in nature:

> Q. If you would, please describe for the Court the mission of the Kentucky Colonels.
>
> A. Well, again, we have several. We indeed are ambassadors of goodwill. I get frequent calls and requests for the Honorable Order of Kentucky Colonels to participate in some event that is somewhat related to the state. But our basic mission, if you will, and this dates back to the original organization being put together in 1931, is to serve a charitable function, to take the resources that our members provide for us, to find needy organizations, needy people,

> educational concerns as well as charitable concerns, and to do
> our best to assist them.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, pages 31 – 32.] Consumers are able to distinguish that Building Champions' apparel bearing the Design Mark relates to the basketball team. Even if Plaintiff argues that it is now in the business of retail clothing,[5] the retail clothing business and entertainment services related to basketball games and exhibitions are vastly different. Therefore, as was the case in *Michael Caruso,* there is no likelihood of confusion.

In *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D. N.Y. 1995), the court concluded that there was no likelihood of consumer confusion as to the source of plaintiff's products, where plaintiff operated an independent jazz record company and sold records under the label "UPTOWN RECORDS" and defendant sold rap records under the label "UPTOWN RECORDS," even though such records were sold in the same stores and applied to the same goods. While plaintiff's mark was registered with the State of New York, the mark was not federally registered. However, the court did find that the mark was suggestive and therefore entitled to trademark protection without proof of secondary meaning. Despite such protection, the court found no likelihood of confusion existed. As illustrated in *Sunenblick*, even if the Honorable Order and Building Champions use variations of the element "KENTUCKY COLONELS" on identical products sold in the same stores, such circumstances do not necessarily result in a likelihood of confusion.

See also *Captain Tony's Pizza, Inc. v. Domino's Pizza, Inc.*, 1992 WL 218673 (W.D. N.Y. 1992) (Court found use of the phrase "ANY WAY YOU WANT IT" in connection with Domino's national pizza ad campaign created no confusion as to source

---

[5] This argument is highly suspect coming from an organization committed to charitable services.

even though Captain Tony's Pizza owned a federal registration for the service mark "ANY WAY YOU WANT IT" in connection with restaurant services, namely take-out and dine in of Italian-American food); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358 (S. N.J. 2002) (Court found no likelihood of confusion between plaintiff's registered mark "BREAK & BAKE" in connection with pre-formed cookie dough when a competitor used the same mark on similar products); *Becoming, Inc. v. Avon Products, Inc.*, 2001 WL 930794 (S.D.N.Y. 2001) (Court found no likelihood of confusion between the parties' respective uses of the mark "BECOMING" in connection with certain beauty products); and *Worthington Foods, Inc. v. Kellogg Company*, 732 F. Supp. 1417 (S.D. Ohio 1990)(Court found no likelihood of confusion between the parties' respective uses of the mark "HEARTWISE" in connection with breakfast foods).

Clearly, Plaintiff's contention that no case law exists to support the position that identical marks can be used on identical goods without confusion is plainly wrong. Moreover, the marks in question in this case are ***not identical***. The Honorable Order has a trademark registration for the word mark "KENTUCKY COLONELS." Building Champions uses the Design Mark in connection with its merchandise. The parties' marks are not identical.

The Sixth Circuit has identified the following eight factors which must be examined and weighed to determine a likelihood of confusion: (1) strength of Plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of Defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Daddy's Junky Music Stores,* 109 F.3d at 280. While these factors need not be

applied with mathematical precision, "a thorough and analytical treatment must nevertheless be attempted." *Daddy's Junky Music Stores*, 109 F.3d at 280.  Based upon an analysis of the Sixth Circuit factors, it is clear that there are insufficient grounds upon which to base a determination that there exists a likelihood of confusion by Building Champions' use of the Design Mark.

          1.  Strength of Plaintiff's Mark.

      The Sixth Circuit has noted that the "strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." *Homeowner's Group v. Home Marketing Specialists*, 931 F.2d 1100, 1107 (6th Cir. 1991).  Plaintiff's mark is extremely weak and any recognition of the mark appears to be limited to a narrow universe.  As a matter of fact, at the preliminary hearing, Mr. Jim Lindsey testified that in a 1998 marketing plan prepared for the Honorable Order, he discovered, "from the research that our [the Honorable Order's] communication was not very good. People really didn't understand clearly what we [the Honorable Order] did and how much money we gave away and why we gave it away. So we changed all of our communication tools completely."  [*See* Transcript from the Preliminary Hearing, dated August 30, 2004, lines 24 - 25 on page 139 and lines 1-3 on page 140.]  The Honorable Order's head of the Marketing Committee clearly admits that even as late as 1998, citizens of the Commonwealth were not familiar with the Honorable Order and its mission.  Therefore, the Honorable Order's claim that it has acquired widespread recognition of the term "KENTUCKY COLONELS" is ambitious at best.

      Further, Plaintiff cited *Bridgestone Tire Co. v. Bridgestone Trading Co.*, 221 U.S.P.Q. 1012 (T.T.A.B. 1984) in its Supplemental Memorandum for the proposition that

famous marks are afforded a higher degree of protection. Plaintiff referenced such marks as BRIDGESTONE, HARLEY-DAVIDSON, COCA-COLA, FIRESTONE, and GOODYEAR. All of these marks are famous marks. Comparing such famous marks to the "KENTUCKY COLONELS" mark is a giant leap. As set forth above, the Honorable Order's use of the mark "KENTUCKY COLONELS" is generic or at best merely descriptive and is therefore not entitled to any protection, much less the protection trademark law affords to famous marks.

2. <u>Relatedness of the Goods</u>.

As previously noted, the parties are not competitors by any stretch of the imagination. The Honorable Order is a non-profit organization that distributes grants to needy organizations and educational institutions. Building Champions owns the American Basketball Association's new Louisville basketball team. The services of the two parties are not even remotely similar. Both parties' use variations of the mark "KENTUCKY COLONELS" in connection with promotional and souvenir items which relate directly back to the parties' primary businesses. Due to the inherent differences in the services provided by the Honorable Order and Building Champions, a prospective purchaser is not going to believe that the items sold by Building Champions relate to the charitable activities of the Honorable Order. Relatedness does not mean that there is necessarily a physical relationship between the goods or services identified by the marks, it means that the marks are related in the minds of the purchasing public in the sense that buyers will believe that the products emanate from the same source.

3. <u>Similarity of the Marks</u>.

Much has been said that the marks used by the parties are identical. However, that is manifestly untrue. The marks as used by the parties in connection with the novelty items are not identical. In connection with its merchandise, Building Champions ***only*** uses the following mark in red, white and blue colors:

This stylized mark is *not* identical or in any way confusingly similar to the Honorable Order's use of the word mark "KENTUCKY COLONELS." When analyzing similarity, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junky Music Stores*, 109 F.3d at 283.

Further, courts have noted that when trademarks include similar terms, "the question of likelihood of confusion entails consideration of the entire marks, where and how those marks are used and whether or not there are other distinguishing aspects, such as accompanying logos." *Basic American Medical, Inc. v. American Medical International, Inc.*, 649 F. Supp. 885, 891 (S.D. Ind. 1986); citing *James Burrough Ltd. v. Lesher*, 309 F. Supp. 1154 (S.D. Ind. 1969) and *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973). In *Basic American Medical*, the court found no likelihood of confusion between the use of the marks AMERICAN MEDICAL INTERNATIONAL and Design and BASIC AMERICAN MEDICAL and Design because when considered in their entirety, the marks as used by the parties incorporated logos which sufficiently

distinguished the marks. Similarly, the distinct nature of the Design Mark, which incorporates a basketball, a stylized design and the red, white and blue colors of the ABA, signifies to the consumer that the merchandise directly relates to the basketball team and not the Honorable Order. As noted by the court in the Harlem Wizards case, the "use of a design as part of a mark minimizes any likelihood of confusion." *Harlem Wizards Entertainment Basketball v. NBA Properties*, 952 F.Supp. 1084, 1094 (N.J. 1997).

Plaintiff has cited *Allstate Ins. Co. v. Delibro*, 6 U.S.P.Q. 1220 (T.T.A.B. 1988) for the proposition that as between a design and word mark, the word portion is dominant. As noted in *Allstate Ins. Co.*, "although marks must be judged in the final analysis, in their entireties, it is nonetheless true that more or less weight may be given to a particular feature of a mark." *Allstate Ins. Co.*, 6 U.S.P.Q. at 1223. While the word portion of a mark may be dominant, that does not mean that the overall impression of the mark is not considered. As noted by the Allstate court, marks must be judged in their entireties. Therefore, Building Champions' marks must be considered in its entirety (i.e. the distinctive colors and the basketball image). Moreover, as pointed out by the Honorable Order, if the word portion of the mark is dominant, and Building Champions' use of the mark includes the word "LOUISVILLE," then considerable weight should be given to Building Champions' addition of the word "LOUISVILLE."

Further, Plaintiff cited *In re Pedro Ruiz-Tagle Decombe*, 1988 WL 252674 (T.T.A.B. 1988) for the proposition that little weight should be given to nondistinctive design elements. However, *In re Pedro Ruiz-Tagle Decombe* involved a mark which included the design element which was a stylized "V." Surely, Plaintiff is not equating

the image of a red, white and blue basketball together with an all-star design with an image of a simple stylized letter. Use of the image of a basketball further serves to indicate the secondary source of the merchandise, i.e., the basketball team. Plaintiff's reliance on this case is clearly distinguishable from the matter at hand.

Plaintiff also relies upon *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir. 1988) for the proposition that the addition of elements to a protected mark will not eliminate the likelihood of confusion. The court in *International Kennel Club of Chicago* found that the similarity of the marks "INTERNATIONAL KENNEL CLUB" and "INTERNATIONAL KENNEL CLUB OF CHICAGO" weighed in favor of plaintiff. However, this case is clearly distinguishable as well. In *International Kennel Club of Chicago*, the infringer was using the mark "INTERNATIONAL KENNEL CLUB OF CHICAGO" in connection with toy pedigree dogs. The senior user used the mark "INTERNATIONAL KENNEL CLUB" in connection with the sport of showing pure breed dogs. The infringer attempted to distinguish its mark by adding the phrase "OF CHICAGO" which the court noted was frequently omitted by the infringer in its use of the mark. Further, the design element of the infringer's mark was a wolfhound head logo. Such logo implicitly indicated that the mark pertained to dogs, which could be toy dogs or dog shows. Therefore, use of the design element did not help to distinguish the marks as they were used in commerce. This is completely different from the case at hand. Building Champions has continuously used the Design Mark, with its distinctive coloring, its basketball design and incorporation of the entire phrase "KENTUCKY COLONELS LOUISVILLE." Unlike *International Kennel Club of Chicago* where the infringer used a design element which

could relate to either party, Building Champions' use of the basketball design element clearly distinguishes the merchandise from that of the Honorable Order. The Honorable Order is not in the business of providing entertainment services, namely, basketball games and exhibitions.

Further, Mr. Dickerson, Marketing Director for Building Champions, testified that Building Champions will never use just the phrase "KENTUCKY COLONELS" on its merchandise:

> Q. Mr. Dickerson, would you ever use just the term "Kentucky Colonels" in connection with merchandise?
> A. Absolutely not.
> Q. Why not?
> A. Because we are a basketball team. We need to brand that identity. The only way of doing so is by incorporating the basketball as well as our team name into that merchandise. There's also a lot of other uses of the term "Kentucky Colonels," so we need to find a way to differentiate ourselves.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 156.]

> Q. If someone sees a shirt walking down the street with "Kentucky Colonels" on it, they are not going to know that it was purchased at kentuckycolonelsbasketball.com, are they?
> A. If it just says "Kentucky Colonels," then you wouldn't have bought that from our web site anyway. We don't sell merchandise that just says --
> Q. Please just try to answer the question. They are not going to know where that shirt was purchased, are they?
> A. They wouldn't have purchased it from us because we don't sell merchandise like that.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 164-165.]

Plaintiff also relied upon *Appleseed Foundation Inc. v. Appleseed Institute, Inc.*, 981 F. Supp. 672 (D.D.C. 1997) in which the court found that adding the term

"JOHNNY" to "APPLESEED" did not distinguish two non-profit organizations – Appleseed Foundation, Inc. and Appleseed Institute. In reaching its decision, the Appleseed court noted that the terms "JOHNNY APPLESEED" and "APPLESEED" conjured up the same images and found the minor name change did not overcome the similarities between the marks. However, this case is clearly distinguishable as well. Building Champions' use of the Design Mark is substantially different from the Honorable Order's mark in overall impression.

In designing the mark to be used on merchandise, Ms. Roach specifically testified that she sought to incorporate distinct imagery in Building Champions' mark in order to associate the mark with its basketball services:

Q. Can you please describe the basketball logo?
A. Yeah. It's just a red, white and blue logo that says "Kentucky Colonels Louisville," and it has the ABA signature red, white and blue basketball almost shooting around it with some shooting stars.
Q. Why did you select the current design element of the basketball logo?
A. We chose the colors red, white and blue obviously so we could try to unite the UK fans along with the U of L fans because we hoped to have both players who represented those schools at one time on our team. We chose the red, white and blue for those reasons as well as that that's the ABA signature color for the basketball.
Q. So the red represented the Louisville team, the blue represented Kentucky, and the red, white and blue represents the ABA?
A. Correct.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 178-179.]

As demonstrated above, Building Champions solely intends for its merchandising mark to be associated with basketball services. The current Design Mark as used by Building Champions clearly accomplishes that goal. When considered in its entirety,

Building Champions' mark quite obviously creates a substantially different commercial impression than that conveyed by the Honorable Order's mark.

In addition, as noted above, the Honorable Order often incorporates secondary source identifying imagery in connection with its use of the "KENTUCKY COLONELS" mark on novelty items, such as the seal of the Commonwealth of Kentucky. This use of the mark by the Honorable Order further distinguishes the parties' goods and services.

4. Evidence of Actual Confusion.

The Sixth Circuit has recognized that, "evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284. There is no evidence of actual consumer confusion. The Honorable Order offered two alleged instances of "confusion" at the preliminary injunction hearing however, those instances of confusion are irrelevant. First, the Honorable Order noted an error by a news broadcaster for *Fox* who erroneously attributed to Building Champions instead of the Honorable Order a $25,000 donation to hurricane disaster relief.[6] If a likelihood of confusion exists, it must be based on the confusion of a customer or purchaser, not confusion or mistake in general. As noted in *Sunenblick v. Harrell*, 895 F.Supp. 616, 631 (S.D. N.Y. 1995), "the relevant confusion to be avoided is that which affects purchasing decisions and not confusion generally." The *Fox* broadcast was merely a reporting error. The error in no way related to the merchandise being offered by either party.

The second instance of alleged confusion was Mr. Bastin's testimony that his daughter wore a hat sold by the Honorable Order, and someone allegedly believed that

[6] Defendant objected to the admission of this evidence on the basis of relevance.

the hat was associated with the ABA team.[7] Since the Honorable Order has not objected to the name of the basketball team, this type of confusion is irrelevant because the source of confusion must be the disputed mark. The relevant inquiry is whether anyone wearing merchandise bearing Building Champions' Design Mark would believe that such merchandise was affiliated with the Honorable Order. "The test is not whether confusion is possible; nor is it whether confusion is probable among customers who are not knowledgeable. Rather, the test, . . . is whether confusion is probable among numerous customers who are ordinarily prudent." *Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2nd Cir. 1997). The prudent purchaser and fan of Building Champions' will recognize the team logo in connection with both the basketball services and its merchandise therefore, there is no likelihood of confusion in connection with merchandise bearing the Design Mark.

Further, courts generally require plaintiffs to submit surveys to establish evidence of confusion. The Honorable Order has not submitted any such surveys and the hearsay evidence of the Honorable Order's Chief Operating Officer that his daughter was approached by an unknown individual does not sufficiently establish actual confusion.

5. Marketing Channels.

This factor "requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services." *Daddy's Junky Music Stores*, 109 F.3d at 285. The predominant customers of the parties are inherently distinct. The customer base for the Honorable Order is individuals who desire to support the organization and its charitable functions through the purchase of novelty items. Building Champions' prospective customers are fans of the basketball team. The Sixth

[7] Defendant objected to the admission of this evidence on the grounds that it was hearsay.

Circuit has recognized that, "dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception." *Homeowner's Group*, 931 F.2d at 1110. Since charitable services and basketball services are wholly unrelated, there is no overlap in the customer base and the likelihood of confusion is lessened.

While testimony at the preliminary hearing indicated that both parties may attempt to sell their merchandise in some retail establishments, the apparel would undoubtedly be located in different sections of the store. Building Champions merchandise would always be placed in a sports section of the store and associated with the team. Even if the parties' goods are sold in the same stores, courts have recognized that even though marks are applied to the same goods and sold in the same store that does not necessarily result in a likelihood of confusion. *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D. N.Y. 1995).

      6.  Likely Degree of Purchaser Care.

While the goods sold by the parties are relatively inexpensive, such items are unusual, in fact they are unique. The merchandise of both parties such as hats, shirts and jackets are being purchased based on the purchaser's affinity for the sponsoring organization. For example, a consumer will purchase a shirt sporting the Design Mark to show its loyalty and affection for the basketball team. As noted by the court in the Harlem Wizards case, fans are "generally sophisticated and knowledgeable of their sport; they read about their favorite teams in the sports pages or listen to sports reporting and commentary on television and radio." *Harlem Wizards Entertainment Basketball*, 952 F.Supp. at 1097. Sports fans have a loyalty for their teams that is usually expressed by

wearing team gear. These items are only purchased because of the consumer's affiliation with the sponsoring group. No one would purchase these items but for their support of the secondary source – in this case the basketball team.

7. Defendant's Intention in Selecting the Mark.

Courts have noted that, "intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that this copying may divert some business from the senior user." *Daddy's Junky Music Stores*, 109 F.3d at 286. Building Champions' intent in selecting the name "KENTUCKY COLONELS" had nothing whatsoever to do with the Honorable Order. As Ms. Roach testified at the preliminary hearing, it had everything to do with basketball:

> Q. I want to talk about selecting the team name. How was the team's name selected?
> A. We conducted a name-the-team contest where participants were to cast their votes as to what they wanted to name the team.
> Q. How are you familiar with that process?
> A. Because I created the contest.
> Q. When did you first consider the name "Kentucky Colonels" for the basketball team?
> A. Immediately. When I first chose Louisville, I said that Kentucky Colonels would be a great name.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 173-174.]

> Q. What was response of the public from the survey that you conducted?
> A. Over 25 percent of the people that voted in wanted and requested the name "Kentucky Colonels."
> Q. Okay. What impact did that survey have on your decision to name the team "Kentucky Colonels"?
> A. It almost solidified it, my decision. I knew if I wanted and the people of Louisville wanted it or the surrounding counties, it had to be a perfect fit.

[*See* Transcript from the Preliminary Hearing, dated August 30, 2004, page 175.] In selecting its name and ultimately the Design Mark used on merchandise, Building Champions sought to associate the two marks with its basketball services.

8. Likelihood of Expansion of the Product Lines.

While Building Champions anticipates expanding its product lines to meet customer demand, such expansion will not affect the rights of the Honorable Order. As demonstrated above, use of the Design Mark by Building Champions in connection with entertainment services related to basketball is not likely to cause confusion with the Honorable Order's use of the mark "KENTUCKY COLONELS" because the services are so unrelated.

**D. The Honorable Order has Failed to Establish the Factors Necessary for Injunctive Relief**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Big Time Worldwide Concert & Sport Club at Town Center v. Marriott International*, 236 F.Supp. 2d. 791 (E.D. Mich. 2003); citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). The Court must consider four factors in determining whether or not to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Michigan Bell Telephone Company v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001). These factors, "are not prerequisites that must be satisfied; rather, they are considerations to be balanced that guide the discretion of the court."

*Milliron v. Louisville & Jefferson County Metropolitan Sewer District*, 867 F.Supp. 559, 563 (W.D. Ky. 1994). Plaintiff has clearly failed to meet its burden of proving the first element required to be entitled to injunctive relief.[8] Further, Plaintiff has failed to establish that it will suffer irreparable harm and yet, Defendant and the public will suffer immeasurably by such a result. In applying each of these factors to the present case, Plaintiff's lack of any right to relief is so clear that the only result must be that Plaintiff's motion for injunctive relief be denied.

**CONCLUSION**

FOR THE FOREGOING REASONS, Defendant Building Champions requests that this Court deny Plaintiff's request for preliminary injunctive relief.

Respectfully submitted,

Michelle Kaiser Bray by HN

Michelle Kaiser Bray
Stephanie A. Hale (Ky. Bar #87929)
SOMMER BARNARD ATTORNEYS, PC
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204

and

Amy B. Berge
Holland McTyeire
Greenebaum Doll & McDonald PLLC
3500 National City Tower
Louisville, KY 40202

*Counsel for Defendant*

---

[8] As set forth above, <u>none</u> of the eight Sixth Circuit factors demonstrates that Building Champions' use of the Design Mark is likely to cause confusion. For these reasons, Plaintiff is not likely to succeed on the merits in its claim of trademark infringement.

**Certificate of Service**

The undersigned hereby certifies that a copy of the foregoing including all attachments and this certificate of service was served on Plaintiff by delivering a true copy thereof to its attorneys of record, this 10th day of September, 2004, in an envelope, first class postage prepaid, addressed as follows:

William H. Hollander
Steven L. Snyder
Roxanne Baus Edling
WYATT, TARRANT & COMBS, LLP
PNC Plaza
500 West Jefferson Street, Suite 2600
Louisville, Kentucky 40202-2898

[signature]
Counsel for Defendant