UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| THE HONORABLE ORDER OF KENTUCKY COLONELS, INC., | ) ) ) |
| PLAINTIFF, | ) ) |
| v. | ) CIVIL ACTION NO. 3:04CV-465-H ) |
| BUILDING CHAMPIONS, LLC, d/b/a KENTUCKY COLONELS BASKETBALL | ) ) ) ) |
| DEFENDANT. | ) ) |

**PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The Court should balance the following four factors when assessing a request for injunctive relief, none of which is singularly dispositive: (1) The likelihood that Plaintiff, the Honorable Order of Kentucky Colonels, Inc. ("the Kentucky Colonels") will succeed on the merits; (2) the threat of irreparable harm posed by Defendant's continued conduct; (3) the potential harm that the relief could cause to Defendant; and (4) whether it is in the interest of the public to order such relief. *See, e.g., Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998); *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Assoc.*, 110 F.3d 318, 322 (6th Cir. 1997); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *Milliron v. Louisville and Jefferson County Metropolitan Sewer District*, 867 F.Supp. 559, 563 (W.D. Ky. 1994). Consideration of each of these factors in the present case clearly demonstrates that the Kentucky Colonels' request for injunctive relief should be granted.

## STATEMENT OF THE CASE

The Honorable Order of the Kentucky Colonels, Inc. ("Kentucky Colonels") is a non-profit organization that distributes grants to needy organizations and educational institutions [Hearing Transcript at 29-31]. The organization was formalized in May of 1931, when groundwork was laid for a group to be known as The Kentucky Colonels [Hearing Transcript at 26]. The Governor at that time, Flem Sampson, not only endorsed the organization but defined it, as he urged the individuals present at the first meeting to be a non-political organization for the benefit and advancement of Kentucky and Kentuckians [Hearing Transcript at 26].

The Kentucky Colonels have used the KENTUCKY COLONELS mark on merchandise since 1931 [Hearing Transcript at 34]. In recent years, however, the Kentucky Colonels have engaged in a concentrated marketing effort, and significantly increased their use of the KENTUCKY COLONELS mark on a wide variety of merchandise [Hearing Transcript at 34, 43]. The sale of this merchandise supports the Kentucky Colonels' mission [Hearing Transcript at 41].

Since at least as early as 1998, the Kentucky Colonels have been actively pursuing increased licensing of the KENTUCKY COLONELS brand [Hearing Transcript at 37-38]. Kentucky Colonels have aggressively defended the mark when others sought to appropriate it [Hearing Transcript at 71-76]. As part of the effort to license and protect the mark, the Kentucky Colonels filed an application with the United States Patent and Trademark Office ("USPTO") on March 10, 2003, to register the KENTUCKY COLONELS trademark in connection with numerous types of goods and merchandise [Plaintiff's Hearing Ex. 20]. On February 10, 2004, the USPTO registered the

2

KENTUCKY COLONELS trademark and assigned it the registration number 2,812,681 [Plaintiff's Hearing Ex. 21].

Defendant Building Champions, LLC ("Building Champions"), owner of the recently-formed American Basketball Association's new Louisville team, decided to name the team the Kentucky Colonels on or about April 9, 2004 [Defendant's Pre-Hearing Brief at 5]. In approximately mid-July of this year, Defendant began offering t-shirts, golf shirts, and caps under the description KENTUCKY COLONELS and bearing the KENTUCKY COLONELS mark for sale on its website, www.colonelsbasketball.com [Plaintiff's Hearing Ex. 30; Hearing Testimony at 89]. To stop this unfair competition, Plaintiff has brought this action pursuant to the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 et seq., to enjoin Defendant from violating Plaintiff's trademark, to recover damages, and to obtain an accounting of Defendant's profits associated with its unlawful behavior.

## ARGUMENT

### I. THE KENTUCKY COLONELS ARE LIKELY TO SUCCEED ON THE MERITS OF THIS TRADEMARK INFRINGEMENT CLAIM.

The Kentucky Colonels reiterates what it alleged in its Complaint: This is a straightforward case of trademark infringement [Verified Complaint, ¶ 1]. As the court noted in *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 n. 4 (6th Cir. 1991), "[i]n some cases it may be unnecessary to undertake an extended analysis to infer confusion, e.g., where there is no difference between the marks of directly competitive goods/services." The Sixth Circuit has consistently emphasized this general principle:

> . . . [Where] both marks use absolutely identical language
> to sell a nearly identical service, the likelihood of confusion
> must be considered great.  As Professor McCarthy wrote,
> "cases where a defendant uses an identical mark on
> competitive goods hardly ever find their way into the
> appellate reports.  Such cases are 'open and shut' and do
> not involve protracted litigation to determine liability for
> trademark infringement."

*Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190-1191 (6th Cir. 1988).  In fact, in a case

involving two parties selling shirts, just as in this case, the Sixth Circuit has expressly

rejected many of the arguments made by the Defendant here:

> TS [the defendant] says this case is a complicated and
> detailed trademark infringement action, ill-suited to
> summary judgment because of the complexity and
> interdependence of the facts necessary to prove
> infringement under the Lanham Act.  We disagree.

*WSM, Incorporated v. Tennessee Sales Company*, 709 F.2d 1084, 1086 (6th Cir. 1983).

The Sixth Circuit even noted that the appeal of the summary judgment for the trademark

holder was "frivolous."  *Id.* at 1088.

Like the defendant in *WSM,* the Defendant has attempted to distract the

Court from its blatant infringement with references to theories and doctrines which are

red herrings, irrelevant and inapplicable to this case.  There is one paramount theme,

however, which this Court must keep in mind when reviewing the Defendant's brief and

the evidence in this case:  the Defendants are using the same mark on the exact same

goods as those currently being marketed by the Kentucky Colonels and for which the

Kentucky Colonels own a federal trademark registration.  This is a classic case of

trademark infringement.

The Kentucky Colonels' trademark registration is prima facie evidence of

the validity of its mark, the registration of the mark, the Colonels' ownership of the mark,

4

and the Colonels' exclusive right to use the KENTUCKY COLONELS mark for the goods for which it has been registered. *See* 15 U.S.C. § 1115 and § 1057(b). "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

The Sixth Circuit weighs eight factors to determine whether a likelihood of confusion exists:  (1) the strength of the plaintiff's mark; (2) the relatedness of the goods or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the intent of the defendant in selecting the mark; and (8) the likelihood of expansion of the product lines. *PACCAR, Inc. v. Telescan Technologies, LLC*, 319 F.3d 243, 249-50 (6th Cir. 2003); *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982), *cert. denied*, 459 U.S. 916 (1982).   These factors are a guide, and it is not necessary for a court to apply these factors with mathematical precision. *See Daddy's Junky Music Stores*, 109 F.3d at 280.   Here, the likelihood that consumers will confuse the Defendant's use of Kentucky Colonel's trademark as emanating from, or being authorized or endorsed by the Kentucky Colonels is extremely high.

### A.      Strength of the KENTUCKY COLONELS Mark

Contrary to Defendant's assertions, the Kentucky Colonels' trademark is strong.  When assessing the strength of a trademark, the Court must categorize the mark as either generic, descriptive, suggestive, or fanciful/arbitrary. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).   As

applied to merchandise of the type sold by the Kentucky Colonels, the mark is fanciful or arbitrary. KENTUCKY COLONELS says <u>nothing</u> about the goods except the source, and that is the hallmark of a strong mark.

As applied to services, which are not at issue in this case, evidence of the strength of the KENTUCKY COLONELS mark is demonstrated by the Colonels' registration for its service mark, HONORABLE ORDER OF KENTUCKY COLONELS, in 1983 [Plaintiff's Hearing Ex. 22]. If the U.S. Patent and Trademark Office had ruled that any portion of the service mark was "descriptive," it would have required the organization to disclaim any exclusive right to use that portion of the mark. There is no disclaimer. In fact, the registration was issued under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), which indicates a finding, more than <u>twenty years ago</u>, that the mark had become distinctive of the services in commerce. That conclusion is incontestable now, as the registration is far more than five years old. *See Wynn Oil Co.*, 839 F.2d at 1186-1187 (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985).

Even without that registration, the evidence indicates that the mark is strong. For many years, the Kentucky Colonels have referred to themselves and been referred to by others as simply the Kentucky Colonels. Plaintiff has introduced plentiful proof of this fact, both in the form of merchandise bearing the KENTUCKY COLONELS brand name and in the form of newspapers from many states [Plaintiff's Hearing Exs. 10, 11]. It clear that KENTUCKY COLONELS is used as the name for the organization--- the only membership or charitable organization known by that name.

## 1.    **Plaintiff's Trademark is Not Generic.**

Defendant's contention that the KENTUCKY COLONELS mark is generic makes it obvious that Defendant is grasping at straws.  Defendant is painfully aware that the only way it can avoid liability for trademark infringement is if the Colonels have no trademark to infringe.  Unfortunately for Defendant, the contention that the mark is generic is utterly without merit.  A generic term is one which is commonly used as the name or description of a kind of goods, such as "shredded wheat" for a kind of cereal or "escalator" for a moving sidewalk.  *See Kern's Kitchen, Inc. v. Bon Appetit*, 1988 WL 69137, at *1 (6th Cir. 1988)("A generic term or common descriptive term is one which is commonly used as the name or description of a kind of goods.")(citation omitted).[1]  *See also Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938)("shredded wheat" is generic term when used for a breakfast cereal).  In fact, Defendant cites *Nartron Corp. v. Stmicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002) for the definition of a generic trademark:  "If a mark's primary significance is to *describe a type of product rather than a producer*, it is generic and is not a valid trademark." (emphasis added) [Defendant's Pre-Hearing Brief at 10].

Kentucky Colonels simply is not the common name of any good, product or service.  No one can seriously contend that KENTUCKY COLONELS is the generic name for shirts or hats.  When we dressed this morning, none of us looked for a clean KENTUCKY COLONELS.  KENTUCKY COLONELS is the name of the party which arranges for the manufacture of the goods and authorizes their sale, as is clearly indicated

---

[1] Copies of the cited sections from treatises, Trademark Trial and Appeal Board decisions, and unpublished decisions which have not been attached as exhibits to previous briefs filed by Plaintiff are attached hereto collectively as Exhibit A.

7

on the tag of every item sold by the Colonels. It is a very strong trademark---both for a charitable organization and for the brand of merchandise that the organization sells.

Defendant's assertion that the Colonels' mark is generic because the Governor of Kentucky makes the honorary appointment of a Kentucky Colonel is preposterous. Defendant claims that because the Governor was awarding the designation "Kentucky Colonel" before the Honorable Order was founded in 1931, the mark must be generic [Defendant's Pre-Hearing Brief at 11-12; Hearing Transcript at 19-20]. Defendant seems to completely ignore the fact that the Governor has never used the mark in commerce: "The first to use a designation as a mark in the sale of goods or services is the 'owner' and the 'senior user,'" *McCarthy on Trademarks*, § 16.4, and "[w]ith each sale of goods and services under such a business symbol, the seller builds up greater and greater legal rights in that symbol," *McCarthy on Trademarks* § 16.1.

Defendant also asserts that if anyone owns the KENTUCKY COLONELS mark, it is the Governor [Hearing Transcript at 55]. First, Defendant has no standing to assert any purported rights of the Kentucky Governor. Second, the Governor has never asserted any such rights. In fact, the Governor of Kentucky works very closely with The Honorable Order of Kentucky Colonels [Hearing Transcript at 26-29; Plaintiff's Exhibit #1], and the Plaintiff would venture to say that it is extremely unlikely that the Governor would ever object to the organization's valuable trademark rights, which serve the sole purpose of advancing numerous charitable efforts in the Commonwealth and nationwide. Even if this were not the case, however, there is a strong argument that Governor Flem Sampson gave any rights the Commonwealth may have had in the name to The Honorable Order in 1931, when he not only endorsed the organization but defined it, as

8

he encouraged the individuals present at the first formal meeting to form "a society organization to restore the grandeur and sentiment of the original Kentucky Colonel; to more closely bond together this group into a great non-political brotherhood for the advancement of Kentucky and Kentuckians." [Verified Complaint, ¶2; Hearing Transcript at 26]. Subsequent Kentucky Governors and Kentucky Secretaries of State have consistently endorsed the Kentucky Colonels' efforts [Plaintiff's Hearing Ex. 1; Hearing Transcript at 27-28].

Infringers frequently argue that marks are generic and courts very infrequently buy the argument. For example, in *Kern's Kitchen,* 1988 WL 69137, at *2, the Sixth Circuit reversed the district court's summary judgment finding that DERBY PIE was generic. The court emphasized that when a plaintiff has a federal registration--- as the Kentucky Colonels do here---"there is a strong presumption that the term is not generic." *Id.* at *1. The court also stressed that "registration places the burden on the defendant to overcome that presumption." *Id.* Defendant's attempt to meet that burden is woefully inadequate.

### 2.     There is No Evidence of Current Usage of the KENTUCKY COLONELS Trademark on Goods.

In an attempt to show that KENTUCKY COLONELS is widely used, Defendant has introduced references to expired registrations, with absolutely no evidence that the products or services which may have formerly borne the marks are still for sale. That is insufficient. *See Homeowner's Group,* 931 F.2d at 1108 (stating that "merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens

9

in the marketplace"). Moreover, as the court explained in *Big Daddy's Junky Music Stores,* 109 F.3d at 281, cited by Defendant, registrations that do not relate to the plaintiff's products are irrelevant and even registrations that do relate to the plaintiff's products are not important---the focus must be on what is occurring in the marketplace.

In the present case, the only current registration other than the Plaintiff's is for whiskey, which the Kentucky Colonels do not sell, and Defendant has introduced no evidence of current use of that mark in the marketplace [Hearing Transcript at 104]. In fact, Defendant admitted that it has no evidence of any use of the mark on any goods:

> Q:    Good afternoon.  As you sit here today, are you aware of any other goods of the type marketed by the Kentucky Colonels which are being sold using the name "Kentucky Colonels" other than those you are marketing?
>
> A:    I have a question if Eastern Kentucky University would be the same because we are using Kentucky Colonels Basketball, and they use Eastern Kentucky Colonels Basketball or Eastern Kentucky University Colonels.
>
> Q:    I believe the exhibits that you put up a minute ago show the use of Eastern Kentucky University Colonels.
>
> A:    Okay.
>
> Q:    And EKU Colonels.  Is that right?
>
> A:    That's right.
>
> Q:    So do you know of any use by them of "Kentucky Colonels"?
>
> A:    No, I do not.
>
> Q:    All right.  Now, your letter, a letter that was just introduced into evidence, talked about Mr. Ed Stein having a registration in 1964 for a barbeque sauce.  Can you present any evidence to the Court today that anyone is selling a barbeque sauce called "Kentucky Colonel," today?
>
> A:    No, I cannot.

10

Q:      It also mentioned there was a gasoline station in 1971 called "Kentucky Colonel." Do you have any evidence as you sit here today that anyone is operating a "Kentucky Colonel" gasoline station today?

A:      Only other than the trademark, the filing of the trademark, no, I cannot.

Q:      I'm talking about sales, not the registration.

A:      No, I cannot.

Q:      Your letter indicated that there was a registration for the mark "Kentucky Colonels" for a bluegrass-country band. You may have heard testimony that a member of that band died many years ago. Are you aware of that band still being in existence today?

A:      No.

Q:      Okay. Now, you also asserted to Mr. Snyder and put up a minute ago evidence that in 1980 Philip Morris obtained a registration for the "Kentucky Colonel" cigarettes. As you sit here today, do you have any evidence to offer the Court that "Kentucky Colonel" is used for cigarettes?

A:      No. I don't smoke. So no.

Q:      There was some testimony this morning about having--how someone has, Jim Beam, I believe, has a registration of "Kentucky Colonel" for whisky. As you sit here today, can you offer the Court any evidence that there is on the market today a brand of whisky known as "Kentucky Colonels"?

A:      No.

Q:      Or "Kentucky Colonel"?

A:      No.

Q:      Miss Roach, there was an ABA basketball team, the old ABA, which was named Kentucky Colonels, I believe. Do you take any rights from that team?

A:      No, I do not.

Q:     It's my understanding that that team disbanded in 1976. Is that right?

A:     No. I think it was later than that. I believe it was around 1974.

Q:     Okay. You think they disbanded in around--

A:     I'm not sure about that.

Q:     It's been more than 25 years ago since there was a Kentucky Colonels basketball team--

A:     Sure.

Q:     --until you selected the name in February?

A:     Right.

[Hearing Transcript at187-190].

As is obvious from the testimony of Defendant's owner, Defendant has no evidence sufficient to overcome the presumptions which arrive from the Kentucky Colonels' federal registration. There is no evidence of any of the alleged uses previously cited by Defendant. Except for the whiskey mark, which does not appear to be in use, all of the cited registrations are "dead," and none of the products were among those sold by the Kentucky Colonels. This information is simply irrelevant.

Defendant has also introduced no evidence of any organization using KENTUCKY COLONELS for charitable services, and has therefore done nothing to cast doubt on the strength of the KENTUCKY COLONELS mark for services. But this case is not about rights in the KENTUCKY COLONELS mark for charitable services. It is about rights in the KENTUCKY COLONELS mark for goods. Defendant's entire case is built on the conclusion that the mark as applied to clothing by the Kentucky Colonels rises and falls on the strength of the mark for charitable services. Even if KENTUCKY

12

COLONELS for charitable services were weak, which is not the case, there is nothing to support the conclusion that it would therefore be a weak mark for goods.

Another famous Kentucky trademark, LOUISVILLE SLUGGER, is illustrative. LOUISVILLE SLUGGER is used by and registered to Hillerich & Bradsby for t-shirts, which it surely doesn't manufacture itself. If Hillerich & Bradsby stopped making bats or if LOUISVILLE SLUGGER became generic for bats, its rights in the mark for clothing would not terminate. The same is true for KENTUCKY DERBY, which is used and registered for clothing and a horse race. The marks are independent in different categories. Indeed, the Court has heard testimony that WINCHESTER remains a very valuable brand, even though its sales of guns stopped long ago and its sale of ammunition may terminate in the future [Hearing Transcript at 137]. Similarly, KENTUCKY COLONELS is a **brand for clothing**, as clearly indicated by the tags on every item, which would remain a valuable and marketable property regardless of whether the Honorable Order continues to function as a charitable service organization. Defendant's assertions to the contrary are meritless, and unsupported by caselaw.

### 3.     The "Secondary Source" Doctrine is a Red Herring in this Case.

The "secondary source" doctrine has surfaced as Defendant's favorite red herring in this case. The "secondary source" doctrine recognizes that a party which authorizes a product and applies its indicia to it (say, Churchill Downs for a KENTUCKY DERBY t-shirt) can acquire trademark rights from the sale of the product, even though it is not the manufacturer. Under the doctrine, the U.S. Patent and Trademark Office and the courts recognize that Churchill Downs can claim KENTUCKY DERBY as its trademark even though it might otherwise be considered "ornamental" and

unregisterable, because consumers will recognize Churchill Downs as the "secondary source" of the shirt. The Sixth Circuit expressly recognized the doctrine in *WSM, supra,* holding that the owners of Opryland have trademark rights in a logo applied to shirts and rejecting the claims of a t-shirt infringer that use of a design on a shirt is " 'functional', *i.e.,* 'ornamental' or 'decorative.'" *Id.* at 1087. The Sixth Circuit found that the trademark holder's mark served to indicate source in addition to any "ornamental" function it might also serve and "[n]o basis exists for upsetting that finding." *Id.*

In this case, the Kentucky Colonels' use of the mark for goods also indicates source. An increasingly large percentage of KENTUCKY COLONELS brand merchandise, already 25 percent, is sold to individuals who are not members of the organization [Hearing Transcript at 42-43]. Every product sold carries a hang tag specifically saying that the product is KENTUCKY COLONELS brand merchandise [Hearing Transcript at 46]. The United States Patent and Trademark Office never even raised the "ornamental" issue in the prosecution of the KENTUCKY COLONELS trademark application for goods and the registration of the mark is prima facie evidence that the mark indicates source. There is simply no legal difference between the Kentucky Colonels' rights in KENTUCKY COLONELS for shirts and hats and the rights of the owner of any other brand for those types of goods.

*In re Paramount Pictures Corp.*, 213 U.S.P.Q. 1111 (T.T.A.B. 1982), which has been discussed before the Court several times by Defendant, provides no obstacle---or relevant issue---in this case. In that decision, the Trademark Trial and Appeal Board determined that the mark MORK AND MINDY was registrable for decals because the mark was not mere ornamentation, but rather an indicator of source (ie, the

television series). <u>Nowhere</u> in that decision is there <u>any</u> indication that the mark would have been registerable for decals if it was already registered to someone else for decals.

Defendant asserts, without any authority, that because it can use the mark for a basketball team it can also use the mark for clothing promoting that team despite the fact that the clothing field is already occupied by the Defendant. There is **no law** to support Defendant's position. The only case Defendant cites for this "novel" proposition is *CBS, Inc. v. David Liederman and William Liederman*, 866 F. Supp. 763 (S.D.N.Y. 1994), which the Defendant falsely claims stands for the premise that "the mark TELEVISION CITY can be used by one owner in connection with the production of television shows and can be used by another owner in connection with restaurant services without confusion even where both parties sell T-shirts, posters and other related memorabilia bearing the mark" [Defendant's Pre-hearing Brief at 18].

Defendant could not be more misleading, or blatantly wrong. That case holds, not surprisingly, that a television studio in California known as "Television City" could not prevent the use of the name "Television City" for a restaurant in New York. *Id.* at 765 (noting "The central issue is whether this mark extends from the television production arena to the restaurant area"). The court's holding in *CBS, Inc.* has absolutely nothing to do with T-shirts or merchandise, and there is nothing in the decision indicating that the defendant used or intended to put TELEVISION CITY on <u>any</u> goods. Interestingly, the Second Circuit felt that this distinction was imperative when affirming the district court's decision:

> We affirm for substantially the reasons stated by Judge Duffy. We add only that the sole issue resolved concerns the use of the name "Television City" for a restaurant in New York City. Because of the fact-specific nature of the

15

issues and the need for a record posing these issues in a concrete fashion, we do not address the propriety of the use of that name in other commercial or geographic contexts. Specifically, *we do not address the marketing of memorabilia or other items bearing the name or the opening of a second restaurant in Los Angeles.*

*CBS, Inc. v. Liederman*, 44 F.3d 174 (2nd Cir. 1995), *affirming* 866 F. Supp. 763 (S.D.N.Y. 1994).

Defendant should select its "supporting" cases with more scrutiny. Essentially, the case before this Court is a perfect example of what the Second Circuit cautioned against, although the circumstances at bar force this Court to address the issue the Second Circuit could not. Here, unlike CBS, the Kentucky Colonels do not object to the use of the name "Kentucky Colonels" for the Defendant's basketball team, because the Kentucky Colonels don't raise charitable funds by having a basketball team. However, unlike the Leidermans, the Defendants have already marketed t-shirts and other memorabilia bearing the Colonels' mark and, unlike CBS's use of TELEVISION CITY, the Colonels have registered the mark for goods and the sale of these goods is a significant and growing source of funds for the Colonels. As the Second Circuit seemed to be cautiously whispering, the circumstances here present a classic case of trademark infringement.

At the hearing, Defendant cited two other cases for the proposition that two parties can use the same mark on the exact same goods with no confusion as to the "source" of the parties' products. The first case, *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D.N.Y. 1995), held that both parties could use the mark UPTOWN RECORDS, where the plaintiff produced jazz records and the defendant produced rap records. Defendant failed to mention, however, that in the *Sunenblick* case, neither party had a federally

16

registered trademark. *Id.* at 621, 624. In addition, the primary basis for the court decision was the fact that the parties' labels had "co-existed in the market place in apparent ignorance of each other for at least two years, and possibly longer," *Id.* at 623 n. 8, and that there was absolutely no evidence in the record of actual consumer confusion which had occurred during the entire period when the parties were concurrently selling their respective labels. *Id.* at 632. As many cases say, the lack of actual confusion during a long period of simultaneous use is a very significant factor weighing against a finding that confusion will be likely. *See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.* 799 F.2d 867, 875 (2nd Cir. 1986)(noting that "[w]hile the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor. . . . it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion"); *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991)(noting that although evidence of actual confusion not necessary to prove likelihood of confusion, lack of evidence of actual confusion over several years during which defendant had substantial sales is a strong indicator that likelihood of confusion is minimal)(internal citations omitted). On the other hand, the lack of actual confusion when there has been no extended period of simultaneous use is entitled to little or no weight. *Daddy's Junky Music Stores*, 109 F.3d at 284 (holding lack of evidence of actual consumer confusion is "rarely significant" due to the difficulty of securing such evidence). The UPTOWN RECORDS case is easily distinguished. In this case, unlike the UPTOWN RECORDS case, the Kentucky Colonels <u>have</u> a federal registration, and

17

took action to stop Defendant as soon as the Defendant began selling merchandise on its website. The parties have not co-existed for years, and this Court must not allow that to happen.

The second case, *Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc.*, 994 F.Supp. 1454, (S.D. Fl. 1998), is simply not analogous to the case before this Court. In *Michael Caruso*, the court refused to enter a preliminary injunction completely enjoining Defendant's use of the mark BONGOS CUBAN CAFÉ, where the Plaintiff had a registered mark for BONGO for clothing. *Id.* at 1457. First, the court noted that the word "bongo" was a common English word, and that the mark was "further weakened by extensive third party use of the term." *Id.* at 1458-59. In fact, the defendant's evidence revealed that at least seventy-five other businesses had utilized "bongo" or "bongos" in their marks, and twelve of those marks were previously or currently used in connection with clothing products. *Id.* at 1460. The court also determined that the two marks were not similar, and that each had distinct appearances and sounds. *Id.* at 1460. Perhaps most importantly, the Court found that the plaintiff's sweeping request for relief was overbroad:

> At the outset, the Court observes that Plaintiff has requested truly far-reaching relief:  the prohibition of Defendants' use in any manner of the mark "Bongos Cuban Café." Even if the Court were to find that the use of the mark "Bongos Cuban Café" in connection with Defendants' souvenir clothing and even non-clothing merchandise infringes upon Plaintiff's trademark, such a finding would not justify the clearly over broad remedy of enjoining Defendants from using the mark in any context.

*Id.* at 1458. As the Kentucky Colonels has emphasized in this action, it is not requesting that the Defendant be enjoined from naming its basketball team "Kentucky Colonels," but rather that Defendant be prevented from utilizing the Colonels' trademark on the

18

same goods which the Colonels sell and for which they have a federal registration. The law entitles the Kentucky Colonels to this relief.

Defendant contends that similar names are frequently registered for the same goods, but provides citations in its pre-hearing brief to names that are not similar at all: NEW YORK GIANTS and SAN FRANCISCO GIANTS, FLORIDA PANTHERS AND CAROLINA PANTHERS, WASHINGTON WIZARDS and HARLEM WIZARDS, etc. Those marks compared in Defendant's "examples" simply are not confusing. For example, no one can doubt that the KENTUCKY DERBY mark is very strong, but there are clearly other "derbies" run in other states. Indeed, VIRGINIA DERBY and CALIFORNIA DERBY are registered to others. In this case, of course, both the Kentucky Colonels and the Defendant are using KENTUCKY COLONELS. If Defendant wished to sell merchandise bearing the mark IDAHO COLONELS, the parties would not be before the Court today.

Defendant will no doubt cite other cases in which simultaneous use of two marks is allowed, but each case must be carefully read in light of the eight factors cited by the Sixth Circuit. In this case, those factors point strongly in favor of the Kentucky Colonels. On the first factor, the strength of the mark, there is no evidence that anyone other than Plaintiff---and now Defendant---is selling clothing bearing the KENTUCKY COLONELS mark. Defendant's owner admitted as much at the hearing in this case [Hearing Transcript at 187-188]. The mark is arbitrary as applied to goods and inherently strong. This factor points strongly in favor of the Kentucky Colonels.

19

B.      **Relatedness of the Goods**

The second factor is the relatedness of the goods.  In this case, the goods are identical.  The Plaintiff sells KENTUCKY COLONELS brand shirts and caps.  The Defendant sells KENTUCKY COLONELS shirts and caps.  A party wanting a KENTUCKY COLONELS shirt has two choices.  The purpose of trademark law is to prevent the confusion which is likely to result.

Because both parties are selling the same goods in the same market using the same mark, confusion as to source is likely.  The Sixth Circuit held as much in *WSM*, 709 F.2d 1086, noting the use of the two marks "on identical inexpensive goods (T-shirts)".  As the Sixth Circuit stated in *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1121 (6th Cir. 1996), confusion as to affiliation or sponsorship is also actionable.  Consumers can be confused even where a mark is used on goods not previously sold by the plaintiff.

As *McCarthy* states, "the public assumes that these uses are permitted only if licensed, which in turn means, that they will legally have to be licensed." *McCarthy on Trademarks* §24:9.1.  The Trademark Trial and Appeal Board has frequently denied registration of marks because the public will assume they are licensed by the owners of similar marks for other goods.  *See, e.g., Black & Decker Mfg. Co. v. Big Yank Corp.*, 231 U.S.P.Q. 484 (T.T.A.B. 1986) (maker of WORKMATE tools showed likelihood of confusion and successfully opposed registration of clothing under that mark, because the public would assume that opposer had in fact licensed clothing for promotional use, as have the owners of other well-known marks such as COCA-COLA, CHAMPION, FIRESTONE, DUNLOP and GOODYEAR).  After some initial reluctance, the courts

have also held that application of a senior user's trademark or service mark to clothing and other goods creates a likelihood of confusion as to affiliation. In *University of Georgia Athletic Association v. Laite,* 756 F.2d 1535 (11th Cir. 1988), the Eleventh Circuit squarely held that confusion was likely regarding the sale of beer bearing a mark similar to the University of Georgia's bulldog. The court noted that older cases are based on unsupported assertions that consumers do not buy goods bearing marks because they assume the goods originated with or are sponsored by the organization which owns the mark. *Id.* at 1546, n. 28 (criticizing *International Order of Job's Daughters v. Lindenburg & Co.,* 633 F. 2d 912 (9th Cir. 1980)).

*Job's Daughters* and its progeny have, in fact, been widely criticized and distinguished. The Sixth Circuit did so in *WSM,* 709 F.2d 1084 (6th Cir. 1983), in which it affirmed a grant of summary judgment to the owner of a federal trademark for services which also used the mark on goods, based on the use of a similar mark on t-shirts. *WSM* is squarely on point here, holding not only that the trademark holder was entitled to summary judgment but that the infringer's appeal of that decision was "frivolous." *Id.* at 1088.

In this case, there is a likelihood that the public will assume that Defendant's KENTUCKY COLONELS shirts are somehow connected with the Kentucky Colonels' KENTUCKY COLONELS shirts. Confusion is even more likely where, as here, the goods---shirts and caps---are identical.

### C.   Similarity of the Marks

Defendant argues that the mark it is using is not similar to the mark registered to the Kentucky Colonels because it applies a basketball design and the word

LOUISVILLE (in miniscule type) to the goods.  Defendant completely ignores, however,

how the goods are marketed.   Defendant's own website advertises the goods as

KENTUCKY COLONELS shirts [Plaintiff's Hearing Ex. 30, attached hereto as Exhibit

B].[2]  If Defendant advertises its goods as KENTUCKY COLONELS shirts, surely it is

not unreasonable that others will do so as well.  In fact, the team's owner, Stephanie

Roach, admitted this likelihood at the hearing:

> Q:     And you would never envision Dillard's, for
> example, taking an ad in the paper saying "Kentucky
> Colonels shirts, $12.99" without all this logo on it?
>
> A:  Yeah.  I could see that happening, yes.

[Hearing Transcript at 192-193].

Ms. Roach also candidly admitted that individuals will refer to the

merchandise as KENTUCKY COLONELS shirts or caps:

> Q:     My son wears a lot of T-shirts.   Would it be
> reasonable to think that my 11-year old might tell me that
> he wants a Kentucky Colonels shirt for Christmas?
>
> A:     Sure.
>
> Q:     Isn't it in [sic] fact if he wants a shirt that says
> "Kentucky Colonels" on it more likely he's going to tell me
> I want a Kentucky Colonels shirt than he says, Dad, I want
> one of those Kentucky Colonels with the basketball and
> stars and the big logo on it?
>
> A:     Uh-huh.

---

[2] Curiously, the Defendant has recently revised its website so that its merchandise page
now advertises "Kentucky Colonels Basketball" shirts, acknowledging that its previous
marketing use of the Kentucky Colonels' trademark was likely to cause confusion.
Defendant's revisions, however, do nothing to eliminate the inevitable confusion which
will result from the marketing efforts of others if Defendant is not enjoined.  Indeed, the
team's owner has already admitted that it is likely other retailers would market their shirts
as "Kentucky Colonels shirts" [Hearing Transcript at 192].

> Q:      How am I going to know when my son tells me he wants a Kentucky Colonels shirt whether he wants one of these shirts or whether he wants your shirt?
>
> A:      If he opens up his box and gets one of those shirts and starts crying and says, I was talking about the basketball team, you'll know then.

[Hearing Transcript at 193]. As Defendant fails to recognize, trademark law is designed to avoid exactly the kind of confusion which Ms. Roach tacitly acknowledges is likely. Two parties selling the same product, under the same mark, in the same market, is simply one too many.   The possibility of tears when the box is opened, and all of the other likely confusion, can and should be prevented by this Court.

Numerous courts have recognized that addition of a logo to a word mark will not avoid confusion, because consumers are more likely to refer to the product by the word mark.  *See In re Appetito Provisions Co., Inc.*, 3 U.S.P.Q.2d 1553 (T.T.A.B. 1967)(emphasizing that if a mark "comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services").   Indeed Defendant's goods are already known that way, as Defendant concedes and promotes by its advertising.  Such references will likely lead to confusion--how is someone to know which KENTUCKY COLONELS shirt is being requested as a gift when two are available?  Ms. Roach had no answer to that question [Hearing Transcript at 193].

Even when assessing the shirts themselves, as opposed to the way they are marketed, it is clear that KENTUCKY COLONELS is the dominant portion of the mark. *See Price Candy Co. v. Gold Medal Candy Corp.*, 220 F.2d 759, 761 (CCPA 1955)("If a buyer would be more likely to remember and use one part of a mark as indicating origin of goods, this is the dominant part of the mark."); *West Disinfecting Co. v. Lan-O-Sheen*

*Co.*, 163 F.2d 566, 569 (CCPA 1947)("If the purchaser of trade-marked goods would be more likely to remember one part of a mark than another part as indicating origin of the goods, such word is the dominant part of the mark")(citation omitted).   There are numerous cases acknowledging that words generally predominate over designs when considering the dominant part of a mark, and the likelihood of confusion with a party which uses the same words for competing goods. *See, e.g., Allstate Ins. Co. v. Delibro*, 6 U.S.P.Q. 1220 (T.T.A.B. 1988)(noting that "[t]here are numerous cases which state that, as between a design and a word mark, the word portion is dominant").   There are also numerous cases holding that the addition of weak or non-distinctive terms ("Louisville") or logos does little to reduce the likelihood of confusion.   *See e.g., Appleseed Foundation Inc. v. Appleseed Institute, Inc.,* 981 F. Supp. 672, 678 (D.D.C. 1997)(upholding preliminary injunction even in light of defendant's subsequent addition of 'Johnny' to Appleseed mark because "[o]rganizations are frequently referred to by a single dominant word in their names, and. . . . this small cosmetic change is unlikely to prevent future confusion"); *Golden Door, Inc. v. Odisho,* 646 F.2d 347 (9th Cir. 1980)(holding defendant's attempt to distinguish his mark from plaintiff's GOLDEN DOOR trademark on the grounds he used the terms "Golden Door Coiffeur" and "Golden Door for Hair" was unpersuasive; *Kentucky Fried Chicken Corp. v. Smith*, 351 F. Supp. 1311 (E.D. Mich. 1972) (enjoining defendant from using "Al's Kentucky Fried Chicken" and "Al's Kentucky Style Fried Chicken" due to confusing similarity to KENTUCKY FRIED CHICKEN mark).   The additions of LOUISVILLE (in tiny type) and/or the design are woefully inadequate to prevent confusion between KENTUCKY COLONELS

brand merchandise and Defendant's identical goods emblazoned with KENTUCKY COLONELS, which is clearly the dominant portion of Defendant's mark.

Most significantly, the Sixth Circuit's t-shirt case, *WSM*, 709 F.2d 1087, held that an effort to erect a fact issue on the minute differences between the transfer [defendant's use] and WSM's mark is without merit: "Infringers rarely make absolutely identical copies, and a side-by-side comparison is not the test." The Sixth Circuit found that confusion was likely in the *WSM* case, despite the fact that the marks there were considerably <u>different</u>, including different words and, as in the case of Defendant here, the addition of a city name to the infringing mark. *WSM*, 709 F.2d 1085-1086.

The marks in this case are identical, and Defendant's empty promise to add "Louisville" in small type or add a colored basketball only to the goods themselves does nothing to reduce the likelihood of confusion. Ms. Roach acknowledged the offer extended only to the goods, not to the marketing, where the goods are already hailed as KENTUCKY COLONELS shirts and hats:

> Q:   When you said, I believe in your letter to Mr. Snyder, that you would agree that you would always use "Kentucky Colonels" with an ABA basketball, the stars, basketball, et cetera, you were referring to how you would use it on the goods, is that right?
>
> A:   Correct.
>
> Q:   You were not referring to how you would market shirts under that name, were you?
>
> A:   We were strictly talking about how we would put the name on merchandise itself.
>
> Q:   And so you felt free, despite that representation to Mr. Snyder, to use "Kentucky Colonels" to describe, without any ABA basketball, basketball, Louisville, anything, except the name "Kentucky Colonels," to describe your short sleeve golf shirts?

A: Sure.

[Hearing Transcript at 191-192]. The marks in this case are identical, and the addition of the insignificant material Defendant offers to put on its merchandise only does <u>nothing</u> to reduce the likelihood of confusion created by Defendant's marketing. This factor strongly favors the Kentucky Colonels.

### D.      Evidence of Actual Confusion

Courts recognize that the lack of evidence of actual consumer confusion, is "rarely significant" due to the difficulty of securing such evidence. *Daddy's Junky Music Stores*, 109 F.3d at 284. The Kentucky Colonels, however, have introduced evidence of actual confusion demonstrated by individuals mistakenly associating the organization's clothing items worn by two individuals on separate occasions as signifying affiliation with Defendant's basketball team [Hearing Transcript at 97-98]. The Kentucky Colonels have also introduced evidence of actual confusion between the two organizations in the form of a newscast giving Defendant the credit for a $25,000 contribution to the Salvation Army which was actually made by The Honorable Order [Plaintiff's Hearing Exs. 27-29].

Although evidence of actual confusion is already present, Defendant's goods are relatively new to the market. If Defendant is not enjoined, the confusion will certainly increase in the near future as Defendant opens its gift shop and begins selling merchandise in stores.

### E.      Marketing Channels

The marketing channels of the parties in this case are very similar. Both parties are selling merchandise bearing the KENTUCKY COLONELS to the public over the internet, and the prime customers of both parties are individuals living in the State of

26

Kentucky.   Moreover, both parties have plans to sell the goods in stores   [Hearing Transcript at 143-144; 156, 167].

In addition, the merchandise being sold by both parties are the types of goods which can engender confusion not only in the stores where they are sold but in all of the places where they are worn.   Members of the general public which observe a KENTUCKY COLONELS shirt on the street or elsewhere away from the point of sale are likely to be confused regarding the affiliation between the Defendant and the Kentucky Colonels, which sell their own brand of KENTUCKY COLONELS shirt.   The Sixth Circuit has specifically recognized that post-sale confusion is relevant and actionable.   *See Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1121-1122 (6th Cir. 1996).   *See also McCarthy, supra,* §23:5.

Defendant makes the assertion that there is no overlap between supporters of the Kentucky Colonels and basketball fans.   In fact, the Kentucky Colonels' catalog has featured a book on basketball, because quite the opposite is true [Plaintiff's Hearing Exs. 7, 9].   Furthermore, Defendant's sales manager has admitted that Defendant would love to promote its team to members of the Kentucky Colonels because those individuals could be a great draw for their team:

> Q:   Why did you say that?
>
> A:   Why did I welcome that partnership?
>
> Q:   Right.
>
> A:   Because I would love to be a partner with the Honorable Order of the Kentucky Colonels.   You guys have 18,000 members in the State of Kentucky, and that's something we would love to be able to market to.

27

[Hearing Transcript at 168].[3]  In fact, the Kentucky Colonels have 18,000 members in Louisville alone, and many thousands more in Kentucky [Hearing Transcript at 30].  As admitted by Defendant, the primary marketing channels and target consumers of the parties are nearly identical.  This factor weighs in favor of the Kentucky Colonels.

### F.   Degree of Consumer Care

When assessing the degree of care with which consumers will likely purchase the parties' goods or services, the court should consider the buyers' expertise with respect to the products at issue, as well as the expense of the product.  *Daddy's Junky Music Stores*, 109 F.3d at 285.  "[W]hen services are expensive or unusual, the buyer can be expected to exercise a greater care in her purchases."  *Id.*  In the present case, the majority of the items sold by the Kentucky Colonels, as well as the items which the Defendant will likely wish to sell at its basketball exhibitions, are relatively inexpensive items such as shirts, caps, glasses, and jackets [Hearing Transcript at 70-71].  For example, Plaintiff sells KENTUCKY COLONELS hats for $19.00, t-shirts for $16.00, and pens for $6.00 [Plaintiff's Hearing Exhibit 9].  Defendant is currently selling "Kentucky Colonels" golf shirts for $29.95, t-shirts for $9.95, and caps for $19.95 [Plaintiff's Hearing Ex. 30].  Under such circumstances, it is predictable that the degree of care exercised by consumers purchasing these products would be low.  The Sixth Circuit found as much in its t-shirt case, noting that the goods were "inexpensive."  *WSM*, 709 F.2d at 1086.  Again, this factor supports the position of the Kentucky Colonels.

---

[3] Despite the testimony about "partnering," Defendant's attorney has repeatedly stated that it needs no license from the Kentucky Colonels [Plaintiff's Hearing Exs. 24, 26; Hearing Transcript at 180-181].

G.     **Intent of Defendant in Selecting the Mark**

"Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Daddy's Junky Music Stores*, 109 F.3d at 286 (citation omitted). As the Sixth Circuit put it in *WSM*:

> Wrongful intent need not, and ordinarily cannot, be established by direct evidence, but may be inferred from defendant's acts. *O. & W. Thum Co. v. Dickinson*, 245 F.609 (6th Cir. 1917).
>
> "When a defendant, who is aware of the name, mark or other device of the plaintiff, appropriates it without justification, it is conclusively presumed that he intends all injuries attributable to his intentional piracy. The similarity itself may be sufficient evidence. (citations omitted)."
>
> R. Callman, T*he Law of Unfair Competition, Trademarks and Monopolies*, § 89.2(b) (3d ed. 1969).
>
> Here, TS was aware of WSM's mark, yet with an infinite variety of non-similar designs available, it chose a virtually identical design, knowing that it intended to sell that design on identical goods in the same channels of trade as that in which WSM's mark moved.   It is reasonable to infer therefrom that TS intended to deceive the public concerning the origin of the goods.

*WSM*, 709 F.2d at 1087.

Based upon prior correspondence between counsel in this case, it is clear that Defendant knew of Kentucky Colonel's trademark before it began using the mark [Plaintiff's Hearing Ex. 24]. Defendant's knowledge of the Colonel's mark was also admitted by Stephanie Roach, the team's owner [Hearing Transcript at 190]. This factor is undisputed and, again, weighs in favor of the Kentucky Colonels.

### H.   <u>Expansion of Product Lines</u>

The factor regarding the likelihood of expansion of product lines is normally critical only where the goods are not already competitive. Here, both parties sell shirts and caps already. Nevertheless, the Kentucky Colonels have introduced evidence which makes this an important element in this case. The Kentucky Colonels have shown that increasing the value of the brand has been a focus of its board of directors since at least as early as 1998 [Plaintiff's Hearing Exs. 3-6; Hearing Transcript at 138-140]. The organization has zealously protected its rights, successfully taking on the NBA, Kentucky Fried Chicken and Caufield's [Plaintiff's Hearing Exs 12-19; Hearing Transcript at 71-78; 140]. It has spent substantial money both protecting the mark against newcomers and registering its mark so that its rights were clear to the world [Hearing Transcript at 78]. The Kentucky Colonels have presented evidence that the sale of merchandise under this mark could bring millions of dollars to the organization and evidence that, for many years, the Colonels have been adjusting its product line and taking other steps to make that happen [Hearing Transcript at 80-82; 138-143].

Although evidence of the Kentucky Colonels' efforts was available in numerous public records before Defendant chose the mark, Defendant completely ignored the Kentucky Colonels' marketing and licensing effort and now threatens to take away the Colonels' right to realize the value of the brand it has built. If Defendant can sell KENTUCKY COLONELS shirts without a license, what licensee will pay for the right to use the mark?

The seriousness of this issue is made clear in Defendant's pre-hearing brief, where it makes the remarkable statement that, if the Kentucky Colonels sell its

merchandise in sporting good stores---the same merchandise the Colonels have sold for years and for which they have registered the mark---it would be "an obvious attempt to profit from the goodwill related to Building Champions mark and the anticipated success of the sports team" [Defendant's Pre-Hearing Brief at 27].  In other words, Defendant is admitting that if it is successful here, the Kentucky Colonels' well-laid plans will be seriously impaired. The **junior** user and the **non-**registrant will have won.  Such a result is simply not equitable and, fortunately, it is also not the law.

The cases cited by the Colonels---and the Defendant as well----are very strong on this point.  Either a geographic expansion or an increase in the type of products or services can be relevant when assessing the likelihood of confusion.  *Homeowners Group, Inc.*, 931 F.2d at 1112.  In this case, the Kentucky Colonels already sell products which directly compete with those sold by Defendant.  But even greater sales are on the horizon, unless Defendant is successful here.

In sum, each of the eight factors to be considered by this Court strongly favor the Kentucky Colonels.  Courts have held that "[i]n a close case amounting to a tie, doubts [regarding likelihood of confusion] are resolved in favor of the senior user." *See, e.g., Dr. Seuss Enterprises v. Penguin Books USA, Inc.*, 109 F3d 1394 (9th Cir. 1997); *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 n.1 (6th Cir. 1983); *P.T.C. Brands, Inc. v. Conwood Co.*, 887 F. Supp. 963, 973 (W.D. Ky. 1995).  But this is not a close case.  This is a classic case of trademark infringement, and it is extremely likely that the Kentucky Colonels will succeed on the merits.

31

## II. DEFENDANT'S CONTINUED INFRINGEMENT OF THE TRADEMARK OF THE HONORABLE ORDER POSES A THREAT OF IRREPARABLE HARM.

The Sixth Circuit has recognized that in an infringement action, "'a finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears.'" *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (internal citation omitted). *See also Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999). "The irreparable injury flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values.'" *Wynn Oil Co,* 943 F.2d at 608 (citation omitted).

The Kentucky Colonels' merchandise sales which support numerous charities will be irreparably harmed if Defendant is permitted to continue selling merchandise bearing the KENTUCKY COLONELS mark. Moreover, unless Defendant is enjoined from infringing the Honorable Order's mark, it will be difficult to subsequently quantify how many sales it lost due to Defendant's actions. *See, eg., Budish v. Gordon*, 784 F. Supp. 1320, 1337 (N.D. Ohio 1992).

Most importantly, however, the Kentucky Colonels have already entered into discussions with third parties regarding the potential licensing of the KENTUCKY COLONELS mark. These negotiations, which the testimony reveals could result in millions of dollars for the organization, would be irreparably jeopardized if Defendant's infringing activities are allowed to continue [Hearing Testimony at 141-144].

The injury which will be sustained by the Kentucky Colonels is more than financial, however. The Colonels have spent many years developing its reputation and goodwill in the community. Here, continued use of its mark by Defendant could cause

32

the Kentucky Colonels to suffer a substantial loss of goodwill among its members and the general public, as consumers are confused into thinking that the organization is acting in concert with Building Champions and/or the American Basketball Association. In fact, the Kentucky Colonels introduced evidence that its hard-earned goodwill is already being diminished in the community due to public confusion. The immediate threat to the goodwill and reputation of the Kentucky Colonels is an injury which cannot be rectified monetarily. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (holding that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute"); *Michigan Bell Telephone Co.*, 257 F.3d 587, 599 (6th Cir. 2001) (noting same); *Genny's Diner & Pub, Inc. v. Sweet Daddy's, Inc.*, 812 F.Supp. 744, 747 (W.D. Ky. 1993) (finding that where confusion is highly likely, the loss of goodwill is irreparable or, at best, only very slowly regained, and noting that damages for such harm are clearly inadequate).

Defendant's retort that the Kentucky Colonels' delay in filing this action is demonstrative of the lack of irreparable injury borders on ridiculous. Although the Colonels first sent correspondence to Defendant on April 20, 2004 suggesting the possibility of a licensing agreement, this correspondence was served **in anticipation of Defendant's merchandising efforts** [Plaintiff's Ex. 23]. Defendant did not actually **begin** selling merchandise bearing the KENTUCKY COLONELS mark until approximately mid-July [Hearing Transcript at 89], which it decided to do despite the Colonels' notice and warning. The Kentucky Colonels filed this suit on August 12, 2004, along with a Motion for Temporary Restraining Order and Preliminary Injunction. The

33

Kentucky Colonels took immediate action, and Defendant's argument to the contrary is meritless.

The Kentucky Colonels have sufficiently demonstrated the irreparable harm which it will suffer if the injunctive relief being sought is not granted. The Defendants must be stopped from further damaging the organization while this litigation is pending.

### III.   THE BALANCE OF INJURIES WEIGHS DECIDEDLY IN PLAINTIFF'S FAVOR.

The relief requested by the Kentucky Colonels prohibits Defendant from doing what it should not be doing in the first place -- using a trademark to which it has no legal right. Defendant's current merchandise violates the rights of the Kentucky Colonels, and thus any negligible effect the injunction may have on Defendant's merchandising efforts should be of no consequence whatsoever in this Court's decision: "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Budish v. Gorden*, 784 F.Supp. 1320, 1338 (N.D. Ohio 1992) (citations omitted). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F.Supp.2d 943, 973 (E.D. Ky. 2003)("One cannot build a business based upon infringing another's intellectual property rights, and then be allowed to complain that making them stop will cause harm"). Furthermore, when a plaintiff has made a substantial investment of time and money in its mark as opposed to the investment by the infringer, the balance of hardships tips in the plaintiff's favor. *See Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 919 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993).

34

The Kentucky Colonels have invested 73 years in developing the goodwill behind it KENTUCKY COLONELS trademark, and has invested substantial sums of money in protecting its rights, fending off potential infringers, and registering its mark for goods.  On the other hand, Defendant's basketball team is in its very early stages. The Louisville team has yet to play a single basketball game.  Refraining from selling team merchandise, changing the name of the team, or selling different merchandise not bearing the mark will impose little, if any, hardship on Defendant.  Any of those actions could be taken by Defendant without endangering the future of the team or the viability of downtown Louisville.  Defendant's arguments to the contrary are not persuasive.  The Kentucky Colonels' motion for injunctive relief should be granted.

## IV.    GRANTING INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The injunctive relief sought by the Kentucky Colonels is clearly in the best interest of the public.  The Kentucky Colonels is a non-profit organization which raises and distributes more than $1,000,000 dollars annually to charitable and educational organizations across the state [Hearing Transcript at 31].  The Colonels hope to multiply this figure through its concentrated efforts to expand the licensing of its trademark.  Any confusion which could impair the Kentucky Colonels' efforts to raise money for the worthy causes to which it contributes is not in the best interest of the public welfare.  The Plaintiff's motion for a preliminary injunction is in the public interest and should be granted.

## CONCLUSION

The Honorable Order of Kentucky Colonels, Inc. is suffering irreparable injury from Defendant's infringement of its trademark.   The Kentucky Colonels

35

respectfully request that its motion for a preliminary injunction be granted and that the

proposed Order be entered by the Court.

Respectfully submitted,

*Roxanne B. Edling*

William H. Hollander
Steven L. Snyder
Roxanne Baus Edling
WYATT, TARRANT & COMBS, LLP
PNC Plaza
500 West Jefferson Street, Suite 2600
Louisville, KY 40202-2898
502.589.5235
*Counsel for Plaintiff, The Honorable Order of Kentucky Colonels, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served upon the following, by mail, first class, postage prepaid, on this the ___ day of September, 2004:

Michelle Kaiser Bray
Stephanie Hale
Sommer Barnard Ackerson, PC
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023

Holland McTyeire
Amy Berge
Greenebaum Doll & McDonald PLLC
101 S. 5th Street, Suite 3500
Louisville, KY 40202-3197

*Roxanne B. Edling*

One of Counsel for Plaintiff

20230082.1

36